IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| JERRY DEVANE BRYANT, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:15-cv-866-ECM |
| | ) | [WO] |
| GREG LOVELACE, Commissioner, | ) | |
| Alabama Department of Corrections, | ) | |
| | ) | |
| Respondent. | ) | |

**MEMORANDUM OPINION and ORDER**

## I. INTRODUCTION

On November 18, 2015, Petitioner Jerry Devane Bryant ("Bryant") filed this federal habeas corpus petition pursuant to 28 U.S.C. § 2254, challenging his 1998 conviction of capital murder and resulting death sentence in the Circuit Court of Houston County, Alabama, in connection with the kidnapping and murder of Donald Hollis ("Hollis"). (Doc. 1).[1] Bryant and Greg Lovelace, Commissioner of the Alabama Department of Corrections ("Respondent"), have briefed the petition, and it is ripe for review. (Docs. 12, 21, 24, 30, 33, 77, 79, 82). After consideration of the entire record, and for the reasons set forth below, Bryant's federal habeas petition is due to be denied.

---

[1] When filed, this case was assigned to then-Chief United States District Judge W. Keith Watkins. (Doc. 1). On November 1, 2023, this case was reassigned to the undersigned. (Doc. 62).

## TABLE OF CONTENTS

**I. INTRODUCTION** .......... 1

**II. JURISDICTION AND VENUE** .......... 4

**III. BACKGROUND AND PROCEDURAL HISTORY** .......... 4

**A. Facts of the Crime** .......... 4

**B. Guilt Phase of Bryant's Trial** .......... 7

**C. Penalty Phase of Bryant's Trial** .......... 9

**D. Bryant's Direct Appeal and Resentencing** .......... 10

**E. Bryant's Rule 32 Proceedings** .......... 12

**F. Bryant's 28 U.S.C. § 2254 Habeas Proceedings** .......... 17

**IV. STANDARDS OF REVIEW** .......... 17

**A. Exhaustion and Procedural Default** .......... 18

**B. AEDPA Review of State Court Decisions** .......... 21

**V. DISCUSSION OF BRYANT'S CLAIMS** .......... 25

**A. Bryant's Claim that the Trial Court Violated his Right to Have the Aggravating Circumstances on Which the State Intended to Rely Specified in the Indictment or Otherwise Specified Before His Trial (Doc. 1 at 26–28, paras. 74–78)** .......... 25

**B. Bryant's Claim that the Trial Court Violated his Right to Have the Jury Complete Special Verdict Forms as to Each Aggravating Circumstance that it Found to Exist Beyond a Reasonable Doubt (Doc. 1 at 28–29, paras. 79–84)** 34

**C. Bryant's Claim that Trial Counsel Rendered Ineffective Assistance During the Guilt Phase of His Trial (Doc. 1 at 29–71, paras. 85–217)** .......... 40

**1. Bryant's subclaim that trial counsel unreasonably failed to investigate a potential defense based on consensual sexual activity (doc. 1 at 31–40, paras. 92–118)** .......... 46

**2. Bryant's subclaim that trial counsel failed to retain a DNA expert to challenge the State's use of the mixed sample DNA evidence (doc. 1 at 40–54, paras. 119–50)** .......... 54

**3. Bryant's subclaim that trial counsel unreasonably failed to retain a DNA expert to test the used condoms found at the crime scene (doc. 1 at 54–57, paras. 151–59)** .......... 74

**4. Bryant's subclaim that trial and resentencing counsel unreasonably failed to retain a blood spatter expert (doc. 1 at 57–63, paras. 160–78)** .......... 80

**5. Bryant's subclaim that trial counsel unreasonably failed to cross-examine Vickers effectively by failing to impeach him with his prior inconsistent statements to police (doc. 1 at 63–71, paras. 179–217)** .................................... 92

**D. Bryant's Claim that Resentencing Counsel Rendered Ineffective Assistance (Doc. 1 at 71–85, paras. 218–77)** ........................................................................ 107

**1. Bryant's subclaim that resentencing counsel failed to challenge Vickers's unavailability during the penalty phase retrial (doc. 1 at 71–81, paras. 218–61)** ........................................................................................................ 108

**2. Bryant's subclaim that resentencing counsel failed to impeach Vickers' trial testimony, which was read into the record during Bryant's penalty phase retrial, with Vickers' prior inconsistent statements to police (doc. 1 at 81–85, paras. 262–77)** ........................................................................................ 115

**E. Bryant's Claim that the Admission of Vickers' Prior Trial Testimony at his Resentencing Trial Violated the Confrontation Clause (Doc. 1 at 85–86, paras. 278–85)** ................................................................................................... 123

**F. Bryant's Claim that the Rule 32 Court Erred in Denying his Requests for Discovery to Prove his Ineffective Assistance of Trial Counsel Claims (Doc. 1 at 87–91, paras. 286–302)** ........................................................................ 129

**G. Bryant's Claim that the Trial Court Violated his Constitutional Rights by Permitting the Use of an Aggravating Circumstance as an Element of the Substantive Charge Against Him (Doc. 1 at 91–92, paras. 303–07)** .............. 132

**H. Bryant's Supplemental Argument that AEDPA is Unconstitutional in Light of *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024) (*See* Doc. 77 at 18–26)** ................................................................................................................. 135

**VI. CERTIFICATE OF APPEALABILITY** ........................................................... 137

**VII. CONCLUSION** ........................................................................................ 138

## II. JURISDICTION AND VENUE

Jurisdiction and venue over Bryant's petition for writ of habeas corpus are proper under 28 U.S.C. § 2241(d) because he was convicted and sentenced in state court in Houston County, Alabama, which is within the United States District Court for the Middle District of Alabama.

## III. BACKGROUND AND PROCEDURAL HISTORY

### A. Facts of the Crime

In its opinion addressing Bryant's direct appeal from his conviction and sentence, the Alabama Court of Criminal Appeals ("ACCA") described the crime as follows:

> On January 27, 1997, Donald Hollis and his cousin Bert Brantley drove from Newville to an Auto Zone automobile parts store in Dothan, where Brantley purchased transmission fluid sealer to repair his car. Brantley testified that he and Hollis left Newville in Hollis's car at approximately 7:00 p.m. After leaving Auto Zone, at about 8:00 p.m., Hollis and Brantley were driving down Wheat Street in Dothan when they heard someone whistle at them. Brantley testified that Hollis turned his car around and then stopped, and that Bryant and another man, Ricky Vickers, approached the car. Soon after, Vickers left, and Hollis, Brantley, and Bryant had a conversation. According to Brantley, Bryant asked him and Hollis if they had been drinking, and Hollis said that they had not, but that he would go buy some beer. Bryant told Hollis to get the beer and to come back and pick him up in 30 minutes. After buying the beer, Hollis returned and picked up Bryant, and the three men drove around while Brantley and Bryant drank beer.
>
> Brantley testified that they drove to his house in Newville, where the three of them went inside, drank beer, and talked. Brantley said that Bryant mentioned doing some drugs, but that Hollis and Brantley told Bryant that they did not do drugs. The three men then left Brantley's house and drove back to Dothan. After driving around Dothan for a while, Hollis drove Bryant back to the house where they had picked him up. Brantley testified that when they reached the house, Bryant did not get out of the car and that Bryant said he had something he wanted to talk to Hollis about. Hollis asked Bryant what it was, but Bryant did not say anything. Brantley further testified that he said he would turn his head and look out the window while

Bryant talked to Hollis. Brantley said that he then heard a gasp, and when he turned back around, Bryant, who was in the backseat, was holding a gun to Hollis's head. According to Brantley, Bryant said, "This is what it's all about." (R. 458.) Bryant told Brantley to get out of the car. Brantley initially refused, but when Bryant became angry and said to him, "Nigger, get out of the car," Brantley got out of the car and stood beside the passenger's door for several minutes. (R. 459.) Hollis then rolled down his window and told Brantley that he would be back in a few minutes. Hollis and Bryant drove off.

Brantley testified that he waited around 10 minutes for Hollis to return, but that he got scared and walked to a service station down the road. Brantley used the telephone at the service station to call his sister to come and pick him up. Brantley also tried to reach Hollis by calling him on Hollis's cellular telephone. Brantley testified that Bryant answered the telephone and told Brantley that Hollis was with Bryant's brother. Bryant wanted to know where Brantley was so that he could come and get him. Brantley called Hollis's cellular telephone several more times; each time he got Bryant. Brantley told Bryant that he was going to telephone the police, and Bryant said that he did not want any trouble. Brantley's sister then arrived to pick Brantley up, and they telephoned the police.

Ricky Vickers testified that on the evening of January 27, 1997, he saw Bryant leave with Hollis in Hollis's car. Vickers testified that later that same night Bryant returned to his house in Hollis's car, but that Bryant was alone. Vickers later went riding with Bryant in the car, and Bryant told Vickers that Hollis was with a friend of Bryant's. Bryant and Vickers went to "Mickey's," a nightclub. When Bryant and Vickers left the club, the police were standing around Hollis's car. Vickers walked off, and Bryant picked him up several blocks away from the club in Hollis's car. Vickers testified that Bryant had said he wanted him to help him do something. Vickers stated that Bryant told him that Bryant had done something, and that he "had to kill the victim." (R. 524.) Vickers testified that Bryant had a gun and told him that if he did not help him, he was "going to do Vickers." (R. 526.) The two men then went back to Vickers's house, where they each got a pair of gloves. Bryant then drove to where Hollis's body was located. Vickers testified that after Bryant put some clothes and towels in the trunk of Hollis's car, they put Hollis's body in the trunk.

Vickers testified that he and Bryant drove to Greenwood, Florida, to the home of Raymond Mathis. Mathis rode around with Bryant and Vickers in Hollis's car, and Bryant and Mathis discussed selling Hollis's cellular telephone. According to Vickers, Mathis said that he knew someone who

would give them crack in exchange for the cellular telephone. After Bryant traded Hollis's cellular telephone for crack, the men returned to Mathis's house, and Bryant told Mathis that there was a body in the trunk. Bryant wanted to know where he could dump the body. Bryant, Vickers, and Mathis left Mathis's house, drove down a dirt road, and dumped Hollis's body. Bryant and Vickers then drove to Tallahassee, Florida, where they tried unsuccessfully to sell Hollis's car. Bryant and Vickers returned to Dothan, and abandoned Hollis's car, after cleaning the inside and wiping away any fingerprints. Vickers testified that they then looked for the "other guy" (Brantley) because Bryant believed that Brantley could identify him. According to Vickers, Bryant planned to kill Brantley. Raymond Mathis testified to essentially the same facts as did Vickers.

Lori Ann Andrews, Bryant's girlfriend, testified that on January 29, 1997, Bryant and Vickers arrived at her apartment in a black car that she had never seen before. Bryant asked her if she would pick him up at his mother's house in a few minutes. Bryant and Vickers left, and Andrews picked Bryant up as he had requested, and they went back to her apartment. Andrews further testified that the police came to her apartment to arrest Bryant that evening, and that when they knocked on the door, Bryant tried to give her a set of keys. The keys were later identified at trial as belonging to Hollis.

Testimony at trial further revealed that a bloodstain on Bryant's blue jeans was consistent with a mixture of Bryant's blood and Hollis's blood. Bloodstains found inside the trunk of Hollis's car and on the bumper and taillight of the car were consistent with Hollis's blood.

In his statement to police, Bryant initially denied any involvement in Hollis's murder. However, he eventually admitted to being with Hollis in Hollis's car, but he claimed that Hollis left with a "guy named Terry Johnson" and that he let Bryant use his car. Bryant said that he saw Johnson later that night and that Johnson had asked him to move Hollis's body. Bryant stated that he agreed to do it for a substantial amount of cocaine, and he got Vickers to help him dump the body in Florida. Bryant denied shooting Hollis, but said that he was with Johnson when Johnson shot Hollis. When giving his statement, Bryant was asked why it took so many shots (three shots to the head) to kill the victim. According to testimony from the police officer taking the statement, Bryant said "Man, I don't know, I think I need help. Sometimes I am just not Jerry." (R. 788.) According to the officer, Bryant then put his head down, covered his ears, and refused to talk anymore.

*Bryant v. State*, 951 So. 2d 702, 706–08 (Ala. Crim. App. 1994), *affirmed in part and reversed and remanded in part by Ex parte Bryant*, 951 So. 2d 724 (Ala. 2002).

**B. Guilt Phase of Bryant's Trial**

The Dothan Police Department collected and logged over thirty items of evidence from the crime scene, the wooded area in Florida where officers recovered Hollis' body, and Bryant's apartment. (Doc. 10-7 at 152–202; doc. 10-8 at 64–74).[2] These items included shell casings, men's underwear, empty condom packages, two used condoms, a tennis shoe, bloody leaves, bloody dirt, Hollis' car key and key chain, a pair of Bryant's blue jeans with a small blood stain on the front, a pair of sweatpants with blood on them from Bryant's apartment, blood stain samples taken from a section of Hollis' car's rear bumper and plastic trunk liner, and bullets recovered from Hollis' head. (*See id.*). Additionally, penile swabs from Hollis tested positive for components of semen, but not for spermatozoa, and a pair of boxer shorts that Hollis was wearing when his body was discovered tested positive for components of semen in the front area and for a small amount of blood in the rear crotch area. (Doc. 10-37 at 64–65). The Alabama Department of Forensic Sciences ("ADFS") tested the evidence for the presence of biological stains. (Doc. 10-8 at 5–16). On February 21, 1997, a sexual assault kit was performed on Bryant, and his blood was drawn. (Doc. 10-7 at 203, doc. 10-8 at 2–4). The ADFS sent the following items to its Birmingham lab for DNA testing: blood-stained dirt, blood-stained leaves, a blood stain from the pair of Bryant's blue jeans, a blood stain from a pair of sweatpants

[2] References to page numbers are to those generated by the Court's CM/ECF electronic filing system.

recovered from Bryant's apartment, blood from a tennis shoe, a blood stain from the top of the rear bumper of Hollis' vehicle, a blood stain from the trunk liner of Hollis' vehicle, a blood standard from Bryant, and a blood standard from Hollis. (Doc. 10-3 at 77–79).

On April 14, 1997, a Houston County, Alabama grand jury indicted Bryant on one count of murder in the course of the kidnapping of Hollis, pursuant to ALA. CODE § 13A-5-40(a)(1). (Doc. 10-1 at 18–19). Bryant was represented by court-appointed counsel Derek Yarbrough ("Yarbrough"), Gene Spencer ("Spencer"), and Deborah Seagle ("Seagle"). (Doc. 10-5 at 42). Yarbrough and Seagle handled the guilt phase of the trial, and Spencer handled the penalty phase. Assistant District Attorney ("DA") Gary Maxwell ("Maxwell") prosecuted the case. (*Id.* at 45).

Bryant's counsel filed numerous pretrial motions, including seeking funds for expert and investigative assistance. (Doc. 10-1 at 48–62; doc. 10-2 at 105–09). On August 17, 1998, the trial court held a predicate hearing to determine whether the results of the DNA analysis performed on the crime scene evidence by the ADFS' laboratory would be admissible at trial. (Doc. 10-4 at 117–95). Regarding the blood stain found on Bryant's jeans, Anthony Della Manna ("Mr. Della Manna"), a forensic analyst with ADFS' DNA lab in Birmingham, testified that there was "extremely strong evidence" that the DNA found on the blood stain was a mixture of Hollis and Bryant, but he could not say that "conclusively." (*Id.* at 151–52; *see also* doc. 10-3 at 79 (ADFS memorandum)). Additionally, Hollis' DNA was likely present on the bloody leaves, the blood on the rear bumper of his car, and the blood on the plastic trunk liner of his car. (Doc. 10-3 at 79).

Neither Hollis' nor Bryant's DNA was found on the sweatpants. (*Id.*). Over the defense's objection, the trial court ruled that the DNA evidence would be admissible at trial.

Bryant's trial began on August 31, 1998, and lasted four days. (Doc. 10-5 at 42–203; doc. 10-6; doc. 10-7; doc. 10-8; doc. 10-9 at 2–98 (transcripts)). The State's theory was that Bryant kidnapped Hollis at gunpoint; physically assaulted him; shot him at close range with the intent to steal Hollis' cell phone and car; and then requested help from his friends Ricky Vickers ("Vickers") and Raymond Mathis ("Mathis") to dispose of Hollis' body in Florida, sell Hollis' cell phone for crack, and attempt to sell or rent Hollis' car. The defense's theory aligned with what Bryant told police shortly after he was arrested: that Mathis, who was bisexual and also went by the name Terry Johnson, murdered Hollis while Bryant had borrowed Hollis' car and was in a different location, but that Bryant later agreed to help Mathis dispose of the body in exchange for a large amount of cocaine. Mr. Della Manna testified as an expert in DNA forensic testing for the State. (*See* doc. 10-8 at 16–18). He explained that the DNA testing performed on the blood stain on Bryant's blue jeans showed results that were "consistent with being a mixture of Jerry Bryant and Donald Hollis." (*Id.* at 35). On September 3, 1998, the jury convicted Bryant of capital murder. (Doc. 10-9 at 98).

**C. Penalty Phase of Bryant's Trial**

The penalty phase of Bryant's trial occurred on the same day as the jury's verdict. (*Id.* at 98–203; doc. 10-10 at 2–10 (transcripts)). The State offered two aggravating circumstances in support of the death penalty: (1) the murder was committed during the course of a kidnapping, *see* ALA. CODE § 13A-5-49(4), which the jury had already found

to exist by virtue of its capital murder guilty verdict; and (2) the murder was committed for pecuniary gain, *see id.* § 13A-5-49(6), due to Bryant's stealing Hollis' car and cell phone. (Doc. 10-9 at 107–09). At the conclusion of the penalty phase, by an eleven to one vote, the jury recommended that Bryant be sentenced to death. (Doc. 10-10 at 8).

On September 29, 1998, the trial court held a sentencing hearing to determine whether it would sentence Bryant to life imprisonment without parole or to death as the jury recommended. (*Id.* at 11–22). At the conclusion of the hearing, the trial court sentenced Bryant to death. (*Id.* at 22).

The trial court issued a sentencing order on September 30, 1998. (Doc. 10-11 at 153–56). In its order, the trial court found the existence of two statutory aggravating circumstances: the murder was committed during the course of a kidnapping and for pecuniary gain. (*Id.* at 154). The trial court did not find the existence of any statutory mitigating circumstances but did find some non-statutory mitigating circumstances. (*Id.* at 155). However, the trial court concluded that the aggravating circumstances outweighed the mitigating circumstances. (*Id.* at 156). Thus, the trial court sentenced Bryant to death. (*Id.*).

## D. Bryant's Direct Appeal and Resentencing

On September 30, 1998, Bryant appealed his conviction and sentence to the ACCA. The ACCA appointed attorneys Michael Crespi ("Crespi") and Deanna Higginbotham to represent Bryant on appeal. On November 19, 1999, the ACCA affirmed Bryant's conviction and death sentence. *Bryant*, 951 So. 2d at 724.

On February 11, 2000, Bryant petitioned for certiorari review in the Alabama Supreme Court. (Doc. 7-13 at 2–4). The Alabama Supreme Court granted the petition, and on June 21, 2002, it affirmed Bryant's conviction but reversed and remanded the ACCA's judgment insofar as it affirmed the death sentence. *Ex parte Bryant*, 951 So. 2d 724, 725–26 (Ala. 2002). The Alabama Supreme Court held that Bryant was entitled to a new penalty phase trial because the trial court's penalty phase instructions implied that the jury could not recommend a penalty of life in prison without the possibility of parole instead of death unless the mitigating circumstances outweighed the aggravating circumstances. *Id.* at 726–31. On February 12, 2003, the trial court appointed Crespi and attorney John Byrd, Jr. ("Byrd") to represent Bryant in the new penalty phase trial. (Doc. 10-15 at 25). On March 21, 2003, the ACCA remanded the case to the trial court for the new penalty phase trial before a jury. *Bryant v. State*, 951 So. 2d 732, 736 (Ala. Crim. App. 2003).

Bryant's second penalty phase trial began on January 26, 2004, and lasted four days. (Doc. 10-16 at 134–206; doc. 10-17; doc. 10-18; doc. 10-19; doc. 10-20 at 2–102 (transcripts)). The same judge who presided over Bryant's first trial presided over his second penalty phase trial. The State called several of the same witnesses that it had called at the original guilt phase trial: among others, Bert Brantley ("Brantley"), Vickers (by reading his original trial testimony into the record), law enforcement officers, and the state medical examiner who conducted the autopsy. Over defense counsel's objection, the trial court allowed the State to read Vickers' prior testimony into the record because the State demonstrated that he was an unavailable witness under Rule 804(a)(5) of the Alabama Rules of Evidence. (Doc. 10-16 at 143–48). The defense called numerous witnesses who

knew Bryant and his family members to show that Bryant had a rough upbringing filled with alcohol and drug use and neglect. (Doc. 10-19 at 33–154). Dr. Michael Passler, a neuropsychologist, testified for the defense as an expert in the field of neuropsychology and stated that he performed an examination of Bryant and found that he suffered from fetal alcohol syndrome. (*Id.* at 154–67).

On January 29, 2004, the jury recommended that Bryant be sentenced to death by a vote of eleven to one. (Doc. 10-20 at 99–100; doc. 10-16 at 55 (jury verdict)). On March 4, 2004, the trial court held a sentencing hearing to determine whether it would sentence Bryant to life in prison without parole or to death as recommended by the jury. (Doc. 10-20 at 103–16). The trial court sentenced Bryant to death. (*Id.* at 113). The trial court issued a written sentencing order on March 8, 2004. (*Id.* at 121–24).

Still represented by Crespi, Bryant appealed on March 4, 2004. On April 29, 2005, the ACCA affirmed Bryant's sentence. *Bryant v. State*, 951 So. 2d 732, 755 (Ala. Crim. App. 2005). On August 12, 2005, Bryant petitioned the Alabama Supreme Court for certiorari review, (doc. 10-22 at 2–36), but the Alabama Supreme Court denied the petition on September 29, 2006, *Bryant*, 951 So. 2d at 732.

On December 28, 2006, Bryant filed a petition for certiorari in the United States Supreme Court. (Doc. 10-23 at 2–24). The United States Supreme Court denied the petition on April 2, 2007. *Bryant v. Alabama*, 549 U.S. 1324 (2007) (Mem.).

### E. Bryant's Rule 32 Proceedings

On September 26, 2007, Bryant sought post-conviction relief pursuant to Rule 32 of the Alabama Rules of Criminal Procedure by filing a Petition for Relief from Judgment

in the Houston County Circuit Court (hereinafter, the "Rule 32 Court"). (Doc. 10-24 at 8–100). Bryant raised numerous claims, including several claims of ineffective assistance of trial counsel and resentencing counsel; a claim that the State violated *Brady v. Maryland*, 373 U.S. 83 (1963), by not turning over to the defense for DNA testing the two used condoms found at the scene of the murder; claims of juror and prosecutorial misconduct; a claim that the State violated *Batson v. Kentucky*, 476 U.S. 79 (1986), at his second penalty phase trial; and a claim that he was subject to a custodial interrogation after asking for a lawyer in violation of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). The State filed an answer and a motion to dismiss the petition on January 10, 2008. (Doc. 10-24 at 191–201; doc. 10-25 at 2–179).

On February 21, 2008, Bryant filed a "Motion for Discovery of Institutional Files, Records, and Information Necessary to a Fair Rule 32 Evidentiary Hearing," requesting numerous items. (Doc. 10-25 at 191–202; doc. 126 at 3–27). The Rule 32 Court denied the request on February 26, 2008. (*See* doc. 126 at 28).

Bryant filed an amended Rule 32 petition on March 21, 2008. (Doc. 10-26 at 45–129). The State filed an answer and a motion to dismiss the amended petition on May 21, 2008. (*Id.* at 131–202, doc. 10-27 at 3–36). On October 3, 2008, Bryant filed a motion for reconsideration of his discovery request, (doc. 10-27 at 121–57), which was denied by the Rule 32 Court on October 13, 2008, (*see id.* at 158). On October 27, 2008, the Rule 32 Court issued an order summarily dismissing all of the claims in Bryant's amended petition on the grounds that all of the claims were procedurally barred, insufficiently pleaded, or meritless on their face. (*Id.* at 159–65). Bryant filed a motion to reconsider on November

21, 2008, (*id.* at 166–78), which the Rule 32 Court denied on December 3, 2008, (*see id.* at 179).

On December 4, 2008, Bryant appealed (*id.* at 180–82), and on February 4, 2011, the ACCA affirmed the dismissal of most of the claims in Bryant's amended Rule 32 petition, *Bryant v. State*, 181 So. 3d 1087, 1097–1131 (Ala. Crim. App. 2011). However, the ACCA remanded the case for the Rule 32 Court to hold an evidentiary hearing on three ineffective assistance of counsel claims that it held Bryant had sufficiently pleaded:

> (1) that trial counsel at [Bryant's] first trial were ineffective for not properly investigating and retaining a blood-spatter expert and a DNA expert . . . ; (2) that trial counsel at his first trial were ineffective for not properly investigating and presenting evidence to support a motion to suppress the first statement he made to police . . . ; and (3) that trial counsel at his first trial and trial counsel at his second penalty-phase trial were ineffective for failing to adequately impeach Ricky Vickers's testimony and that trial counsel at his second penalty-phase trial were ineffective for failing to adequately challenge Vickers's unavailability.

*Id.* at 1129. The ACCA also ordered the Rule 32 Court to reevaluate Bryant's discovery requests as they related to those claims. *Id.* at 1129–30.

On remand to the Rule 32 Court, Bryant asked the court to reconsider its denial of his initial discovery motion and filed a supplemental discovery motion in which he requested numerous files and records that he claimed he needed for the evidentiary hearing. (Doc. 10-30 at 99–118, doc. 10-31 at 16–24). After a hearing held on April 13, 2011, to address this request, (doc. 10-41 at 100–71), the Rule 32 Court denied the motion with the exception of ordering the State to turn over to Bryant the DA's entire file on the murder except its attorney work product, (doc. 10-32 at 83). After receiving the DA's file, Bryant filed a supplemental motion for discovery, listing fifty-three additional categories of

requested evidence. (Doc. 10-33 at 124–55). The Rule 32 Court denied the motion on August 30, 2011, (doc. 10-34 at 10–11), but it later granted Bryant access to the entire court file for purposes of copying and photographing it, (*id.* at 141). Bryant also filed a second amended Rule 32 petition that presented new claims and repleaded some claims that the Rule 32 Court had previously dismissed. (*Id.* at 36–139). The State moved to strike the second amended Rule 32 petition on the ground that the Rule 32 Court had no jurisdiction to hear new claims outside of the ACCA's limited remand directive. (*Id.* at 142–50). The Rule 32 Court agreed and struck the second amended Rule 32 petition on December 28, 2011. (*Id.* at 188).

The Rule 32 Court conducted an evidentiary hearing on the three claims remanded by the ACCA on March 1, 2012. (Doc. 10-38 at 13–202, doc. 10-39 at 3–163) (transcripts)). Bryant called as witnesses his former trial attorneys Yarbrough (doc. 10-38 at 107–202; doc. 10-39 at 3–15), Seagle (doc. 10-38 at 67–107), and Spencer (*id.* at 28–32), as well as his former direct appeal and resentencing attorney Crespi (*id.* at 32–66). Each testified about their work on Bryant's case and the strategies that they employed in defending Bryant. In support of his claim that his trial counsel were ineffective for failing to retain a blood spatter expert, Bryant called Thomas Bevel ("Mr. Bevel"), a former police officer who owned a forensic education and consulting firm located in Oklahoma. (Doc. 10-39 at 15–51). In support of his claim that his trial counsel should have retained a DNA expert, Bryant called Mr. Della Manna with the ADFS to testify. (*Id.* at 51–90). Bryant also called Matthew Quartaro, a forensic scientist with Orchid Cellmark in Dallas, Texas. (*Id.* at 90–

127). After the hearing, the Rule 32 Court issued an order denying Bryant relief on October 24, 2012. (Doc. 10-36 at 132–40).

On December 20, 2012, Bryant once again appealed to the ACCA. (Doc. 10-40 at 2–159). In addition to arguing that the Rule 32 Court erred in denying his substantive claims that trial counsel and resentencing counsel rendered ineffective assistance, Bryant also argued that the Rule 32 Court erred in denying his requests for discovery and in striking his second amended Rule 32 petition. (*See id.* at 5).

On April 18, 2014, the ACCA remanded the case a second time for the Rule 32 Court to reconsider Bryant's claim that Crespi was ineffective at Bryant's resentencing for failing to impeach Vickers' prior trial testimony with his prior inconsistent statements to police. (Doc. 10-41 at 177–79); *see also Bryant*, 181 So. 3d at 1132. The ACCA determined that the Rule 32 Court's dismissal of that claim was "based on an incorrect conclusion of law—that the rules of evidence apply to the penalty phase of a capital-murder trial." (Doc. 10-41 at 178). On May 29, 2014, the Rule 32 Court complied with the ACCA's instructions and submitted an order entitled "Second Return to Remand" in which it found that Crespi was not ineffective for failing to impeach Vickers with his prior inconsistent statements to police because Bryant could not demonstrate that he was prejudiced by the alleged failure. (*Id.* at 180–82).

On June 19, 2014, Bryant was permitted to file a brief to the ACCA on second return to remand, raising the same claims. (Doc. 10-42 at 2–27). On September 5, 2014, the ACCA affirmed all of the Rule 32 Court's rulings. *Bryant*, 181 So. 3d at 1131–68.

Bryant petitioned the Alabama Supreme Court for certiorari review, (doc. 10-43 at 2–120), but Alabama Supreme Court denied the petition on May 22, 2015, without an opinion, (*id.* at 225).

### F. Bryant's 28 U.S.C. § 2254 Habeas Proceedings

On November 18, 2015, Bryant filed this federal habeas petition, raising twelve claims. (Doc. 1). This is his first and only federal habeas petition. The Respondent filed an answer, the state court record, and a brief arguing that one of Bryant's claims is procedurally defaulted and thus unable to be considered on its merits by this Court. (Docs. 10, 11, 12, 21). Bryant responded to the procedural default argument, and the parties addressed the merits of the remaining claims in further briefs. (Docs. 24, 30, 33). This action was reassigned to the undersigned in November 2023, (doc. 62), and in June 2025, the Court gave the parties the opportunity to supplement their arguments with any relevant cases decided since briefing had concluded on the petition in 2017, (doc. 68). The parties filed supplemental briefs. (Docs. 77, 79, 82). The Court has reviewed the supplemental briefs and will address one argument made therein at the conclusion of this Opinion.

## IV. STANDARDS OF REVIEW

A federal court may issue a writ of habeas corpus for a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). In other words, this Court's habeas review is limited to federal constitutional questions. *Wilson v. Corcoran*, 562 U.S. 1, 5 (2010) (per curiam). "[F]ederal habeas corpus relief does not lie for errors of state law." *Estelle v. McGuire*, 502 U.S. 62, 67 (1991) (quoting *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990)).

In reviewing state court proceedings, the federal court applies different standards of review depending on whether the petitioner properly presented his claim to the state courts and whether the state courts addressed the claim.

**A. Exhaustion and Procedural Default**

A petitioner in state custody must exhaust the remedies available to him in the state courts before he can bring his claim in a federal habeas corpus action. 28 U.S.C. § 2254(b)(1)(A). A remedy is "available" if the petitioner "has the right under the law of the State to raise, by any available procedure, the question presented." *Id.* § 2254(c). The exhaustion requirement generally permits federal courts to consider only those claims that the petitioner has marshalled through "one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). This includes filing a petition for discretionary review in the highest court of the state if such review is part of the state's appellate procedure. *See id.* at 845–47. "[A]n issue is exhausted if 'the reasonable reader would understand [the] [federal] claim's particular legal basis and specific factual foundation' to be the same as it was presented in state court." *Pope v. Sec'y for Dep't of Corr.*, 680 F.3d 1271, 1286 (11th Cir. 2012) (second alteration in original) (quoting *Kelley v. Sec'y for Dep't of Corr.*, 377 F.3d 1317, 1344–45 (11th Cir. 2004)). "Thus, . . . a petitioner must fairly present every issue raised in his federal petition to the state's highest court, either on direct appeal or on collateral review." *Ward v. Hall*, 592 F.3d 1144, 1156 (11th Cir. 2010).

A habeas petitioner who fails to properly present a claim to the state court and who therefore loses the right to raise the claim within state procedures is said to have

"procedurally defaulted" the claim and is no longer able to raise it in either state or federal court. *See Martinez v. Ryan*, 566 U.S. 1, 9–10 (2012); *see also Coleman v. Thompson*, 501 U.S. 722, 732 (1991) (explaining that "a habeas petitioner who has failed to meet the State's procedural requirements for presenting his federal claims has deprived the state courts of an opportunity to address those claims in the first instance"). A state court's rejection of a federal constitutional claim on state procedural grounds may only preclude federal review if the procedural ruling rests upon an "adequate and independent" state ground. *Marek v. Singletary*, 62 F.3d 1295, 1301 (11th Cir. 1995) (citing *Harris v. Reed*, 489 U.S. 255, 262 (1989)). A state procedural ruling is "adequate and independent" if three elements are met:

> First, the last state court rendering a judgment in the case must clearly and expressly state that it is relying on state procedural rules to resolve the federal claim without reaching the merits of that claim. Second, the state court's decision must rest entirely on state law grounds and not be intertwined with an interpretation of federal law. Third, the state procedural rule must be adequate, i.e., firmly established and regularly followed and not applied "in an arbitrary or unprecedented fashion."

*Ward*, 592 F.3d at 1156–57 (quoting *Judd v. Haley*, 250 F.3d 1308, 1313 (11th Cir. 2001)).

However, procedural default is not an absolute bar to federal habeas relief. There are two exceptions to the general rule that a federal court may not consider a procedurally defaulted claim on the merits: "cause and prejudice" and "actual innocence." *See Dretke v. Haley*, 541 U.S. 386, 393 (2004) ("[A] federal court will not entertain a procedurally defaulted constitutional claim in a petition for habeas corpus absent a showing of cause and prejudice to excuse the default. We have recognized a narrow exception to the general rule when the habeas applicant can demonstrate that the alleged constitutional error has resulted in the conviction of one who is actually innocent of the underlying offense . . . .").

A habeas petitioner can establish "cause" if "some objective factor external to the defense impeded the effort to raise the claim properly in the state court," and "prejudice" if "there is at least a reasonable probability that the result of the proceeding would have been different." *Harris v. Comm'r, Ala. Dep't of Corr.*, 874 F.3d 682, 688 (11th Cir. 2017) (first quoting *Wright v. Hopper*, 169 F.3d 695, 703 (11th Cir. 1999); then quoting *Henderson v. Campbell*, 353 F.3d 880, 892 (11th Cir. 2003)). Attorney negligence does not generally constitute cause to excuse procedural default unless it rises to the level of ineffective assistance of counsel. *Coleman*, 501 U.S. at 752–54. Attorney error may also supply cause for procedural default "when a State requires a prisoner to raise an ineffective-assistance-of-trial-counsel claim in a collateral proceeding," but the prisoner did not have effective counsel in his first collateral proceeding. *Martinez*, 566 U.S. at 14; *see Trevino v. Thaler*, 569 U.S. 413, 429 (2013). As for prejudice, a habeas petitioner must show "not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphases in original).

"Actual innocence," on the other hand, "applies to a severely confined category: cases in which new evidence shows 'it is more likely than not that no reasonable juror would have convicted [the petitioner].'" *McQuiggin v. Perkins*, 569 U.S. 383, 395 (2013) (alteration in original) (quoting *Schlup v. Delo*, 513 U.S. 298, 329 (1995)). The petitioner bears the burden of establishing that one of these exceptions to the procedural default rule applies. *See Gordon v. Nagle*, 2 F.3d 385, 388 n.4 (11th Cir. 1993) ("A defendant has the burden of establishing cause and prejudice . . . ."); *Arthur v. Allen*, 452 F.3d 1234, 1245

(11th Cir. 2006) ("The petitioner must support the actual innocence claim 'with new reliable evidence . . . that was not presented at trial.'" (quoting *Schlup*, 513 U.S. at 324)).

States "'can waive procedural bar defenses in federal habeas proceedings,' including exhaustion." *Vazquez v. Sec'y, Fla. Dep't of Corr.*, 827 F.3d 964, 966 (11th Cir. 2016) (quoting *Hills v. Washington*, 441 F.3d 1374, 1376 (11th Cir. 2006) (per curiam)). However, "[a] State shall not be deemed to have waived the exhaustion requirement . . . unless the State, through counsel, *expressly* waives the requirement." 28 U.S.C. § 2254(b)(3) (emphasis added); *see McNair v. Campbell*, 416 F.3d 1291, 1304 (11th Cir. 2005).

**B. AEDPA Review of State Court Decisions**

When a state prisoner petitions a federal court for a writ of habeas corpus on grounds that were considered and rejected by the state courts, review is governed by the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *Penry v. Johnson*, 532 U.S. 782, 792 (2001). AEDPA establishes a "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)).

Under AEDPA, a petitioner is not entitled to habeas corpus relief in connection with "any claim that was adjudicated on the merits in State court proceedings[,] unless the adjudication of th[at] claim" either: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an

unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *Brown v. Payton*, 544 U.S. 133, 141 (2005); *Williams v. Taylor*, 529 U.S. 362, 404–05 (2000). When making this determination, if the relevant state court decision on the merits does not come accompanied with reasons for its decision, the federal court should "'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale" and "then presume that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 584 U.S. 122, 125 (2018).

The "contrary to" and "unreasonable application" clauses of 28 U.S.C. § 2254(d)(1) have independent meanings. *Bell v. Cone*, 535 U.S. 685, 694 (2002). Under the "contrary to" clause, a federal court may grant relief "if the state court applies a rule different from the governing law set forth" in United States Supreme Court cases, or if the state court decides a case differently than the Supreme Court "on a set of materially indistinguishable facts." *Id.*; *see Mitchell v. Esparza*, 540 U.S. 12, 15–16 (2003) (per curiam). A state court's failure to cite governing Supreme Court authority does not automatically establish that the state court's decision is "contrary to" clearly established Supreme Court precedent. *Mitchell*, 540 U.S. at 16 (citing *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam)). Rather, "a state court need not even be aware of [the relevant] precedents, 'so long as neither the reasoning nor the result of the state-court decision contradicts them.'" *Id.* (citing *Packer*, 537 U.S. at 8).

Under the "unreasonable application" clause, a federal court may grant relief if the state court identifies the correct governing legal principle from the Supreme Court's

decisions but unreasonably applies that principle to the facts of the petitioner's case. *See Brown*, 544 U.S. at 141; *Wiggins v. Smith*, 539 U.S. 510, 520 (2003). A federal court making this inquiry should ask whether the state court's application of clearly established Supreme Court precedent was "objectively unreasonable." *McDaniel v. Brown*, 558 U.S. 120, 132–33 (2010) (per curiam) (quoting *Williams v. Taylor*, 529 U.S. 362, 409 (2000)); *Wiggins*, 539 U.S. at 520–21. An "unreasonable" application is different from a merely "incorrect" one. *See Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold."); *see also Wiggins*, 539 U.S. at 520 (explaining that "the state court's decision must have been more than incorrect or erroneous").

The Supreme Court has summarized these two clauses in simple terms: "[A] state prisoner seeking a writ of habeas corpus from a federal court 'must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Bobby v. Dixon*, 565 U.S. 23, 24 (2011) (per curiam) (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). A legal principle is "clearly established" for AEDPA purposes if it was found in the holdings—as opposed to the dicta—of a Supreme Court decision that existed at the time of the relevant state court decision. *Yarborough v. Alvarado*, 541 U.S. 652, 660–61 (2004); *see also Lopez v. Smith*, 574 U.S. 1, 2 (2014) (per curiam) (explaining that AEDPA "prohibits the federal courts of

appeals from relying on their own precedent to conclude that a particular constitutional principle is 'clearly established'").

AEDPA also significantly restricts the scope of federal habeas review of state court findings of fact. A federal court cannot contradict state court factual findings merely because it "would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). Rather, the state court must have reached an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding" for a federal court to grant habeas relief on that basis. 28 U.S.C. § 2254(d)(2). Even if reasonable minds reviewing the record might disagree about the factual finding in question (or the implicit credibility determination underlying the factual finding), that is not sufficient grounds for a federal habeas court to supersede the trial court's findings. *Wood*, 558 U.S. at 301; *Rice v. Collins*, 546 U.S. 333, 341–42 (2006). The state court's factual findings are "presumed to be correct," and the petitioner has the burden of rebutting these findings "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

Of course, deference does not mean that habeas relief is always precluded. *See Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) ("Even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review."); *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) ("The standard is demanding but not insatiable."). However, by setting forth necessary predicates before state court judgments may be set aside, AEDPA "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *Burt v. Titlow*, 571 U.S. 12, 19 (2013).

For any claims properly presented to the state courts but left unaddressed, this Court conducts a *de novo* review. *See Porter v. McCollum*, 558 U.S. 30, 39 (2009) (per curiam); *Rompilla v. Beard*, 545 U.S. 374, 390 (2005). If reviewed *de novo*, a fact pleading standard is applied. *See* 28 U.S.C. § 2242 (requiring a petition for writ of habeas corpus to "allege the facts concerning the applicant's commitment or detention"). Similarly, Rule 2(c)(2) of the *Rules Governing Section 2254 Cases in the United States District Courts* also requires a petitioner to "state the facts supporting each ground" in the petition. *See* Rule 2(c)(2), Rules Governing Section 2254 Cases in the United States District Courts [hereinafter, Rules Governing Section 2254 Cases]; *see also Mayle v. Felix*, 545 U.S. 644, 656 (2005) (acknowledging this particularity requirement).

## V. DISCUSSION OF BRYANT'S CLAIMS

### A. Bryant's Claim that the Trial Court Violated his Right to Have the Aggravating Circumstances on Which the State Intended to Rely Specified in the Indictment or Otherwise Specified Before His Trial (Doc. 1 at 26–28, paras. 74–78)

Bryant's first claim, which arises from his resentencing trial in 2004, is that the trial court erred in denying his requests that the State include in the indictment, or otherwise provide to him, the specific aggravating circumstances on which it intended to rely in support of the death penalty at his resentencing. Bryant argues that in failing to notify him of the aggravating circumstances, the trial court violated his Sixth Amendment right to have a jury find beyond a reasonable doubt the existence of an aggravating circumstance that makes a defendant eligible for the death penalty, as held by the Supreme Court in

*Apprendi v. New Jersey*, 530 U.S. 466 (2000); *Ring v. Arizona*, 536 U.S. 584 (2002); and *Hurst v. Florida*, 577 U.S. 92 (2016).

In *Apprendi*, the Supreme Court held that the Constitution requires that any fact that increases a defendant's sentence beyond the statutory maximum must be proven to a jury beyond a reasonable doubt. 530 U.S. at 490. Two years later, the Supreme Court, applying *Apprendi* to a capital murder case, held in *Ring* that a defendant has a Sixth Amendment right to "a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." *Ring*, 536 U.S. at 589. Specifically, the Court held that the right to a jury trial guaranteed by the Sixth Amendment requires that a jury "find an aggravating circumstance necessary for imposition of the death penalty." *Id.* at 609.

Bryant exhausted this claim on direct appeal following his resentencing, and the state courts denied it on the merits, which means that review of this claim is limited to whether the state courts' decisions were reasonable under 28 U.S.C. § 2254(d). More specifically, before his resentencing trial, Bryant filed a motion to dismiss his indictment or remand it to the grand jury. (Doc. 10-15 at 43–44). In support, he argued that the indictment did not allege the aggravating circumstances on which the State intended to rely in support of its claim for application of the death penalty. Bryant further argued that under *Ring* and *Apprendi*, since the jury must determine whether aggravating circumstances exist, aggravating circumstances constitute elements of an offense and thus must be specified in an indictment. Also prior to his resentencing trial, Bryant filed a motion for a more definite statement of the charge against him in the indictment, making the same argument. (*Id.* at 92–93). In that motion, he argued that if the State was not required to specify the

aggravating circumstances upon which it intended to rely, then it should be precluded at the resentencing trial from presenting any other aggravating circumstance other than that the murder took place in the course of a kidnapping. The trial court denied both motions prior to the resentencing trial. (Doc. 10-16 at 89–91, 100–02; doc. 10-10 at 194).

Bryant appealed the trial court's rulings to the ACCA, arguing that "[t]he trial court failed to follow the dictates of the United States Supreme Court in Apprendi v. New Jersey and Ring v. Arizona in its rulings on pretrial motions directed at the indictment and right to more definite written statement of the charge against him." (Doc. 10-21 at 13 (underlining in original); *see also id.* at 49–52)). However, the ACCA affirmed the trial court's rulings, reasoning:

> While this case was pending review by the Alabama Supreme Court, the United States Supreme Court released *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), and *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002)—two cases that dramatically impacted death-penalty cases throughout the United States. Because Bryant's case was not final when *Ring* was released, we have applied *Ring* to this appeal.[FN 4] See *Griffith v. Kentucky*, 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987).
>
> > [FN 4] *Atkins* addresses the rights of mentally retarded persons who have been sentenced to death. Nothing in the record suggests that Bryant was mentally retarded. Indeed, the record indicated that Bryant's full-scale IQ was 85, within the average range of intelligence. (R. 643.) Thus, *Atkins* has no application to this case.
>
> In *Ring*, the United States Supreme Court applied its earlier holding in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), to death-penalty cases and held that "[c]apital defendants . . . are entitled to a jury determination on any fact on which the legislature conditions an increase in their maximum punishment." *Ring*, 536 U.S. at 589, 122 S.Ct. 2428.

Bryant argues that *Ring v. Arizona* requires that the aggravating circumstances be set out in the indictment returned against him. Further, he argues, *Ring* requires that the accused be provided notice of the aggravating circumstances upon which the State intends to rely. The State counters by arguing the Bryant's death sentence complies with applicable Alabama law and that nothing in *Ring* requires the State to include the aggravating circumstances in the indictment or to give an accused notice of the aggravating circumstances upon which the State intends to rely.

In several recent decisions, both this Court and the Alabama Supreme Court have agreed with the State's rationale that *Ring* did not invalidate Alabama's death-penalty statute, which vests the ultimate sentence determination in the hands of the trial judge and not a jury. See, e.g., *Ex parte Hodges*, 856 So.2d 936 (Ala.2003); *Ex parte Waldrop*, 859 So.2d 1181 (Ala.2002); *Duke v. State*, 889 So.2d 1, 41 (Ala.Crim.App.2002) (opinion on return to remand), cert. granted, sentence of death vacated pursuant to *Roper v. Simmons*, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), 544 U.S. 901, 125 S.Ct. 1588, 161 L.Ed.2d 270 (2005); *Turner v. State*, 924 So.2d 737 (Ala.Crim.App.2002); *Stallworth v. State*, 868 So.2d 1128, 1178 (Ala.Crim.App.2001) (opinion on return to second remand). In each of these cases, we recognized the narrowness of the holding in *Ring*, noting that "[t]he *Ring* Court held that any aggravating circumstance that increased a sentence to death must be proved to a jury beyond a reasonable doubt"; however, we noted that the *Ring* Court "did not reach the question whether judicial sentencing or judicial override was constitutional." *Stallworth v. State*, 868 So.2d at 1183 (opinion on return to second remand). Indeed, we quoted the following language from a footnote in *Ring*:

> "'Ring's claim is tightly delineated: He contends only that the Sixth Amendment required jury findings on the aggravating circumstances asserted against him. No aggravating circumstance related to past convictions in his case; Ring therefore does not challenge *Almendarez–Torres v. United States*, 523 U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998), which held that the fact of prior conviction may be found by the judge even if it increases the statutory maximum sentence. He makes no Sixth Amendment claim with respect to mitigating circumstances. *See Apprendi v. New Jersey*, 530 U.S. 466, 490–91, n. 16, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) (noting "the distinction the Court has often recognized between facts in aggravation of punishment and facts in mitigation" (citation omitted [in *Ring*])). *Nor does he argue that the Sixth Amendment required the jury to make the*

> *ultimate determination whether to impose the death penalty*. See *Proffitt v. Florida*, 428 U.S. 242, 252, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976) (plurality opinion) ("[I]t has never [been] suggested that jury sentencing is constitutionally required."). He does not question the Arizona Supreme Court's authority to reweigh the aggravating and mitigating circumstances after that court struck one aggravator. See *Clemons v. Mississippi*, 494 U.S. 738, 745, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990). Finally, Ring does not contend that his indictment was constitutionally defective. See *Apprendi*, 530 U.S., at 477, n. 3, 120 S.Ct. 2348, 147 L.Ed.2d 435 (Fourteenth Amendment "has not . . . been construed to include the Fifth Amendment right to 'presentment or indictment of a Grand Jury'").'"

*Stallworth v. State*, 868 So. 2d at 1183–84 (quoting *Ring*, 536 U.S. at 597 n. 4, 122 S.Ct. 2428) (emphasis added).

This Court, in *Stallworth v. State*, specifically rejected an argument virtually identical to Bryant's—namely, that "the indictment [against him] was void because it failed to include in the indictment the aggravating circumstances" that supported the capital offense. 868 So.2d at 1186. We rejected Stallworth's argument, holding that neither *Ring v. Arizona* nor *Apprendi v. New Jersey* modified prior Alabama caselaw, "which holds that aggravating circumstances do not have to be alleged in the indictment." 868 So.2d at 1186. The indictment returned against Bryant advised him of the crime with which he was charged—the capital offense of murder during kidnapping, in violation of § 13A–5–40(a)(1), Ala.Code 1975—and set forth the elements of the offense that the State was required to prove. Included in the indictment was the aggravating circumstance of kidnapping in the first degree, thus placing Bryant on notice that, if convicted, he could be facing a death sentence. Because this single aggravating circumstance placed Bryant on notice that, if convicted of the charged offense he could be facing a potential death sentence, the trial court correctly denied Bryant's request that the State be required to amend the indictment so that it included all of the aggravating circumstances the State intended to prove at trial.

Likewise, neither *Ring v. Arizona* nor *Apprendi v. New Jersey* requires that an accused be provided with advance notice of all aggravating circumstances upon which the State intends to rely. Indeed, this Court has stated the following with regard to the other enumerated aggravating circumstances listed in § 13A–5–49 that are not elements of a capital offense:

> "The aggravating circumstances enumerated in § 13A–5–49 that may lead to the imposition of the death penalty in a capital case are not elements of the offense and are not required to be set forth in the indictment. *Dobard v. State*, 435 So.2d 1338, 1347 (Ala.Cr.App.1982), aff'd, 435 So.2d 1351 (Ala.1983), cert. denied, 464 U.S. 1063, 104 S.Ct. 745, 79 L.Ed.2d 203 (1984). A defendant has no right to advance notice of the state's intention to rely on any of the aggravating circumstances. *Clark v. Dugger*, 834 F.2d 1561, 1566 (11th Cir.1987), cert. denied, 485 U.S. 982, 108 S. Ct. 1282, 99 L.Ed.2d 493 (1988); *Knotts v. State*, 686 So.2d 431 (Ala.Cr.App.[1995] ); *Ruffin v. State*, 397 So.2d 277, 282 (Fla.), cert. denied, 454 U.S. 882, 102 S.Ct. 368, 70 L.Ed.2d 194 (1981). The list of aggravating circumstances in § 13A–5–49 is exclusive and puts the defendant charged with a capital felony on notice of those circumstances against which the defendant may be required to defend. This statutory notice satisfies constitutional requirements."

*Bush v. State*, 695 So.2d 70, 87 (Ala.Crim.App.1995), aff'd, 695 So.2d 138 (Ala.), cert. denied, 522 U.S. 969, 118 S.Ct. 418, 139 L.Ed.2d 320 (1997). *Cf. Arthur v. State*, 711 So.2d 1031 (Ala.Crim.App.1996), aff'd, 711 So.2d 1097 (Ala.1997) (when aggravating circumstances relied on by the State are elements of the capital offense they must be charged in the indictment).

Here, Bryant was given notice of the aggravating circumstance that constituted an element of the capital offense with which he was charged. Moreover, as noted by the State, because this was Bryant's second sentencing hearing, he had the added benefit of knowing precisely which aggravating circumstances the State would rely upon—the same aggravating circumstances it used at Bryant's original sentencing hearing. Accordingly, the circuit court correctly denied Bryant's request for such notice.

*Bryant*, 951 So. 2d at 748–50 (emphases in original). Bryant raised the claim again in his petition for certiorari in the Alabama Supreme Court, (doc. 10-22 at 6–7), but the Alabama Supreme Court denied the petition without an opinion, *see Bryant*, 951 So. 2d at 732.

To obtain relief on this claim, Bryant must demonstrate that the decision of the ACCA, which was the last reasoned state court decision, *see Wilson*, 584 U.S. at 125, was

contrary to, or an unreasonable application of, clearly established federal law as determined by the United States Supreme Court, or that it was based on an unreasonable determination of the facts that were before the state courts. *See* 28 U.S.C. § 2254(d).

Bryant argues that the ACCA's decision was contrary to *Apprendi* and *Ring* because, according to him, those cases hold that an aggravating circumstance is the "functional equivalent" of an element of the underlying offense. *See Ring*, 536 U.S. at 605 ("[W]hen the term 'sentence enhancement' is used to describe an increase beyond the maximum authorized statutory sentence, it is the functional equivalent of an element of a greater offense than the one covered by a jury's guilty verdict." (alteration in original) (quoting *Apprendi*, 530 U.S. at 494 n.19)). Bryant's logic is that because aggravating circumstances are akin to elements of the offense, *Apprendi* and *Ring* required the State to specify the aggravating circumstances it intended to pursue in his indictment, and the ACCA's failure to recognize that was contrary to those decisions.

However, Bryant cannot establish that the ACCA's decision was objectively unreasonable because nothing in *Apprendi* or *Ring* requires that an accused be provided advance notice of all aggravating circumstances upon which the State intends to rely. As noted by the ACCA, Alabama law does not require an aggravating circumstance to be specified in an indictment unless it is also an element of an underlying capital offense with which the defendant is charged. And Bryant's indictment *did* give him notice of one aggravating circumstance because that circumstance also constituted an element of the capital offense with which he was charged—that the murder was committed in the course of a kidnapping. Thus, Bryant was apprised that he could face the death penalty if

convicted. Moreover, this was Bryant's second sentencing, so as a factual matter, Bryant already knew which aggravating circumstances the State would pursue—the same circumstances that it pursued at his first sentencing. To be contrary to or an unreasonable application of a Supreme Court decision under AEDPA, the state court must apply a rule that contradicts the governing law set forth in that Supreme Court decision, decide a case differently based on a set of materially indistinguishable facts, or unreasonably apply a governing principle from the case. *See Bell*, 535 U.S. at 694. Since neither *Apprendi* nor *Ring* pertains to a defendant receiving advance notice of aggravating circumstances, Bryant cannot overcome the deference that AEDPA requires this Court give to the ACCA's decision.

Bryant adds an argument for the first time in his merits brief that Alabama's death penalty statute is unconstitutional because it vests the ultimate sentencing decision to a judge, not a jury, in violation of the Sixth Amendment. (Doc. 24 at 136–41).[3] He contends that the ACCA thus unreasonably applied the Supreme Court's clearly established holdings in *Apprendi* and *Ring* when it held that these cases did not invalidate Alabama's death penalty statute. Bryant also cites the Supreme Court's decision in *Hurst v. Florida*, 577 U.S. 92, 94 (2016), in which the Court applied *Ring* to Florida's capital-sentencing scheme and held that the scheme was unconstitutional because, under that scheme, the judge, and

[3] The Alabama legislature has since repealed that aspect of Alabama's capital sentencing scheme that allowed for judicial override of a jury's recommendation of a life sentence. *See* ALA. CODE § 13A-5-47.1. The statute only applies to capital murder defendants charged after April 11, 2017, and does not apply retroactively. *See id.*

not the jury, found the existence of the aggravating circumstance that made the defendant death eligible.

Bryant's argument fails for several reasons. First, because this claim was not raised in his habeas petition, it fails to comply with Rule 2(c) of the Rules Governing Section 2254 Cases. Rule 2(c) requires a habeas petitioner to "specify all the grounds for relief available to [him]" and to "state the facts supporting each ground." Rule 2(c), Rules Governign Section 2254 Cases; *see also Mayle*, 545 U.S. at 649 (comparing Rule 8 of the Federal Rules of Civil Procedure with Rule 2(c) of the habeas rules). Because Bryant did not specify this ground for relief in his petition, it is not properly before this Court. Even if it had been properly raised in this Court, it fails on the merits for two independent reasons. First, *Hurst* was not clearly established federal law when the ACCA decided Bryant's claim. *See Yarborough*, 541 U.S. at 660–61 (holding that a legal principle is clearly established if it was found in the holdings of a Supreme Court decision that existed at the time of the state court decision). Second, the facts of *Hurst* differ materially from the facts here. In *Hurst*, the United States Supreme Court held that Florida's capital sentencing scheme was unconstitutional because the judge, not the jury, found the existence of the aggravating circumstance that made the defendant death eligible. 577 U.S. at 94. In Alabama, however, a jury determines by a unanimous verdict whether an aggravating circumstance exists beyond a reasonable doubt to make a defendant death eligible. *See Ex parte Bohannon*, 222 So. 3d 525, 532 (Ala. 2016). For this additional reason, *Hurst* does not assist Bryant in showing that the ACCA unreasonably determined that the Alabama death penalty statute in effect when Bryant was convicted and sentenced

is constitutional. *Cf. Jones v. Sec'y, Dep't of Corr.*, 644 F.3d 1206, 1212 (11th Cir. 2011) (per curiam) (concluding that the cases upon which the petitioner relied were "too different" from the petitioner's case for the court to conclude that the state court's decision was unreasonable under AEDPA). Additionally, Bryant's death sentence complies with the Sixth Amendment because the jury, not the trial judge, unanimously found beyond a reasonable doubt at the guilt phase of his trial the existence of an aggravating circumstance necessary for imposition of the death penalty—that the murder was committed during the course of a kidnapping.[4]

Bryant has failed to meet his burden to show that the ACCA unreasonably applied the clearly established federal law of *Apprendi*, *Ring*, or *Hurst* in holding that the trial court did not err in rejecting his requests that the indictment specify the aggravators that the State intended to rely upon or that he otherwise be apprised of the specific aggravators prior to his trial. *See* 28 U.S.C. § 2254(d). On AEDPA review, Bryant is not entitled to federal habeas relief on this claim.

### B. Bryant's Claim that the Trial Court Violated his Right to Have the Jury Complete Special Verdict Forms as to Each Aggravating Circumstance that it Found to Exist Beyond a Reasonable Doubt (Doc. 1 at 28–29, paras. 79–84)

Bryant's second claim is similar to his first claim and also arises from his resentencing trial in 2004. He claims that the trial court erred in denying his requests that a special verdict form be presented to the resentencing jury that would specify which

[4] Indeed, in 2016, the Alabama Supreme Court upheld Alabama's capital sentencing scheme against a constitutional challenge based upon *Hurst* because in Alabama, a jury, not the judge, determines by a unanimous verdict the critical finding that an aggravating circumstance exists beyond a reasonable doubt to make a defendant death eligible. *See Ex parte Bohannon*, 222 So. 3d at 528–34.

aggravating circumstances, if any, the jury found to exist beyond a reasonable doubt. Bryant argues that since *Ring* and *Apprendi* require that the jury determine specifically which aggravating circumstances, if any, the State has proven beyond a reasonable doubt, a special verdict form was constitutionally required to give him notice as to which aggravating circumstance the jury found to exist. Bryant thus claims that the trial court's refusal to require a special verdict form violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

Bryant exhausted this claim on direct appeal following his resentencing trial, and the state courts denied the claim on the merits, which means that review of this claim is limited to whether the state courts' consideration was reasonable under 28 U.S.C. § 2254(d). More specifically, before his resentencing trial, Bryant filed a motion entitled "Motion to Apply the Rules Enunciated in *Ring v. Arizona*," in which he asked the trial court to require the jury to complete a special verdict form regarding each aggravating circumstance, if any, that they found to exist. (Doc. 10-15 at 87–88). The trial court denied the motion. (Doc. 10-16 at 95–98). Bryant also requested a jury charge that would explain to the jury that they would be required to submit a special verdict as to aggravating circumstances. (*Id.* at 44–45). The trial court refused to charge the jury as Bryant requested. (*Id.* at 45).

Bryant appealed the trial court's rulings to the ACCA, arguing that "[t]he trial court failed to follow the dictates of the United States Supreme Court in Apprendi v. New Jersey and Ring v. Arizona as to the role of the jury in the capital sentencing process in its rulings on pretrial motions, motions during trial and requested jury charges." (Doc. 10-21 at 13

(underlining in original); *see also id.* at 50–52). However, the ACCA affirmed the trial court's rulings, reasoning:

> Bryant argues that the circuit court erred in denying his request for special verdict forms "as to each aggravator claimed by the State" and "as to each aggravator unanimously found by the jury." (Bryant's brief, p. 47.) He contends that the United States Supreme Court's decisions in *Apprendi* and *Ring* mandate the use of such verdict forms.
>
> This Court has rejected similar claims in previous death-penalty decisions. See, e.g., *Walker v. State*, 932 So.2d 140, 147 (Ala.Crim.App.2004); *Adams v. State*, [Ms. CR–98–0496, August 29, 2003] — So.2d —, — (Ala.Crim.App.2003). The Alabama Supreme Court has likewise rejected this argument. The Supreme Court has held, in numerous cases, that the jury's verdict finding a defendant guilty of capital murder during the guilt phase of his trial indicated that the jury had unanimously found a proffered aggravating circumstance included within the § 13A–5–40(a), Ala.Code 1975, definition of the particular capital-murder offense charged in the indictment. See, e.g., *Ex parte Hodges*, 856 So.2d 936 (Ala.2003); *Ex parte Waldrop*, 859 So.2d 1181 (Ala.2002); *Stallworth v. State*, 868 So.2d 1128 (Ala.Crim.App.2001) (opinion on return to second remand), cert. denied, 868 So.2d 1189 (Ala.2003). But see *Ex parte McGriff*, 908 So.2d 1024, 1039 (Ala.2004) (authorizing prospective use of a penalty-phase special interrogatory). Moreover, in *Ex parte McNabb*, 887 So.2d 998 (Ala.2004), the Supreme Court held that even a nonunanimous recommendation of death by the jury proved that the jury, including the jurors who voted against the recommendation of death, had unanimously found the existence of a proffered aggravating circumstance, even though the circumstance was not included within the definition of the particular capital-murder offense charged in the indictment, because the trial court had specifically instructed the jury that it could not proceed to a vote on whether to impose the death penalty unless it had already unanimously agreed that the aggravating circumstance existed.
>
> In its instructions on aggravating circumstances and mitigating circumstances, the circuit court here instructed the jury, in pertinent part, as follows:
>
> > "Now, an aggravating circumstance is a circumstance specified by law which indicates or tends to indicate that the defendant should be sentenced to death. A mitigating circumstance is any circumstance which indicates or tends to

indicate that the defendant should be sentenced to life imprisonment without parole instead of death. The issue at this sentencing hearing concerns the existence of aggravating and mitigating circumstances which you should weigh against each other to determine the punishment that you recommend. In recommending punishment, you must determine whether any aggravating circumstance or circumstances exists. If you determine one or more do exist, then you must determine if the—anyway, you must determine whether one or more aggravating circumstances exists. And then, you must determine if one or more mitigating circumstances exist. In making these determinations, you may consider evidence from the—from any aspect of the trial that's been presented.

"Alabama law provides a list of aggravating circumstances which a jury may consider in recommending punishment. The jury must first be convinced beyond a reasonable doubt that one or more aggravating circumstances exists. And if you are not so convinced, you must recommend a sentence of life without parole. That is true even if you find that no mitigating circumstances exist.

"This case presents two aggravating circumstances which you may consider if the evidence convinces you beyond a reasonable doubt of their existence. The mere fact that I have included them in these instructions does not mean that I believe that the evidence proves their existence beyond a reasonable doubt. Only you can decide that issue.

"The two aggravating circumstances that the State relies on are, number one, that the capital offense was committed while the defendant was engaged in the commission of or an attempt to commit kidnapping. The other aggravating circumstance which the State relies on is that the capital offense was committed for pecuniary gain.

"Now, in this case, the—you may consider the fact that the defendant has been found guilty of capital murder committed during a kidnapping. Before you could consider recommending the death penalty, *each and every one of you would have to be convinced beyond a reasonable doubt that the State has proved at least one of the aggravating circumstances which I have listed for you.*"

> (R. 731–33.) (Emphasis supplied.) Thereafter, the circuit court went on to instruct the jury at length regarding aggravating circumstances, mitigating circumstances, and all other applicable principles of law that it was required to consider before returning its recommendation. However, the court returned to the requirement that the jury must unanimously find the existence of at least one aggravating circumstance before it could proceed to a vote on whether to impose the death penalty, reminding the jury:
>
>> "Now, as to the aggravating circumstances that the defendant committed the capital offense during a kidnapping, a jury has found [Bryant] guilty of that event, because that is the charge in the indictment, that he committed the capital offense while committing a kidnapping. However, the former jury has not specifically found him guilty of committing the capital offense for pecuniary gain. That is within your realm. You have to find beyond a reasonable doubt that he did that before you could consider—*when I say you, not 10 of you—but all 12 of you must be convinced beyond a reasonable doubt*—in other words, you have that fresh decision that you can make on that issue, yea or nay. You are not bound by a prior jury on that. They have not determined that."
>
> (R. 764–75.) (Emphasis supplied.)
>
> Because the jury recommended by a vote of 11–1 that Bryant be sentenced to death, it is clear that it unanimously found the existence of at least one aggravating circumstance. Accordingly, no basis for reversal exists as to this claim.

*Bryant*, 951 So. 2d at 750–52 (emphases and alterations in original). Bryant raised the claim again in his petition for certiorari in the Alabama Supreme Court, (doc. 10-22 at 6), but the Alabama Supreme Court denied the petition without an opinion, *see Bryant*, 951 So. 2d at 732.

To obtain relief on this claim, Bryant must demonstrate that the decision of the ACCA, which was the last reasoned state court decision, *see Wilson*, 584 U.S. at 125, was contrary to, or an unreasonable application of, clearly established federal law as determined

by the United States Supreme Court, or that it was based on an unreasonable determination of the facts that were before the state courts. *See* 28 U.S.C. § 2254(d).

Bryant argues that the ACCA unreasonably applied the Supreme Court's clearly established federal law in *Ring* and *Apprendi* because he was constitutionally entitled to know whether the aggravating circumstance that the jury found to exist was kidnapping or pecuniary gain. However, Bryant has not demonstrated that the ACCA's decision was objectively unreasonable because neither *Ring* nor *Apprendi* holds that special verdict forms are constitutionally required or even discusses special verdict forms. Indeed, the ACCA correctly rejected Bryant's argument that *Ring* required a defendant to know which aggravating circumstance the jury found to exist, reasoning that the jury's unanimous verdict during the guilt phase of a capital murder trial established that the jury unanimously found the existence of the aggravating circumstance that corresponded to that capital offense. Here, the fact that Bryant was convicted by a unanimous jury of capital murder during a kidnapping meant that the jury had also already determined that the aggravating circumstance enumerated in Alabama Code § 13A-5-49(4) existed beyond a reasonable doubt. Alabama law requires interpreting the jury verdict in this manner. *See* ALA. CODE § 13A-5-45(e) ("[A]ny aggravating circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentenc[ing] hearing.").

Bryant has failed to meet his burden to show that the ACCA unreasonably applied the clearly established federal law of *Apprendi* and *Ring* in holding that the trial court did not err in rejecting his requests that the jury complete special verdict forms specifying

which aggravators it found to exist beyond a reasonable doubt. *See* 28 U.S.C. § 2254(d). On AEDPA review, Bryant is not entitled to federal habeas relief on this claim.

**C. Bryant's Claim that Trial Counsel Rendered Ineffective Assistance During the Guilt Phase of His Trial (Doc. 1 at 29–71, paras. 85–217)**

Bryant claims that his trial counsel were ineffective during the guilt phase of his trial in five separate instances, amounting to a violation of his Sixth Amendment right to counsel. Before turning to these allegations, the Court first discusses the framework used by courts for evaluating ineffective assistance of counsel ("IAC") claims. Then, the Court provides background relevant to the evaluation of Bryant's specific claims.

The Supreme Court has recognized that the Sixth Amendment guarantees a criminal defendant the right to the effective assistance of counsel. *See Powell v. Alabama*, 287 U.S. 45, 63–64 (1932); *Johnson v. Zerbst*, 304 U.S. 458, 465–68 (1938); *Gideon v. Wainwright*, 372 U.S. 335 (1963). The "right to counsel exists, and is needed, in order to protect the fundamental right to a fair trial." *Strickland v. Washington*, 466 U.S. 668, 684 (1984). In *Strickland*, the Supreme Court established the constitutional standard for determining whether a criminal defendant has been denied the effective assistance of trial counsel:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Id.* at 687. A habeas petitioner has the burden to prove both prongs of the *Strickland* standard by a preponderance of the evidence. *Ward*, 592 F.3d at 1163; *Mills v. Singletary*, 63 F.3d 999, 1020 (11th Cir. 1995).

To satisfy the deficient performance prong of *Strickland*, a defendant must show that counsel's representation "fell below an objective standard of reasonableness." *Wiggins*, 539 U.S. at 521 (quoting *Strickland*, 466 U.S. at 688); *see Williams*, 529 U.S. at 390–91. The defendant has the burden of proof and must overcome a strong presumption that his trial counsel's conduct falls within a wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 687–88, 690–91. Courts are extremely deferential in scrutinizing the performance of counsel and make every effort to eliminate the distorting effects of hindsight. *See Wiggins*, 539 U.S. at 523 (holding that the proper analysis under *Strickland*'s performance prong is an objective review of the "'reasonableness [of counsel's performance] under prevailing professional norms,' . . . which includes a context-dependent consideration of the challenged conduct as seen 'from counsel's perspective at the time'" (quoting *Strickland*, 466 U.S. at 688–89)). "Based on this strong presumption of competent assistance, the petitioner's burden of persuasion is a heavy one: 'petitioner must establish that no competent counsel would have taken the action that his counsel did take.'" *Stewart v. Sec'y, Dep't of Corr.*, 476 F.3d 1193, 1209 (11th Cir. 2007) (quoting *Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000) (en banc)). "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how

best to represent a criminal defendant." *Bobby v. Van Hook*, 558 U.S. 4, 7 (2009) (per curiam) (quoting *Strickland*, 466 U.S. at 688–89).

To satisfy the "prejudice" prong, the "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Wiggins*, 539 U.S. at 534 (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome" of the proceeding. *Strickland*, 466 U.S. at 694. "The likelihood of a different result must be substantial, not just conceivable." *Harrington*, 562 U.S. at 112.

Importantly, "whether defense counsel's performance fell below *Strickland*'s standard" is not the question before a federal habeas court reviewing a state court's decision under 28 U.S.C. § 2254(d). *Id.* at 101. Where § 2254(d) applies, "the question is not whether counsel's actions were reasonable" but is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id*. at 105. This "extra layer of deference that § 2254 provides" means that "it will be a rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding." *Johnson v. Sec'y, DOC*, 643 F.3d 907, 911 (11th Cir. 2011).

Having set forth the applicable legal framework, the Court now summarizes and provides background for Bryant's IAC claims, which are as follows: (1) trial counsel unreasonably failed to investigate and present a defense that Bryant and Hollis had consensual sex, which would explain the presence of both men's DNA on Bryant's jeans and which would undermine the State's theory that Bryant kidnapped and murdered Hollis;

(2) trial counsel unreasonably failed to investigate and hire a DNA expert to challenge the State's "mixed sample" DNA evidence; (3) trial counsel unreasonably failed to investigate and hire a DNA expert to test the used condoms found at the crime scene; (4) trial counsel unreasonably failed to investigate and hire a blood spatter expert; and (5) trial counsel unreasonably failed to effectively impeach Ricky Vickers, a key prosecution witness, regarding Vickers' prior inconsistent statements. The first four of the five subclaims implicate trial counsel's decision to pursue the theory at the guilt phase that Bryant did not murder Hollis but helped move his body.[5] Additionally, several of the subclaims relate to the first, broader subclaim that trial counsel unreasonably failed to investigate and present a defense based on consensual sexual activity. Consequently, the Court summarizes certain testimony and evidence concerning trial counsel's decision to pursue the moved-the-body theory and how they presented it.

At the evidentiary hearing before the Rule 32 Court, Yarbrough testified that, based on Bryant's inconsistent stories to counsel about what had happened as well as information Yarbrough's investigator had found, he and Seagle made a deliberate decision to pursue the moved-the-body theory because it was consistent with Bryant's own inculpatory statements to police. (Doc. 10-38 at 140–41, 187–90, 192–93). Specifically, Yarbrough testified:

> [W]e were kind of having problems in the beginning from [Bryant] about getting actually what had happened, what had occurred. And we would get kind of different stories about what exactly had happened. Ultimately, we

[5] For ease of reference, this Opinion occasionally refers to this theory as the "moved-the-body" theory, a phrase Bryant uses in his written submissions. (*See, e.g.*, doc. 24 at 60).

> decided to go with the theory that he had actually told the police, because we thought we could sell that theory.
>
> . . . .
>
> . . . [A]s part of the investigation, we had sent [the investigator] out to talk with people in the community, talk about [Bryant] and things of that nature. And based on what we were told about [Bryant] and maybe—let me back up. We were kind of told that [Bryant] might have been bisexual by some witnesses. Whether or not that was true or not, I have no idea. We were told—[the investigator] had come to me and said that one witness had said that he would dress up as a woman at times, things of that nature. So as part of that, you know, I was concerned about the actual—maybe whether or not there was sex involved in this particular case. We had a lot of discussions about that, you know, how were we going to proceed with that. And ultimately, we decided that going on his statement was really the only way that we could proceed, because I don't think we could prove anything else.

(*Id.* at 187–88).

The ACCA further recounted the moved-the-body theory as follows:

> In his statement to police, Bryant admitted to riding around with Hollis and Hollis's cousin, Bert Brantley, on the night of the murder. He also admitted that, at some point during the evening, he asked Brantley to leave and that he and Hollis then continued riding around until they met up with a man named Terry Johnson. Bryant said that, after he obtained crack cocaine from Johnson, Hollis got in a vehicle with Johnson and allowed Bryant to keep possession of Hollis's vehicle. A short time later, Bryant said, he saw Johnson at Mickey's Lounge in Dothan, at which point Johnson asked him to move Hollis's body. Bryant admitted that he agreed to move Hollis's body in exchange for drugs and that he obtained the assistance of his cousin, Ricky Vickers, to move the body. Bryant stated that he and Vickers took Hollis's body to Florida and dumped it in the woods, drove around the panhandle of Florida for a while, and then returned to Dothan and abandoned Hollis's vehicle. At the end of his statement, when asked why it took three shots to kill Hollis, Bryant responded, "Man I don't know, I think I need help . . . Sometimes I am just not Jerry," and then put his head down on the table and refused to speak further. (Record on Direct Appeal ("RDA"), R. 788.)
>
> To support the defense theory and Bryant's statement to police, trial counsel presented testimony at trial that Raymond Mathis—who testified against Bryant and who was admittedly with Bryant and Vickers when they

> dumped Hollis's body in Florida—was also known as Terry Johnson—the man who Bryant had implicated in Hollis's murder. Bryant's counsel also presented testimony that Mathis was bisexual and that he had been seen in Dothan at Mickey's Lounge speaking with Bryant the night of the murder. Further, counsel elicited on cross-examination of Mathis that Mathis had thrown away the clothing and shoes he had been wearing the night of the murder and then argued to the jury that the only rational basis for Mathis to get rid of all of his clothing from the night of the murder was because his clothing and shoes had been covered in blood, unlike Bryant's clothing.

*Bryant*, 181 So. 3d at 1145–47.

As indicated above, Bryant claims that trial counsel were constitutionally deficient for not investigating and presenting a defense that Bryant and Hollis had consensual sex, which Bryant says would have undermined the State's theory that Bryant kidnapped and murdered Hollis. According to Bryant, it should have been apparent to his trial counsel that consensual sex occurred, for the following reasons: Two used condoms were among the evidence collected at the scene where Hollis was shot. Further, Hollis' penile swabs tested positive for semen, (doc. 10-37 at 64), which Bryant claims made it obvious that Hollis likely had sex not long before he was killed. Additionally, one of the pairs of underwear Hollis was wearing tested positive for semen in the front and for blood in the rear crotch area, which, according to Bryant, further indicates that Hollis had consensual sex the night he was killed. (*See id.* at 65).[6] Bryant further argues that that the sexual undertone of the crime was apparent based on his statement to police that he believed Hollis picked him up and bought him beer because Hollis was romantically interested in him.

[6] Bryant asserts that the blood in the rear crotch area of Hollis' underwear "may have come from [Hollis] having engaged in anal sex." (Doc. 24 at 71–72).

(Doc. 10-3 at 124).[7] According to Bryant, the consensual sex theory would also explain why Brantley and Hollis went to a rough neighborhood in Dothan to pick up Bryant, a stranger, and take him to Brantley's home. In further support of the consensual sex theory, Bryant highlights the fact that after he allegedly kidnapped Hollis, Brantley did not immediately call the police but instead waited until his sister picked him up and took him home, at which point he called the police using a fake name. According to Bryant, Brantley's delay in calling the police and his use of a fake name would have "supported an obvious defense theory that Brantley was so concerned with not revealing that his cousin [Hollis] was gay that he concocted the kidnapping story to keep from having to tell police that his cousin had left willingly to meet a sexual partner." (Doc. 24 at 36; *see also* doc. 1 at 34 n.2). Bryant relatedly argues that, had counsel properly investigated the consensual sex theory, it would have prompted counsel to investigate and retain a blood spatter expert and a DNA expert to test the mixed DNA sample and the condoms.

**1. Bryant's subclaim that trial counsel unreasonably failed to investigate a potential defense based on consensual sexual activity (doc. 1 at 31–40, paras. 92–118)**

Bryant's first allegation is that his trial counsel failed to properly investigate and present a theory that Bryant and Hollis had consensual sex. Bryant contends that the evidence known to his trial counsel supported a theory that Bryant and Hollis had consensual sex on the night that Hollis was killed and, if his trial counsel had presented

[7] The Court believes this interpretation of Brantley's statement requires several inferential leaps. Nonetheless, even assuming Bryant's interpretation of Brantley's statement is correct, the Court's analysis and conclusion remains the same.

that defense, it would have undermined the State's theory that Bryant kidnapped Hollis at gunpoint and would have thus made Bryant ineligible for the death penalty. Bryant contends that his trial counsel's failure in this regard amounted to ineffective assistance of counsel pursuant to *Strickland*, 466 U.S. at 690–91.

The parties vigorously dispute whether Bryant procedurally defaulted this claim and whether the state court addressed it on the merits. "[S]hould a state court reach the merits of a claim notwithstanding a procedural default, the federal habeas court is not precluded from considering the merits of the claim." *Alderman v. Zant*, 22 F.3d 1541, 1549 (11th Cir. 1994) (citing *Cnty. Ct. of Ulster Cnty. v. Allen*, 442 U.S. 140, 148–49 (1994)). However, "[w]hen a state court addresses both the independent state procedural ground and the merits of the federal constitutional claim, the federal court should apply the state procedural bar and decline to reach the merits of the claim." *Marek*, 62 F.3d at 1301–02 (citing *Alderman*, 22 F.3d at 1549). Therefore, if the state courts addressed both the independent state ground and the merits of this IAC claim, this Court should honor the state procedural bar. *See id.* Consequently, the Court addresses whether the state court determined that this IAC was procedurally barred as a matter of state law.

The Respondent contends that Bryant did not raise this claim in his amended Rule 32 petition and that Bryant's ineffective assistance of trial counsel claims concerned other "distinct" matters, including trial counsel's (1) failure to retain a DNA expert to test the blood stain on Bryant's jeans and two condoms recovered from the crime scene and (2) failure to retain a blood spatter expert to give an opinion as to why Bryant would only have one spot of blood on his blue jeans if he shot Hollis three times at close range. (*See*

doc. 10-26 at 66–70). The Respondent further contends that neither the Rule 32 Court nor the ACCA addressed Bryant's IAC claim regarding the consensual sex theory and that they addressed only the three claims the ACCA determined warranted an evidentiary hearing: (1) trial counsel were ineffective for not properly investigating and retaining a blood spatter expert and a DNA expert; (2) trial counsel were ineffective for not properly investigating and presenting evidence to support a motion to suppress Bryant's first statement to police; and (3) trial counsel and resentencing counsel were ineffective for failing to adequately impeach Vickers, and that resentencing counsel were ineffective for failing to adequately challenge Vickers' unavailability.

The Respondent further highlights that, after the ACCA remanded for an evidentiary hearing on the above claims, Bryant filed a second amended Rule 32 petition in which he presented new allegations and claims which did not appear in his amended Rule 32 petition, including new allegations concerning trial counsel's failure to investigate and present the consensual sex theory. (*See* doc. 10-34 at 36–138 (second amended petition); *see also id.* at 71–80 (additional allegations concerning the consensual sex theory)). The Rule 32 Court struck Bryant's second amended Rule 32 petition on the grounds that the court lacked jurisdiction to consider the new claims because it could only review the three claims that the ACCA had remanded. (*Id.* at 188; *see also id.* at 142–149 (Respondent's motion to strike second amended Rule 32 petition)). The ACCA affirmed, concluding that the Rule 32 Court properly struck Bryant's second amended petition because it was untimely under the Alabama Rules of Criminal Procedure and because under state law, the Rule 32 Court had "no authority to go beyond [the ACCA's] remand order and to consider additional

factual allegations or new claims of ineffective assistance of counsel because 'any act by a trial court beyond the scope of an appellate court's remand order is void for lack of jurisdiction.'" *Bryant*, 181 So. 3d at 1136–37 (quoting *Anderson v. State*, 796 So. 2d 1151, 1156 (Ala. Crim. App. 2000)). The ACCA further stated that it would not consider "any of the additional factual allegations or new claims raised in the second amended petition." *Id.* at 1137.

Bryant insists that he *did* raise this claim in his first amended Rule 32 petition and that the state courts *did* consider the claim on its merits. Bryant identifies the following language in his first amended Rule 32 petition that alludes to this claim: "Furthermore, both trial and resentencing counsel (as well as the police) believed that the crime was sexually motivated, but neither counsel conducted an adequate investigation into any possible connections regarding the sexual undertone of this crime." (Doc. 10-26 at 69). This sentence was contained within Bryant's claim that his trial counsel were ineffective for failing to retain experts. (*See id.* at 66–70; *see also id.* at 69 (the next sentence reads as follows: "Two used condoms were found at the scene of the crime that undoubtedly contained DNA of a person or persons involved in the crime, but counsel failed to get the condoms tested, or file appropriate motions regarding this evidence.")). In support of his argument that the state post-conviction courts did in fact consider this claim on the merits, Bryant points to the following language in the ACCA's opinion on return to second remand, in which the ACCA quotes the Rule 32 Court's dismissal order: "[T]here is no way to reasonably show that the jury's verdict at the guilt phase would have been different or the death sentence would have been avoided had trial counsel pursued the alter[n]ative

theory based on consensual sex." *Bryant*, 181 So. 3d at 1145. The Rule 32 Court further stated that the "mere existence of a potential alternative defense theory is not enough to establish ineffective assistance based on counsel's failure to present that theory." *Id.* (citation omitted). Earlier in its dismissal order, the Rule 32 Court recounted Bryant's argument that "had trial counsel investigated and retained [blood spatter and DNA] experts, trial counsel would have been able to explore a different defense strategy to explain the mixed sample of blood found on [Bryant's] jeans, specifically that [Bryant] and the deceased, Mr. Hollis, engaged in consensual sex as the explanation for the blood on his jeans." *Id.* at 1144 (second and third alterations in original).

Bryant presents a colorable argument that the Rule 32 Court considered his IAC claim based on the failure to investigate and present the consensual sex theory on the merits. The Rule 32 Court stated, albeit briefly, that Bryant had not shown he was prejudiced by trial counsel's failure to pursue the consensual sex theory. *See Bryant*, 181 So. 3d at 1145 ("[T]here is no way to reasonably show that the jury's verdict at the guilt phase would have been different or the death sentence would have been avoided had trial counsel pursued the alternative theory based on consensual sex."). That the state courts' discussion of this IAC claim was limited to only a sentence or two does not necessarily mean it was not adjudicated on the merits. *See McKiver v. Sec'y, Fla. Dep't of Corr.*, 991 F.3d 1357, 1364–65 (11th Cir. 2021) (explaining that state court denied petitioner's claim on the merits in one substantive sentence—"We conclude that Appellee failed to meet his burden of establishing either prong under *Strickland*."—while also observing that the state court "clearly disposed of the [relevant] claim on the merits and not on procedural or

jurisdictional grounds"); *see also Harrington*, 562 U.S. at 98–100 (concluding that the state court's summary denial of the petitioner's claim was an adjudication on the merits and explaining that "determining whether a state court's decision resulted from an unreasonable legal or factual conclusion does not require that there be an opinion from the state court explaining the state court's reasoning"). True, the entire sentence in which this language appears indicates that the Rule 32 Court was (also) discussing Bryant's IAC claims based on the failure to investigate and present blood spatter and DNA experts. *See Bryant*, 181 So. 3d at 1145 ("It is easy to argue that the outcome would have been different if DNA testing had been conducted and a blood splatter expert had been engaged; however, there is no way to reasonably show that the jury's verdict at the guilt phase would have been different or the death sentence would have been avoided had trial counsel pursued the alter[n]ative theory based on consensual sex."). But the proximity of these discussions is unsurprising, given that the consensual sex theory claim is related to the expert witness claims.

Nonetheless, the record supports the conclusion that the state courts determined that this IAC claim was procedurally defaulted because Bryant failed to properly and timely present it, and that this procedural ruling rests on an adequate and independent state ground.[8] While Bryant's first amended Rule 32 petition hinted at the consensual sex theory, (doc. 10-26 at 69), the reference to this theory was contained within the claim that Bryant's trial counsel were ineffective for failing to retain a DNA expert, (*id.* at 66–73).

[8] Thus, to the extent the ACCA also decided this IAC claim on the merits, this Court should "apply the state procedural bar and decline to reach the merits of the claim." *See Marek*, 62 F.3d at 1301–02.

Perhaps recognizing that this presentation may have been inadequate, Bryant filed a second amended Rule 32 petition in which he proffered additional allegations in support of this IAC claim. (*See* doc. 10-34 at 36–138 (second amended petition); *see also id.* at 71–80 (additional allegations concerning the consensual sex theory)). As stated above, the Rule 32 Court struck the second amended petition, and the ACCA affirmed this decision. The ACCA explained that its remand decision did not set aside the Rule 32 Court's dismissal of Bryant's first amended petition, and therefore Bryant's second amended petition was "clearly untimely" under the Rule 32.7(b) of the Alabama Rules of Criminal Procedure because he filed it after entry of judgment. *Bryant*, 181 So. 3d at 1135–36; *see also* ALA. R. CRIM. P. 32.7(b) ("Amendments to pleadings may be permitted at any stage of the proceedings prior to the entry of judgment."). The ACCA further rejected Bryant's argument that the Rule 32 Court had viewed too narrowly the three IAC claims which had been remanded for an evidentiary hearing:

> On remand in the circuit court, Bryant argued, incorrectly, that the claims for which we remanded this case were much broader than they actually were, and he attempted to change the factual basis for those claims in his second amended petition, at the evidentiary hearing, and again in his post-hearing brief. However, as the circuit court correctly determined, this Court remanded this case for further proceedings *on three very narrow and specific claims of ineffective assistance of counsel* and to reconsider its denial of Bryant's discovery request as it related to those specific claims.

*See Bryant*, 181 So. 3d at 1136 (emphasis added) (footnote omitted). The ACCA further explained that it had remanded the case "to give Bryant an opportunity to present evidence to prove *the specific facts he had alleged in his first amended petition in support of* [*the*] *three claims of ineffective assistance of counsel*," and that the remand order "did not permit

Bryant to allege new and additional facts to support those three claims, or to raise new or different claims." *Id.* (emphasis in original). Additionally, the ACCA stated that it would not "consider or address any of Bryant's arguments in his brief on return to remand that are based on the additional factual allegations or claims that Bryant untimely raised for the first time in his second amended petition, at the evidentiary hearing, or in his post-hearing brief" because "those additional factual allegations and claims were not properly before the [Rule 32] court" and likewise were not properly before the ACCA. *Id.* at 1137.

Thus, the record supports the conclusion that the state courts determined that Bryant failed to properly present this claim—that trial counsel were ineffective for failing to investigate and present a consensual sex theory—because he failed to properly present it in his first amended Rule 32 petition, and that he was barred from trying to raise it in a second amended petition on remand to the Rule 32 Court because it was untimely under Alabama Rule of Criminal Procedure 32.7(b) and based on state law concerning the limited jurisdiction of a circuit court on remand from an appellate court. Consequently, this claim is procedurally defaulted from federal court review, and this procedural ruling rests on an adequate and independent state ground. *See Ward*, 592 F.3d at 1156. Moreover, Bryant does not offer any argument that the procedural default of this claim should be excused under the "cause and prejudice" or "actual innocence" doctrines. *See Dretke*, 541 U.S. at 393. Thus, because he failed to assert those arguments, they are forfeited.[9]

[9] Even if this Court were mistaken about the applicability of the state procedural bar, this IAC claim nonetheless fails on the merits for the reasons explained *infra* Section V.C.2. *See Marek*, 62 F.3d at 1302 & n.4 (concluding that federal claim was procedurally defaulted but holding in the alternative that the claim failed on the merits).

In sum, this IAC claim is procedurally defaulted, thereby precluding review in this Court. Consequently, Bryant is not entitled to relief on this claim.

**2. Bryant's subclaim that trial counsel failed to retain a DNA expert to challenge the State's use of the mixed sample DNA evidence (doc. 1 at 40–54, paras. 119–50)**

Bryant also alleges that his trial counsel unreasonably failed to retain a DNA expert to challenge the testimony of Mr. Della Manna, the State's DNA expert, that the small blood stain on Bryant's blue jeans—referred to by the parties as the "mixed sample"—contained Hollis' and Bryant's DNA. Bryant contends that his trial counsel should have presented expert testimony that the mixed sample may not have been a mix of blood from two individuals but may have been a mix of blood and another type of genetic material, such as semen. According to Bryant, his trial counsel's failure to retain a DNA expert for this purpose amounted to deficient performance in violation of his rights under *Strickland*, 466 U.S. at 691 ("[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."). Additionally, Bryant contends that he was prejudiced under *Strickland* by trial counsel's failure because, if trial counsel had presented expert testimony that the mixed sample could have been blood from one individual and semen from another, trial counsel could have presented the defense that Hollis and Bryant engaged in consensual sex, which would have undermined the State's theory that Bryant kidnapped Hollis to rob and murder him, which would have made Bryant ineligible for the death penalty.

Bryant exhausted this claim during his Rule 32 proceedings, and the state courts denied it on the merits, which means that review of this claim is limited to whether the state courts' decisions were reasonable under 28 U.S.C. § 2254(d). Bryant raised this claim in his first amended Rule 32 petition. (Doc. 10-26 at 69–70). After the Rule 32 Court summarily dismissed the petition, (doc. 10-27 at 159–65), Bryant raised this issue on appeal to the ACCA, (doc. 10-28 at 60–61, 65–67). The ACCA affirmed in part but remanded the case for the Rule 32 Court to hold an evidentiary hearing on three of Bryant's ineffective assistance of counsel claims, including his claim that "trial counsel at his first trial were ineffective for not properly investigating and retaining a blood-spatter expert and a DNA expert." *Bryant*, 181 So. 3d at 1129. After the evidentiary hearing, the Rule 32 Court again denied the claim, finding that Bryant's trial counsel made a reasonable strategic decision not to retain their own DNA expert to test the mixed sample and instead to cross-examine the State's DNA expert about it, since the mixture of substances from Hollis and Bryant actually supported Bryant's defense theory that he did not murder Hollis but merely helped move the body. (Doc. 10-36 at 135–36).

Bryant appealed the Rule 32 Court's ruling to the ACCA. (Doc. 10-40 at 49–90). The ACCA affirmed the Rule 32 Court's ruling, stating:

> *DNA Expert to Test DNA Sample on Bryant's Jeans*
>
> Bryant alleged in his first amended petition that although the State presented expert testimony that a "tiny blood spot found on Bryant's pants was a mixture of Bryant's and the victim's blood[, that] expert[ ] . . . testified that he could not be absolutely sure," and Bryant argued that counsel should have retained a DNA expert "to contradict or provide the jury an alternative explanation regarding the blood and to whom it belonged." (C. 467.) Bryant further argued that a DNA expert "would have evaluated the viability of

obtaining a positive DNA match on such a small amount of blood," which, "[h]ad the DNA expert indicated that it was impossible to obtain a reliable DNA result on this sample, . . . would have removed the one piece of physical evidence tying Bryant to Hollis' homicide." (C. 467.)

At the evidentiary hearing, Seagle testified that the defense team received a list of all the physical evidence that the police had collected in reference to Bryant's case and that they requested and received records from the Dothan Police Department. Seagle testified that there was a "mixed blood sample" on Bryant's blue jeans that testing indicated "was consistent with being the victim's and Mr. Bryant's" DNA but that the State's expert could not conclusively say that it was, in fact, the victim's and Bryant's DNA. (RTR, R. 65.) Seagle said that, other than the DNA on Bryant's blue jeans, there was no other physical evidence tying Bryant to the murder scene but that there was other evidence linking Bryant to the murder.

Because there was no physical evidence tying Bryant to the murder scene other than the DNA evidence on his jeans, Seagle said, the defense did challenge the admissibility of that DNA evidence, and a pretrial hearing on the admissibility of the DNA evidence was conducted. Additionally, at trial, Seagle cross-examined the State's DNA expert, Angelo Della Manna, in an attempt to "poke holes" in the State's case. (RTR, R. 80.) In cross-examining Della Manna, Seagle tried to show that because they were Bryant's blue jeans there could be no way of knowing when his DNA got on them and that merely because the DNA was consistent with someone does not mean that it conclusively was that person.

Seagle further testified that Yarbrough prepared "the bulk" of the pretrial motions and that she did not recall whether they received funds for a DNA expert. (RTR, R. 70.) Seagle said that they did not hire a DNA expert to independently analyze DFS's test results of the blood on Bryant's jeans or to review DFS's testing procedures but that she could not recall why they did not. Seagle testified that she did recall discussing the possibility of a DNA expert with Yarbrough but that she just could not remember why they chose not to pursue it.

Yarbrough testified that the State's DNA expert testified at trial that both Bryant's DNA and Hollis's DNA were found on a mixture on Bryant's jeans. Yarbrough said that he filed a motion asking for funds for a DNA expert, specifically for Cellmark Laboratories, but that, "on the DNA issue, that was something that Deborah Seagle—that I felt that Deborah Seagle was to handle." (RTR, R. 109.) Yarbrough said, however, that he was "sure" there were discussions between himself and Seagle about the DNA evidence

but that he did "not remember" what those discussions involved. (RTR, R. 109.) Yarbrough also could not independently recall any of the meetings or telephone calls involving DNA. Yarbrough did recall going to Birmingham to look at the physical evidence, but he did not recall contacting Cellmark Diagnostics, Inc., a forensic laboratory located in Germantown, Maryland, although his file reflected that he did. Yarbrough testified that he was familiar with DNA and that he knew that DNA testing was available because, as a law student, he had worked at his stepfather's law firm and "had been involved in cases with my stepfather as a law student that involved DNA." (RTR, R. 114.) In some of those cases, his stepfather had retained and called to testify DNA experts. Yarbrough testified that he did "not remember a strategic reason as to why [they] did or did not call a DNA expert." (RTR, R. 116.) Yarbrough said, however, that "if, for whatever reason, I would have thought there should have been a DNA expert, I'm sure that I would have done what I thought to be—to get one." (RTR, R. 117.) Yarbrough admitted that during opening statements at trial he conceded that the State's DNA testimony regarding the blood on Bryant's jeans was correct "due to [Bryant] moving the body." (RTR, R. 126.) When questioned whether his decision to concede the DNA was strategy based on discussions with DNA experts or co-counsel, Yarbrough said:

> "I don't know that I can answer that, because, undoubtedly, I talked to somebody about this [possible DNA testing]. There's notes that I talked with somebody. So I mean, I could have talked to them about it and made the decision, or I couldn't. I don't know—I don't know the answer to it."

(RTR, R. 130.)

Matthew Quartaro testified at the hearing that he had been the supervisor of forensics at Orchid Cellmark in Dallas, Texas, since 2005 and that he had been a DNA analyst for Orchid Cellmark since 2002. Quartaro explained in detail the items of evidence Orchid Cellmark would have needed in 1997 or 1998 to have completed a DNA case review but stated that he was not provided any of the evidence he needed.

Bryant failed to prove that his trial counsel's not retaining a DNA expert to test the blood found on Bryant's jeans constituted deficient performance. Neither Yarbrough nor Seagle could recall whether the decision not to hire a DNA expert to test the blood on Bryant's jeans was strategic. Thus, the record is once again silent on this critical issue. As already noted, "'[i]f the record is silent as to the reasoning behind counsel's actions, the presumption of effectiveness is sufficient to deny relief on [an]

ineffective assistance of counsel claim.'" *Davis v. State*, 9 So. 3d 539, 546 (Ala. Crim. App. 2008) (quoting *Howard v. State*, 239 S.W.3d 359, 367 (Tex. Crim. App. 2007)).

Moreover, after thoroughly reviewing the record from Bryant's direct appeal and bearing in mind the strong presumption that counsel's conduct was reasonable, we conclude, as the circuit court did, that trial counsel was not deficient for not retaining a DNA expert to test the blood on Bryant's jeans. Yarbrough testified at the evidentiary hearing that, based on Bryant's inconsistent stories to counsel regarding what had happened and based on information his investigator had found, he chose to pursue a theory of defense consistent with Bryant's statement to police, i.e., that Bryant had moved Hollis's body but had not been involved in Hollis's murder.

> "The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information. For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable. In short, inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions. See *United States v. Decoster*, [199 U.S.App.D.C. 359,] 372–373, 624 F.2d [196,] 209–210 [ (D.C. Cir. 1976) ]."

*Strickland*, 466 U.S. at 691. Based on the record, we cannot say that counsel's choice to pursue a theory consistent with Bryant's statement to police was unreasonable, especially in light of the fact that counsel was able to present evidence to support that statement. Under the theory presented, a DNA expert to test the mixture found on Bryant's jeans was unnecessary because the fact that Hollis's DNA was found on Bryant's jeans was consistent with the defense theory that Bryant had moved Hollis's body after

the murder, and counsel in fact used the DNA evidence to support their theory of defense.

Additionally, we point out that ""'the failure to call an expert and instead rely on cross-examination does not constitute ineffective assistance of counsel.'"" *Davis v. State*, 44 So.3d 1118, 1136 (Ala.Crim.App.2009) (quoting *State v. Hartman*, 93 Ohio St.3d 274, 299, 754 N.E.2d 1150, 1177 (2001), quoting in turn *State v. Nicholas*, 66 Ohio St.3d 431, 436, 613 N.E.2d 225, 230 (1993)).

> ""'[H]ow to deal with the presentation of an expert witness by the opposing side, including whether to present counter expert testimony, to rely upon cross-examination, to forego [sic] cross-examination and/or to forego [sic] development of certain expert opinion, is a matter of trial strategy which, if reasonable, cannot be the basis for a successful ineffective assistance of counsel claim.'""

*Stallworth v. State*, 171 So.3d 53, 86 (Ala.Crim.App.2013) (quoting *Brown v. State*, 292 Ga. 454, 456, 738 S.E.2d 591, 594 (2013), quoting in turn *Phillips v. State*, 285 Ga. 213, 222–23, 675 S.E.2d 1 (2009)). "'A defendant's lawyer does not have a duty in every case to consult experts even if the government is proposing to put on expert witnesses. . . . There may be no reason to question the validity of the government's proposed evidence or the evidence may be so weak that it can be demolished on cross-examination.' " *Stallworth*, 171 So.3d at 87 (quoting *Miller v. Anderson*, 255 F.3d 455, 459 (7th Cir.2001) (citations omitted)). Indeed, "it can often be more effective to elicit beneficial testimony from the State's expert than to present the same evidence through an expert retained and paid by the defense." *Dowthitt v. Johnson*, 180 F.Supp.2d 832, 857 (S.D.Tex.2000).

Here, the trial record indicates that Seagle thoroughly cross-examined Angelo Della Manna, the State's DNA expert at trial, regarding the DNA found on Bryant's jeans and elicited testimony beneficial to the defense. At trial, Della Manna testified that the sample on Bryant's jeans was "consistent" with a mixture of Bryant's DNA and Hollis's DNA. Through cross-examination, Seagle elicited testimony that Della Manna could not conclusively state that the mixture on Bryant's jeans did, in fact, contain the DNA of both Hollis and Bryant and that Della Manna could not even provide a statistical probability of the mixture's containing both Hollis's and Bryant's DNA. Additionally, Seagle elicited testimony from Della Manna on cross-examination that a blood stain on a pair of sweatpants found in the apartment where Bryant was arrested contained DNA that did not match either Bryant's

> DNA or Hollis's DNA, but which was so similar to Bryant's DNA that it was possibly the DNA of one of Bryant's relatives. We cannot say it was unreasonable for counsel to choose to rely on cross-examination instead of retaining their own expert.
>
> Therefore, the circuit court properly denied Bryant relief on this claim of ineffective assistance of counsel.

*Bryant*, 181 So. 3d at 1149–52 (alterations in original) (footnotes omitted).

As can be seen from the quoted section of the opinion, the ACCA held that Bryant failed to establish deficient performance for several reasons. The ACCA noted that Bryant's trial counsel did consider the blood stain on Bryant's jeans but believed it was consistent with their defense theory that Bryant did not murder Hollis but only helped move the body. The court further found that counsel was reasonable in pursuing a strategy that was consistent with their client's statement to police and that, based on that strategy, testing the blood stain was unnecessary and counsel in fact used the State's DNA evidence to support their theory. Finally, the court found that the record was silent on whether counsel's decision not to retain a DNA expert was strategic, noted the presumption in favor of reasonableness, and emphasized that counsel thoroughly cross-examined the State's DNA expert.

Bryant raised the claim again in his petition for certiorari in the Alabama Supreme Court, (doc. 10-43 at 45–58), but the Alabama Supreme Court denied the petition without an opinion, (*id.* at 225).

Under 28 U.S.C. § 2254(d), in order to obtain relief on this claim, Bryant must demonstrate that the decision of the ACCA, which was the last reasoned state court decision, *see Wilson*, 584 U.S. at 125, was contrary to, or an unreasonable application of,

clearly established federal law as determined by the United States Supreme Court, or that it was based on an unreasonable determination of the facts that were before the state courts. *See* 28 U.S.C. § 2254(d).

Bryant cites *Hinton v. Alabama*, 571 U.S. 263 (2014) (per curiam), in support of his claim that trial counsel was ineffective when they failed to hire experts to help with complex scientific issues. However, *Hinton* does not help Bryant for two independent reasons. First, *Hinton* was not clearly established federal law when the ACCA decided Bryant's claim. *See Yarborough*, 541 U.S. at 660–61. Second, *Hinton* concerned a unique situation and is distinguishable from the facts of this case. In *Hinton*, the Supreme Court held that trial counsel performed deficiently when he failed to request additional funding "to replace an expert he knew to be inadequate because he mistakenly believed that he had received all the funding he could get under Alabama law." 571 U.S. at 274. But Bryant's claim does not involve an allegation that his trial counsel made a mistake of law concerning the amount of funds that would be reimbursed for investigative expenses. Rather, Bryant's claim is a broader claim that trial counsel should have retained an expert to pursue a different strategy. Additionally, the Supreme Court in *Hinton* qualified its holding, stating,

> We do not today launch federal courts into examination of the relative qualifications of experts hired and experts that might have been hired. The only inadequate assistance of counsel here was the inexcusable mistake of law—the unreasonable failure to understand the resources that state law made available to him—that caused counsel to employ an expert that *he himself* deemed inadequate.

*Id.* at 275 (emphasis in original). Thus, *Hinton* does not provide "governing law" that the ACCA's decision contradicted, and its facts are also not "materially indistinguishable" from those of this case. *See Cone*, 535 U.S. at 694.

Bryant's remaining arguments reflect disagreement with the outcome reached by the ACCA, but none demonstrates that the ACCA's decision was contrary to, or an unreasonable application of, *Strickland*. For example, Bryant argues that the ACCA's finding that "at the time of the trial, DNA testing was relatively new," *Bryant*, 181 So. 3d at 1145, was based on an unreasonable determination of the facts because DNA testing was actually not new and was in fact widely used by defense attorneys and prosecutors in 1998. Bryant also contends that the same finding was an unreasonable application of the *Strickland* "standard because trial counsel could not permissibly ignore an obvious tactic like engaging expert assistance to challenge the state's DNA evidence." (Doc. 24 at 65).

Bryant fails to show that the ACCA's decision was based on an unreasonable determination of the facts. Seagle, Bryant's attorney who handled the DNA evidence at trial, testified at the Rule 32 evidentiary hearing that DNA was not as common in 1998 as it was at the time of the evidentiary hearing, and that she was not aware of defense attorneys in 1998 routinely retaining independent DNA experts. (Doc. 10-38 at 93, 98). Further, Bryant did not offer any evidence at the evidentiary hearing that DNA was in wide usage by defense attorneys in 1998, as he now claims. Thus, Bryant's failure to introduce evidence to contradict Seagle's testimony means that the state court's finding was not an unreasonable determination of the facts before it. Nor was the finding contrary to *Strickland*'s "standard," as Bryant claims. (*See* doc. 24 at 65). To the contrary, the Supreme

Court has rejected specific performance guidelines for attorneys. *See Strickland*, 466 U.S. at 688–89 ("No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant.").

Bryant also argues that the ACCA's finding that Seagle "thoroughly" cross-examined Mr. Della Manna, *Bryant*, 181 So. 3d at 1152, was based on an unreasonable determination of the facts before it because Seagle's cross-examination of Mr. Della Manna was perfunctory and failed to meaningfully challenge his testimony. In support, Bryant cites two isolated portions of Seagle's cross-examination, one in which she asked Mr. Della Manna to explain what a "base pair" was in relation to DNA testing, and the other in which Mr. Della Manna corrected Seagle.[10] Bryant asserts that these excerpts demonstrate that Seagle did not understand the DNA testing that was performed and so, without her own expert, she did not subject the State's use of DNA evidence to truly adversarial testing.

[10] Specifically, Bryant quotes the following excerpts from Seagle's cross-examination of Mr. Della Manna:

> Q. Is it true that we each have—what?—about three billion different gene sites on us?
> A. No. That's not true. There is [sic] three billion base pairs if you want to call it that.
> Q. Three billion base pairs. Is that like—is this two base pairs here that you are talking about?
> A. No.
> Q. Explain to me what that is.
> A. A base pair is the very basic molecular level of DNA.
>
> . . . .
>
> Q. Okay. Now, one of the—you said that each of these were independent sites. And that's an assumption you have to make for this to be valid, is that correct?
> A. That's not an assumption. That's been genetically proven.

(Doc. 10-8 at 40–43).

However, when viewed in its entirety, the record shows otherwise. Seagle testified at the evidentiary hearing that she had handled cases with DNA evidence before Bryant's case and had some familiarity with them. (Doc. 10-38 at 93–94). At the DNA predicate hearing before trial, she and Yarbrough both questioned Mr. Della Manna thoroughly about his testing process and the test results, indicating that they grappled with the evidence and understood its implications. (*See* doc. 10-4 at 134–58, 164–69). Simply because Seagle asked Mr. Della Manna to explain one concept and was corrected concerning another concept in the midst of a lengthy cross-examination does not mean that the cross-examination was not thorough. At the very least, it is insufficient to establish that the ACCA's decision was based on an unreasonable determination of the facts. Indeed, as noted by the ACCA, Seagle was able to elicit from Mr. Della Manna that he could not "conclusively" state that the mixed sample on Bryant's jeans did, in fact, contain the DNA of both Bryant and Hollis, (doc. 10-8 at 58), and that he could not even provide a statistical probability of the mixture's containing both Hollis's and Bryant's DNA because it was not the ADFS's practice at the time to statistically test mixtures, (*see id.* at 52–53, 59).

Bryant also takes issue with the ACCA's finding that the record was silent as to why Seagle and Yarbrough did not retain a DNA expert to test the mixed sample. Bryant contends that this factual determination was unreasonable because the record shows that trial counsel actually sought and obtained funds to hire a DNA expert but then failed to use those funds. Bryant appears to argue that Yarbrough's failure to retain a DNA expert—

despite requesting and obtaining funds for hiring such an expert[11]—can only be attributed to incompetence. To be sure, Yarbrough testified at the evidentiary hearing that he could not remember why he ultimately decided not to retain a DNA expert. (Doc. 10-38 at 191). As discussed above, however, he testified that he and Seagle made a deliberate decision to pursue a defense strategy that aligned with Bryant's statement to police, which was that Bryant did not murder Hollis but helped move the body. The ACCA determined that trial counsel's tactical decision to pursue a theory consistent with Bryant's statement to police was reasonable. Further, the ACCA reasoned that, based on this theory, it was unnecessary for trial counsel to hire a DNA expert to test the mixed sample on Bryant's jeans "because the fact that Hollis's DNA was found on Bryant's jeans was consistent with the" moved-the-body theory, "and counsel in fact used the DNA evidence to support their theory of defense." *Bryant*, 181 So. 3d at 1151.

Bryant relatedly argues it was not reasonable for trial counsel to present the moved-the-body theory because it accounted for only Hollis' DNA—not Bryant's—on Bryant's jeans. Instead, according to Bryant, counsel should have investigated and presented the consensual sex theory because it would have accounted for the presence of both men's DNA and would have undermined the State's kidnapping theory. Bryant further argues that, given the lack of conclusive results from the ADFS' DNA testing, trial counsel should

[11] Before trial, Bryant's counsel requested and were granted funds for an expert. (Doc. 10-1 at 48–62; doc. 10-2 at 106–09). Yarbrough's records indicate that he traveled to Birmingham to examine the State's DNA evidence at ADFS, contacted another attorney about locating a DNA expert, drafted a letter to Cellmark Diagnostics, Inc. about conducting a DNA analysis, and had a conference call with Cellmark and Seagle. (Doc. 10-37 at 86–109; *see id.* at 179–82). Yarbrough acknowledged this at the evidentiary hearing, testifying, "It appeared that I had actually asked for funds and had sought out this Cellmark to do the [DNA] work." (Doc. 10-38 at 191).

have sought a DNA expert to determine whether the mixed sample contained biological material other than blood and thus was the product of consensual sexual activity. Bryant relatedly argues that Yarbrough's concession at trial that Bryant's jeans had Hollis' blood on them[12] constituted deficient performance because Yarbrough was wrong about the DNA evidence in two respects: (1) the ADFS' testing did not conclusively show that the mixed sample comprised two parts blood, and (2) the testing did not conclusively show that the mixed sample contained Bryant's or Hollis' DNA. According to Bryant, had trial counsel properly understood the DNA results, they would have investigated and presented the consensual sex theory and not the moved-the-body theory.

"[C]ounsel's reliance on particular lines of defense to the exclusion of others—whether or not he investigated those other defenses—is a matter of strategy and is not ineffective *unless the petitioner can prove the chosen course, in itself, was unreasonable*." *Chandler*, 218 F.3d at 1318 (emphasis added); *see also id.* at 1319 ("Counsel is not required to present every nonfrivolous defense . . . ."). But because the state courts determined that trial counsel pursued a reasonable defense strategy, the question for this Court is not "whether counsel's actions were reasonable" in the first instance but instead "whether there

[12] More specifically, at trial, the State's opening statement included the following:

> You are going to hear that through DNA that there was some blood on the Defendant's blue jeans, and that that particular blood that we are going to be talking about came from the victim, Donald Hollis. There was a couple of other blood stains there on the pants. And you are going to hear that another of the blood stains was a mixture of blood, and that the experts are going to testify to you that that mixture of blood was consistent with being a mixture of the blood of Jerry Bryant and that of Don Hollis.

(Doc. 10-6 at 127). Yarbrough then stated in his opening statement for the defense, "Mr. Maxwell is right on the DNA. We had—Jerry had the victim's blood on his clothes. There was some of Jerry's blood on those clothes." (*Id.* at 142).

is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Gavin v. Comm'r, Ala. Dep't of Corr.*, 40 F.4th 1247, 1264 (11th Cir. 2022) (emphasis omitted) (quoting *Harrington*, 562 U.S. at 105). Thus, to prevail on his claim that trial counsel were ineffective for failing to present the consensual sex theory, Bryant must show that no fairminded jurist could agree with the ACCA's conclusion that trial counsel's chosen defense—that Bryant did not murder Hollis but merely helped move the body—was reasonable. *See Harrington,* 562 U.S. at 101–02.

On this record, Bryant cannot overcome the double deference to which the ACCA's performance determination is entitled. *See Dunn v. Reeves*, 594 U.S. 731, 739 (2021) (per curiam). Yarbrough testified that, based on Bryant's inconsistent stories to counsel regarding what had happened and based on information Yarbrough's investigator had found, he and Seagle made a deliberate decision to pursue the moved-the-body theory because it was consistent with Bryant's own inculpatory statements to police. (Doc. 10-38 at 140–41, 187–90, 192–93). Not only that, the moved-the-body theory allowed trial counsel to provide an alternative explanation for the presence of Hollis' blood on Bryant's jeans, which the State argued came from Bryant beating Hollis before Hollis' death and which Bryant's trial counsel acknowledged was critical evidence for the State because it was the only physical evidence linking Bryant to the crime, (*see* doc. 10-38 at 91 (Seagle testifying that "the DNA evidence was what [the State] had that tied Mr. Bryant to – to the crime"); *id.* at 84 (Seagle testifying that "the only thing [the State] really had tying Mr. Bryant to the victim was the pair of blue jeans")). And while the moved-the-body theory may have accounted for the presence of only Hollis' blood on Bryant's jeans, it is not as

though trial counsel ignored the fact that Bryant's blood was also present. To the contrary, trial counsel, cognizant of this fact, tried to create reasonable doubt by arguing that the State could not say when Bryant's blood got on his jeans, arguing that it could have happened weeks before Hollis' murder. (*See* doc. 10-9 at 40–41). Yarbrough further testified that he and Seagle considered whether sex was involved but ultimately pursued the moved-the-body theory because they did not believe they could prove anything else. (Doc. 10-38 at 188). Thus, the ACCA did not unreasonably determine that the available evidence provided "enough support for counsel's line of defense" such that Bryant failed to show that "no competent counsel would have chosen it." *See Hunt v. Comm'r, Ala. Dep't of Corr.*, 666 F.3d 708, 726 (11th Cir. 2012).

Additionally, Yarbrough's assumption that Hollis' blood, as opposed to some other biological material like Hollis' semen, was on Bryant's jeans was reasonable based on the forensic evidence known to the parties and the court at the time. Although Mr. Della Manna explained at the beginning of his testimony that biological fluids include blood, semen, or saliva, (doc. 10-8 at 17), he repeatedly referred to the mixed sample as containing blood, (*see id.* at 17–63). Similarly, Seagle testified at the evidentiary hearing that she and Yarbrough thought that the mixed sample consisted of blood as opposed to some other biological material because the reports from ADFS referred to it as a blood sample.[13]

---

[13] More specifically, the following exchange occurred between Bryant's post-conviction counsel and Seagle at Bryant's evidentiary hearing:

> Q. Ms. Seagle, did the defense believe that the mixed sample that was presented both at the DNA predicate hearing and at trial was a mixed sample of Mr. Bryant and Mr. Hollis's blood?

Bryant now attempts to undermine this evidence by pointing to Mr. Della Manna's evidentiary hearing testimony that the mixed sample could be from blood and another type of biological material. But Bryant overstates Mr. Della Manna's testimony. At the hearing, Mr. Della Manna was asked whether the mixed sample could have contained blood and some other unknown biological material from two individuals. (Doc. 10-39 at 75, 80). He replied that that was a *possibility*, noting that "blood and saliva" could form one possibility for the genetic contribution. (*Id.* at 80). Matthew Quartaro of Orchid Cellmark, the other DNA analyst called by Bryant to testify at the hearing, similarly could do little more than speculate. He opined: "To me, it indicates there's at least one contributor of blood, because you have blood present. But it doesn't necessarily mean that they are—you know, both sources of DNA are from blood. One *could be* from a different biological material." (*Id.* at 121 (emphasis added)). However, there was no testimony or evidence before the Rule 32 Court that established, beyond speculation, that the mixed sample consisted of (1) blood and (2) a different type of genetic material. There was certainly no evidence that the sample

---

A. Yes. I believe that was what was understood. Or that it was consistent with that. I don't—like I said, they never were able to say positively.
Q. Ms. Seagle, did you believe that mixed sample included both DNA—the DNA in that mixed sample came from two contributors' blood as opposed to blood and another biological material?
A. Yes.
Q. And that was your understanding in preparing this case?
A. Yes.
Q. What informed that understanding, Ms. Seagle?
A. The reports we had from the lab and—which—which called them blood—blood samples.
Q. And just to be—
A. And—and I believe the testimony was how they described how they dissolved the blood samples out from the blue jean material.

(Doc. 10-38 at 89–90; *see also id.* at 120 (Yarbrough testifying that it was his understanding that "[t]here was a mixture, yes. And I think there was some other DNA that was neither [Bryant]'s or Hollis's.")).

contained Hollis' semen. In sum, the record before the state courts when they were deciding this claim does not contradict the parties' assumptions at the time of trial that it was Hollis' blood, as opposed to some other type of genetic material, that contributed to Hollis' DNA profile on the mixed sample. Therefore, Yarbrough's concession that the mixed DNA sample contained Hollis' blood does not help Bryant establish that the ACCA unreasonably found that trial counsel performed adequately.

Bryant also cannot show that the ACCA's performance determination was unreasonable because the record reflects that, rather than retain their own expert, Bryant's counsel's strategy was to use the State's DNA evidence to their advantage at trial to create reasonable doubt. For example, in closing, Seagle and Yarbrough emphasized that the State collected over thirty items of evidence from the crime scene but only sent four items to be DNA tested at the ADFS lab, reasoned that it would be reasonable for Bryant to have a spot of Hollis' blood on his jeans since he moved his body, and reminded the jury that Mr. Della Manna could not conclusively say that the mixed sample contained Hollis' and Bryant's DNA. Indeed, Seagle's portion of the defense closing included the following statements:

> And another reasonable doubt is the DNA evidence. And we think there [are] a lot of doubts with what went on with that DNA evidence. But, first of all, we don't think that it is terribly significant, in that Mr. Bryant admitted that he moved the body.
>
> . . . .
>
> What did they find on all this clothing? They found one pencil eraser size[d] spot of blood on a pair of blue jeans. The DNA expert said that there was no blood found on the other clothing.

> . . . .
>
> [Mr. Della Manna] said it was consistent with a mixture of Mr. Bryant's and Mr. Hollis's. But he could not give us any kind of a probability on that simply because, as he finally said, it could have—that mixture of blood could come from people other than Mr. Hollis and Mr. Bryant, if their blood types carried these same markers in it. It's just not as precise when you leave a mixture. And again, we are talking about one little pin drop of blood.
>
> We don't even know when the blood got on it from Mr. Bryant[]. I mean did he pick a hangnail earlier that afternoon or two weeks ago cut himself fishing? You know, there is just a little spot of his own blue jeans.
>
> . . . .
>
> But, again, we contend even if it was Mr. Hollis's blood which maybe, maybe it wasn't, even according to their DNA expert. Mr. Bryant has admitted to moving the body. That does not make him guilty of capital murder.

(Doc. 10-9 at 37–42). Yarbrough's portion of the closing then included the following:

> The blood—if that's not the biggest kicker in this whole thing, I don't know what is. You heard this long list. We all fell asleep over here. I know we did. All of us fell asleep. Long old list of things they collected.
>
> They choose to test three or four.
>
> . . . .
>
> Is there going to be blood on Jerry's jeans? Absolutely. We moved a body. Absolutely. You saw the pictures.

(*Id.* at 52). Because the fact that Hollis' DNA was found on Bryant's jeans in the blood spot was consistent with the defense theory, and considering counsel's strategic decision to highlight the flaws in the DNA testing to the jury, the ACCA reasonably concluded that

trial counsel's decision not to expend the expense or effort to have the DNA retested was reasonable.

In sum, even assuming trial counsel's performance was less than exemplary, and even assuming the Court would reach a different conclusion if analyzing the issue *de novo*, Bryant fails to show that no fairminded jurist could conclude that trial counsel's related decisions not to hire a DNA expert and to pursue the moved-the-body theory were reasonable. *See Dunn*, 594 U.S. at 739 ("[E]ven if there is reason to think that counsel's conduct 'was far from exemplary,' a court still may not grant relief if '[t]he record does not reveal' that counsel took an approach that no competent lawyer would have chosen." (second alteration in original) (quoting *Burt*, 571 U.S. at 23–24)); *see also Chandler*, 218 F.3d at 1315. On this record, it was not unreasonable for the ACCA to conclude that trial counsel were reasonable in pursuing a defense that was consistent with their client's statement to police and which provided an explanation for the presence of the victim's blood on their client's clothing. Further, the ACCA did not unreasonably determine that trial counsel reasonably declined to hire a DNA expert to opine on the mixed sample because such testimony was unnecessary in light of their chosen defense theory. The evidence which was before the state courts concerning the mixed DNA sample is insufficient to support a finding that the ACCA's performance determinations were unreasonable.

Bryant also claims that he was prejudiced by his trial counsel's failure to retain a DNA expert. The ACCA did not address this prong of *Strickland*, so this Court considers it *de novo*. *See Rompilla*, 545 U.S. at 390. Nonetheless, Bryant fails to show prejudice.

"To establish prejudice, a petitioner must show that there is a reasonable probability that the result of the proceeding would have been different if his counsel had not performed deficiently[.]" *McKiver*, 991 F.3d at 1365. "The likelihood of a different result must be *substantial*, not just conceivable." *Harrington*, 562 U.S. at 112 (emphasis added). A habeas petitioner's burden to show prejudice "is particularly 'heavy where the petitioner alleges ineffective assistance in failing to call a witness because often allegations of what a witness would have testified to are largely speculative.'" *McKiver*, 991 F.3d at 1365 (quoting *Sullivan v. DeLoach*, 459 F.3d 1097, 1109 (11th Cir. 2006)). Bryant claims that a DNA expert could have testified that the mixed DNA sample contained biological material other than blood (i.e., semen), which purportedly would have supported Bryant's theory that he and Hollis had consensual sex and disproven (or at least called into question) the State's theory that Bryant kidnapped and murdered Hollis. But Bryant supports this claim with little more than speculation and conjecture. First, it is speculative on this record that a mixed DNA sample containing one part semen would plausibly support a theory that Bryant and Hollis had consensual—as opposed to nonconsensual—sex. Even assuming that the presence of Hollis' semen on Bryant's jeans would support a theory of *consensual* sex, Bryant does not identify a witness who would have been available and willing to testify beyond mere possibility that the mixed DNA sample contained biological material other than blood. Quartaro's testimony is insufficient because he merely testified that the two sources of DNA were not *necessarily* blood and that one source of DNA *could have been* from different biological material. In sum, Bryant fails to establish a reasonable probability

that he would not have been found guilty or sentenced to death if counsel had presented a DNA expert to opine about the mixed sample.

For all of the foregoing reasons, Bryant is not entitled to relief on this claim.

**3. Bryant's subclaim that trial counsel unreasonably failed to retain a DNA expert to test the used condoms found at the crime scene (doc. 1 at 54–57, paras. 151–59)**

Bryant also claims that his trial counsel unreasonably failed to retain a DNA expert to test the two used condoms found at the crime scene, arguing that counsel unreasonably discounted the potential exculpatory value of such DNA testing. Bryant alleges that if Hollis' DNA, Bryant's DNA, or both were found on the condoms, that would have suggested that Hollis came to the crime scene willingly and had consensual sex with Bryant, which would have undermined the State's theory that Bryant kidnapped Hollis, which was both the aspect of the conviction that made Bryant death eligible and also an aggravating circumstance upon which the trial court relied to impose the death penalty. Alternatively, Bryant alleges that if Hollis and a third party's DNA was found on the condoms, that would have suggested that Hollis had sex with a third party at the crime scene, thereby creating doubt as to whether Bryant was even involved in the killing.

Bryant exhausted this claim during his Rule 32 proceedings, and the state courts denied it on the merits, which means that review of this claim is limited to whether the state courts' decisions were reasonable under 28 U.S.C. § 2254(d). More specifically, Bryant raised this claim in his first amended Rule 32 petition. (Doc. 10-26 at 69–70). After the Rule 32 Court summarily dismissed the petition, (*see* doc. 10-27 at 159–65), Bryant raised

this issue on appeal to the ACCA, (doc. 10-28 at 60–61, 68–71). The ACCA affirmed in part but remanded his case for the Rule 32 Court to hold an evidentiary hearing on three of his ineffective assistance of counsel claims, including Bryant's claim that "trial counsel at his first trial were ineffective for not properly investigating and retaining a blood-spatter expert and a DNA expert." *Bryant*, 181 So. 3d at 1129. After the hearing, the Rule 32 Court again denied the claim, finding that Bryant's counsel's performance was not deficient because they made a reasonable strategic decision not to DNA test the condoms because, if Bryant's DNA was found on the condoms, it would have undermined the most plausible defense that Bryant's counsel had to work with, which was that Bryant did not murder Hollis but only moved the body. (Doc. 10-36 at 135–36).

Bryant appealed the Rule 32 Court's ruling to the ACCA. (Doc. 10-40 at 49–90). However, the ACCA affirmed the Rule 32 Court's decision, reasoning as follows:

> *DNA Expert to Test Condoms Found at the Murder Scene*
>
> Bryant also alleged in his first amended petition that his trial counsel should have had tested for DNA two used condoms found at the scene where Hollis was killed. Specifically, Bryant alleged that although counsel "believed that the crime was sexually motivated, [they did not] conduct[ ] an adequate investigation into any possible connections regarding the sexual undertone of this crime" because they "failed to get the condoms tested, or file appropriate motions regarding this evidence." (C. 467.) Bryant asserted that counsels' failure "to present an expert on DNA evidence is below the objective standard of reasonableness and seriously prejudiced Bryant because the expert may have presented exculpatory evidence." (C. 467.) According to Bryant, Yarbrough's case file indicated that he had contacted Cellmark Diagnostics, Inc., and that Cellmark Diagnostics "was available and willing to do DNA testing on the evidence in this case" and that, "[b]ut for counsel's failure to call a DNA expert, there is a reasonable likelihood that Bryant would have been acquitted or would have avoided a death sentence." (C. 467–68.)

At the evidentiary hearing, Seagle said that the State did not have the condoms tested for DNA and that the defense likewise did not have the condoms tested for DNA. Seagle said that she was familiar with the murder scene, that it was not uncommon for the area to have a lot of trash in and around it, and that it was "[c]ertainly" a possibility that the condoms found in the area were completely "unrelated" to the crime. (RTR, R. 90.) Seagle also said that it "could have been a problem" if they had had the condoms tested for DNA and the result showed Bryant's DNA. (RTR, R. 91.) Seagle testified that, during closing arguments, they used the State's failure to test the condoms in arguing reasonable doubt, which they could not have done had the condoms been tested and found to have Bryant's DNA on them. Seagle said she could not recall whether she and Yarbrough discussed filing an ex parte motion to have the condoms tested.

Yarbrough testified that he was aware of the condoms found at the murder scene, was aware that semen and blood were found on Hollis's boxer shorts, was aware that semen was found on Hollis's penis, and was aware that two pairs of underwear were found on Hollis. Yarbrough said that he may have viewed the condoms with the other evidence but that he did not move to preserve the condoms. When asked if he made any "ex parte attempts to determine whether the condoms were exculpatory," Yarbrough stated that "[w]e were afraid of what the condoms might show. So, no, I did not." (RTR, R. 134.) Specifically, Yarbrough testified that the defense team "felt that the risk . . . was just too great" to test the condoms in the event the DNA on the condoms was Bryant's because, Yarbrough said,

> "our defense was that he wasn't there. He wasn't at that location; he was never at that location except for—I don't remember if it was moving the body or not. But we just felt that if any of the DNA came back him at that parking lot [the murder scene], that—then we would have no defense."

(RTR, R. 177.) Yarbrough further explained:

> "The testing on the condoms was it was either going to come back [Bryant] or not, and if it came back [Bryant], then it would have killed our defense. If it didn't come back, then I don't know—you know, it could—you know, I don't know what the jury would have thought of that at that point in time."

(RTR, R. 195.) When asked specifically what would have happened if the DNA on the condoms had matched Hollis's DNA, Yarbrough said that he did not consider that option, although he admitted it "might have been"

> relevant to the kidnapping aspect of the case. (RTR, R. 196.) Yarbrough also conceded that if the DNA on the condoms had matched Raymond Mathis's DNA, it would have been "very helpful" (RTR, R. 196), and that if it had matched Bert Brantley's DNA, it "[m]ight" have been helpful. (RTR, R. 197.)
>
> We agree with the circuit court that counsel's decision not to hire a DNA expert to test the two used condoms found at the murder scene was an objectively reasonable strategic decision. Yarbrough and Seagle both testified that having the condoms tested could have potentially been detrimental to the defense and that they deliberately chose not to test the condoms and, instead, chose to use the State's failure to test the condoms against the State. "[C]ounsel may reasonably avoid presenting evidence or defenses for a number of sound reasons that lead him to conclude that the evidence or defense may do more harm than good." *Moore v. State*, 659 So.2d 205, 209 (Ala.Crim.App.1994). Bryant failed to present any evidence indicating that counsel's decision in this regard was not reasonably strategic. In his brief on return to remand, Bryant argues that counsel could have had the condoms tested ex parte, thereby removing any risk that the State would have learned of the test results had those results been detrimental to Bryant. However, this argument fails to recognize that the condoms were in the State's possession. Although counsel could have, and in fact did, move for funds for DNA testing ex parte, because the condoms were in possession of the State it would have been impossible to have had the condoms transferred from the State's possession to an outside laboratory for testing without the State's knowledge. Once the State was aware of the defense's testing, the State could have requested discovery of the test results or could have conducted its own DNA testing on the condoms. In either case, if the DNA-test results were harmful, it would have provided the State with more evidence against Bryant. Counsel's decision not to take that risk was reasonable.
>
> Therefore, the circuit court properly denied this claim of ineffective assistance of counsel.

*Bryant*, 181 So. 3d at 1152–54 (alterations in original).

Bryant raised the claim again in his petition for certiorari in the Alabama Supreme Court, (doc. 10-43 at 58–60), but the Alabama Supreme Court denied the petition without an opinion, (*id.* at 225).

Under 28 U.S.C. § 2254(d), in order to obtain relief on this claim, Bryant must demonstrate that the decision of the ACCA, which was the last reasoned state court decision, *see Wilson*, 584 U.S. at 125, was contrary to, or an unreasonable application of, clearly established federal law as determined by the United States Supreme Court, or that it was based on an unreasonable determination of the facts that were before the state courts. *See* 28 U.S.C. § 2254(d).

Bryant argues that the ACCA's holding was based upon an unreasonable determination of the facts because it ignored the possible benefits of testing the condoms. Indeed, Yarbrough acknowledged that if the DNA in the condoms matched Mathis, for example, it would have been "very helpful" for the defense. (Doc. 10-39 at 8–9). Bryant further contends that if the testing revealed that the condoms contained Hollis' DNA, such results would have supported the theory that Hollis came to the crime scene willingly and had consensual sex with Bryant, therefore undermining the State's theory that Bryant kidnapped Hollis. However, based on the record before the ACCA, it was not unreasonable to conclude that Bryant's counsel made a reasonable strategic decision not to test the condoms because of the extreme danger to their case they believed such testing might pose. *See Rogers v. Zant*, 13 F.3d 384, 387 (11th Cir. 1994) ("By its nature, 'strategy' can include a decision not to investigate . . . [and] a lawyer can make a reasonable decision that no matter what an investigation might produce, he wants to steer clear of a certain course."). As discussed by the ACCA, Yarbrough testified that they did not test the condoms because if the DNA matched Bryant, it would have "killed [their] defense," which was that Bryant was not present when Hollis was murdered. (Doc. 10-39 at 7). Similarly, Seagle testified

that DNA testing of the condoms could have done more harm than good. (Doc. 10-38 at 91–92).[14] Instead of testing the condoms and risk (what they perceived to be) potentially disastrous results, counsel chose to highlight to the jury that the State did not DNA test the condoms as a way to argue reasonable doubt. Indeed, Yarbrough stated in closing: "Did the police send these condoms off they found there? No. Did you hear any evidence about any DNA on any condoms? No. You heard all this evidence they had." (Doc. 10-9 at 53–54).

Bryant contends that the ACCA's decision was further based on an unreasonable determination of the facts because, according to Bryant, the presence of Bryant's DNA on the condoms "would have completely undermined the State's kidnapping aggravator" because Bryant's DNA "would have indicated to a near certainty that Hollis left willingly with Mr. Bryant" to have consensual sex. (Doc. 24 at 78). Bryant further contends that the presence of his DNA would not have precluded his counsel from arguing that Bryant was not present when Hollis was killed because it was "entirely plausible" that Bryant and Hollis had consensual sex at the scene but Hollis was later killed by someone else. (*Id.* at 77). But Bryant's interpretation of the facts is not the only reasonable interpretation. And

---

[14] True, Yarbrough acknowledged he could have tested the condoms *ex parte* (without the State knowing) and that he understood at that time that he could have done so. (Doc. 10-38 at 146). But again, the ACCA found it would have been practically impossible for counsel to test the condoms without the State's knowledge, explaining as follows:

> [B]ecause the condoms were in possession of the State it would have been impossible to have had the condoms transferred from the State's possession to an outside laboratory for testing without the State's knowledge. Once the State was aware of the defense's testing, the State could have requested discovery of the test results or could have conducted its own DNA testing on the condoms.

*Bryant*, 181 So. 3d at 1154. Bryant does not challenge this factual finding as unreasonable.

a state court's determination of the facts is unreasonable "only if no 'fairminded jurist' could agree" with it. *Lee v. Comm'r, Ala. Dep't of Corr.*, 726 F.3d 1172, 1192 (11th Cir. 2013) (quoting *Holsey v. Warden, Ga. Diagnostic Prison*, 694 F.3d 1230, 1257 (11th Cir. 2012)). A fairminded jurist could agree with the ACCA that trial counsel reasonably decided that Bryant's DNA on the condoms would foreclose or impede their defense that Bryant was not present during the murder. Moreover, a fairminded jurist could agree with the ACCA's determination that trial counsel reasonably declined to pursue the DNA testing given these perceived risks.

The ACCA's determination that trial counsel performed adequately was not unreasonable, and on AEDPA review, Bryant is not entitled to relief on this claim.

**4. Bryant's subclaim that trial and resentencing counsel unreasonably failed to retain a blood spatter expert (doc. 1 at 57–63, paras. 160–78)**

Bryant alleges that both his trial counsel and resentencing counsel were constitutionally ineffective for failing to retain a blood spatter expert to analyze the crime scene and his clothing. Bryant points out that although the State's medical examiner testified that Hollis was shot three times at close range and blood spatter was found on a building, on trees, and on the ground in the area where the murder occurred, there was only a small spot of blood found on Bryant's jeans about the size of a pencil eraser. Bryant contends that, had his counsel retained a blood spatter expert, that expert could have examined the crime scene evidence and testified that Bryant should have had more blood on his clothing if he shot Hollis, which would have created doubt as to whether Bryant was the murderer. Bryant claims that at the time of his original and resentencing trials,

numerous blood spatter experts were available to testify. He thus claims that his counsel's failure amounted to ineffective assistance of counsel under *Strickland*. The Court first addresses Bryant's claim regarding his resentencing counsel which, as explained further below, is unexhausted and procedurally defaulted from view. The Court then turns to the claim regarding his trial counsel.

Regarding Bryant's claim that his resentencing counsel, Crespi, should have retained a blood spatter expert at Bryant's resentencing, the ACCA affirmed the Rule 32 Court's rejection of that claim, stating:

> With respect to this claim as it relates to Bryant's counsel at his second penalty-phase trial, we find the claim to be meritless on its face. The only issue at the second penalty-phase trial was what sentence Bryant should receive for his capital-murder conviction. Bryant's guilt as to the crime had already been determined in the first trial and could not be attacked at the second penalty-phase trial. The investigation and evidence Bryant asserted that his counsel should have conducted and presented at his second penalty-phase trial—a blood-spatter expert and a DNA expert—would have, as Bryant alleged in his petition, challenged the State's evidence of his guilt of the crime, not what punishment he should receive. However, the Alabama Supreme Court has held that "[r]esidual doubt is not a mitigating circumstance" to be considered at the penalty phase of a capital trial. *Ex parte Lewis*, 24 So.3d 540, 544 (Ala.2009). In addition, this Court specifically held on appeal from Bryant's second penalty-phase trial that the trial court had correctly denied Bryant's request for a jury instruction on residual doubt. Therefore, this claim is meritless insofar as it relates to Bryant's counsel at his second penalty-phase trial.

*Bryant*, 181 So. 3d at 1110. Bryant did not challenge this ruling in his petition for certiorari to the Alabama Supreme Court. (Doc. 10-43 at 2–120 (entire petition)). Because he did not raise this claim in his petition for certiorari in the Alabama Supreme Court, Bryant failed to exhaust it as required by § 2254(b)(1), and he is procedurally barred from raising this claim in this Court. *See O'Sullivan*, 526 U.S. at 845–47 (concluding that the petitioner

must marshal the claim through one entire round of the state's appeal process, including in a petition for discretionary review in the highest court of the state if such review is part of the state's appellate procedure); *Hunt*, 666 F.3d at 730 (explaining that an Alabama prisoner must petition the Alabama Supreme Court for certiorari review to exhaust all available remedies). Moreover, dismissal of his habeas petition to allow him to present this claim in the Alabama Supreme Court now would be futile because the time for filing such a certiorari petition has long passed, and the certiorari petition that he did file has long since been denied. *See* ALA. R. APP. P. 39(c)(2) (providing that a petition for further review by the Alabama Supreme Court must be filed within fourteen days after the ACCA's opinion). Thus, because any state remedy with respect to this claim is procedurally barred by a state procedural rule, the claim is procedurally defaulted from habeas review. *See McNair*, 416 F.3d at 1305. Additionally, Bryant makes no effort to explain how the ACCA erred in rejecting his claim or to excuse the procedural default of the claim. For all these reasons, the claim as it relates to resentencing counsel is due to be denied.

As the claim relates to his trial counsel, Bryant properly exhausted this claim. Bryant raised this claim in his first amended Rule 32 petition. (Doc. 10-26 at 67–68). After the Rule 32 Court summarily dismissed the petition, (*see* doc. 10-27 at 159–65), Bryant raised this issue on appeal to the ACCA, (doc. 10-28 at 60–64). The ACCA affirmed the Rule 32 Court's ruling in part but remanded Bryant's case for the Rule 32 Court to hold an evidentiary hearing on this claim, among others. *See Bryant*, 181 So. 3d at 1129 (remanding the claim that "trial counsel at his first trial were ineffective for not properly investigating and retaining a blood-spatter expert and a DNA expert"). After the evidentiary hearing on

remand, the Rule 32 Court again denied the claim, finding that Bryant's trial counsel's performance was not deficient. (Doc. 10-36 at 136).

Bryant appealed the Rule 32 Court's ruling to the ACCA. (Doc. 10-40 at 67–70). The ACCA affirmed the Rule 32 Court's decision in a lengthy discussion. First, the ACCA recounted some of the testimony from Bryant's former lawyers at his evidentiary hearing. *Bryant*, 181 So. 3d at 1141–42. The ACCA then discussed the pertinent case law relevant to ineffective assistance of counsel claims under *Strickland*, including Bryant's burden of proof. *Id.* at 1142–43.

Next, the ACCA quoted the portion of the Rule 32 Court's order in which it determined that Bryant had not demonstrated that his trial counsel was deficient for failing to retain a DNA or blood spatter expert because trial counsel made reasonable strategic decisions not to hire those experts. *Bryant*, 181 So. 3d at 1143–45. Then, the ACCA explained that it agreed with the Rule 32 Court's finding that Bryant's trial counsel's performance was not deficient as to the blood spatter expert and the DNA expert:

> For the reasons explained below, we agree with the circuit court's finding that trial counsel's performance was not deficient for not investigating and retaining a blood-spatter expert and a DNA expert.[FN 7]
>
> > [FN 7] Because we agree with the circuit court's finding as to the performance prong of *Strickland*, we need not address the prejudice prong of *Strickland*. Likewise, we need not address Bryant's argument in his brief on return to remand that the circuit court applied the wrong standard when evaluating the prejudice prong of *Strickland*.
>
> Initially, we point out that, at the evidentiary hearing, Yarbrough testified that the defense theory at trial was based on Bryant's statement to police. . . .

*Bryant*, 181 So. 3d at 1145–47.

Finally, the ACCA addressed the specific claim that Bryant's counsel should have retained a blood spatter expert, as follows:

> *Blood-Spatter Expert*
>
> In his first amended petition, Bryant asserted that "[t]rial testimony revealed that blood spatter was found on a building, on trees, and on the ground in the area where the murder occurred," and that "the medical examiner [had] testified that Donald Hollis was shot three times at close range," but that "only a minuscule amount of blood (a drop the size of an eraser on a pencil) was found on Bryant's clothing." (C. 465.) Bryant alleged that counsel should have retained a blood-spatter expert "to independently analyze the crime scene and Bryant's clothing to determine whether the blood spatter found on Bryant was consistent with the types of wounds Donald Hollis sustained" because, according to Bryant, had counsel done so, a blood-spatter expert "would have conducted tests to recreate the crime" and "may have testified that a person who shoots another at close proximity should have a significant amount of blood on his person" or that "where the gun shot wounds create blood spatter in the pattern as on and proximity to the building at the location where Hollis was shot, the shooter would have a significant amount of blood on his clothing or, at a minimum, more than a minuscule drop of blood that cannot even be attributed solely to the victim." (C. 465–66.) Bryant asserted that, at the time of his trial, "numerous blood spatter experts were available to testify, including Captain Tom Bevel, owner of TBI LLC located in Oklahoma, and Gary Rini, forensic science consultant located in Cleveland, Ohio." (C. 466.)
>
> Yarbrough testified at the evidentiary hearing that he had access to the evidence and to the photos of the murder scene before trial and that he knew that only a small amount of blood had been found on Bryant's jeans even though Hollis had been shot three times at point-blank range. Yarbrough said that he did not remember whether, when he was preparing for trial, he had thought about the fact that point-blank shots would probably have generated a lot of blood. Yarbrough said that he did not hire a blood-spatter expert and that he did not remember whether or not he spoke to someone at Cellmark Laboratories about blood spatter. Yarbrough further testified that he could not remember whether he made a strategic decision not to hire a blood-spatter expert. Yarbrough said, however, that the State never argued to the jury that the blood on Bryant's jeans came from the gunshots but,

rather, argued simply that the blood contained a mixture of Bryant's DNA and Hollis's DNA.

Yarbrough conceded that with "hindsight being 20/20, would I have done something different, yes, possibly." (RTR, R. 141.) However, when asked whether a blood-spatter expert and whether the blood found on Bryant's jeans were big components of the defense, Yarbrough answered in the negative because, according to Yarbrough, "it would be reasonable that there would be blood on Jerry Bryant based on our defense." (RTR, R. 184.) Specifically, according to Yarbrough, the blood found on Bryant's jeans was consistent with and supported the defense theory. Yarbrough also said that it was not common in 1998 in Houston County to retain blood-spatter experts, and that there were several more experienced attorneys in his law firm that he could discuss cases with, but that none of them had mentioned to him the idea of getting a blood-spatter expert. Seagle also testified that she was not familiar with blood-spatter experts at the time of Bryant's trial and that she had never in her practice at that time seen a blood-spatter expert called to testify on a defendant's behalf.

At the hearing, Bryant presented the testimony of Thomas Bevel, the president of Bevel, Gardner and Associates, a forensic education and consulting group. Based on his credentials, Bevel was deemed an expert by the circuit court in crime-scene investigation and bloodstain and blood-pattern analysis. Bevel said that he was providing consulting services in 1997 and 1998 and that, at that time, lawyers would learn of his services primarily by "word of mouth" but that he also had a "rudimentary website." (RTR, R. 212.) Bevel stated that he would have been available to consult in 1998. Bevel said that, in this case, he reviewed the district attorney's file on Hollis's murder, which included investigative reports, the autopsy protocol, and "a number of printed-out photographs that were black and white originally" but that he also later examined "in color." (RTR, R. 217.) From the documents he reviewed, Bevel determined that Hollis had been shot three times in the head with a .25 caliber pistol at close range. Such close-range gunshots, Bevel said, "can" create blood spatter. (RTR, R. 217.) However, Bevel said that he was unable to determine what type of blood spatter was created in this particular case based on the information he had.[FN 8]

> [FN 8] Most of the testimony Rule 32 counsel elicited from Bevel at the evidentiary hearing was geared toward establishing that Bevel was unable to perform a crime-scene or blood-spatter analysis because of the circuit court's denial of Bryant's postconviction discovery requests.

Bryant failed to prove that his trial counsel's not retaining a blood-spatter expert constituted deficient performance. Yarbrough testified that he could not remember whether the decision not to hire a blood-spatter expert was strategic. Thus, the record is silent on this critical issue. "'If the record is silent as to the reasoning behind counsel's actions, the presumption of effectiveness is sufficient to deny relief on [an] ineffective assistance of counsel claim.'" *Davis v. State*, 9 So.3d 539, 546 (Ala.Crim.App.2008) (quoting *Howard v. State*, 239 S.W.3d 359, 367 (Tex.Crim.App.2007)). Indeed:

> "'Time inevitably fogs the memory of busy attorneys. That inevitability does not reverse the *Strickland* [*v. Washington*, 466 U.S. 668 (1984),] presumption of effective performance. Without evidence establishing that counsel's strategy arose from the vagaries of "ignorance, inattention or ineptitude," *Cox* [*v. Donnelly*, 387 F.3d 193 (2nd Cir. 2004)], *Strickland*'s strong presumption must stand.'"

*Johnson v. State*, [Ms. CR–05–1805, June 14, 2013] — So.3d ––, –– (Ala.Crim.App. 2007) (opinion on return to remand) (quoting *Greiner v. Wells*, 417 F.3d 305, 326 (2d Cir. 2005)).

Moreover, after thoroughly reviewing the record from Bryant's direct appeal and bearing in mind the strong presumption that counsel's conduct was reasonable, we conclude, as the circuit court did, that trial counsel was not deficient for not retaining a blood-spatter expert. There are a range of logical reasons that may have informed Yarbrough's decision not to hire a blood-spatter expert. The drop of blood on Bryant's jeans was consistent with the defense theory that Bryant had moved Hollis's body but had not participated in the murder, which was supported not only by Bryant's statement to police but also by other evidence presented at trial. Additionally, common sense indicates that when a person is shot three times at point-blank range, there will in all likelihood be a large amount of blood spatter on the shooter. Yarbrough could have reasonably concluded, even without having actually consulted with a blood-spatter expert, that he could create the necessary reasonable doubt as to Bryant's involvement in the murder simply by having the jury hear Bryant's statement to the police, and the other evidence supporting Bryant's statement to police, and having the jurors use their own common sense. Although a blood-spatter expert may have strengthened the defense theory at trial, "'[c]ounsel's failure to call an expert witness is not *per se* ineffective assistance, even where doing so may have made the defendant's case stronger, because the State could always call its own witness to offer a contrasting opinion.'" *Benjamin v. State*, 156 So.3d

> 424, 443 (Ala.Crim.App.2013) (quoting *People v. Hamilton*, 361 Ill.App.3d 836, 847, 838 N.E.2d 160, 170, 297 Ill.Dec. 673, 683 (2005)). Simply put, we cannot say that no reasonable attorney would have chosen not to hire a blood-spatter expert under the circumstances in this case.
>
> Therefore, the circuit court properly denied Bryant relief on this claim of ineffective assistance of counsel.

*Bryant*, 181 So. 3d at 1147–49.

As can be seen from the above quoted section, the ACCA held that the Bryant failed to establish deficient performance for several reasons. It found that the record was silent concerning whether the decision not to hire a blood spatter expert was strategic because Yarbrough could not recall whether he made a strategic decision; it noted the strong presumption that counsel's conduct was reasonable; it opined that there are several logical reasons why counsel would have decided against hiring a blood spatter expert; it noted that the drop of blood on Bryant's blue jeans was consistent with counsel's defense theory that Bryant did not murder Hollis but merely helped move the body; and it noted that counsel could have reasonably decided to let the jury use their common sense to question why, if Bryant shot Hollis at close range, there would not have been a large amount of blood spatter on his clothing without having to expend time and resources hiring an expert to state the same thing.

Bryant raised the claim again in his petition for certiorari in the Alabama Supreme Court, (doc. 10-43 at 61–68), but the Alabama Supreme Court denied the petition without an opinion, (*id.* at 225).

Because the state court adjudicated this claim on the merits, to obtain relief Bryant must demonstrate that the decision of the ACCA, which was the last reasoned state court

decision, *see Wilson*, 584 U.S. at 125, was contrary to, or an unreasonable application of, clearly established federal law as determined by the United States Supreme Court, or that it was based on an unreasonable determination of the facts in light of the evidence presented before the state courts. *See* 28 U.S.C. § 2254(d).

The ACCA did not unreasonably determine that trial counsel was not deficient for failing to investigate or present a blood spatter expert, nor was the ACCA's decision based on an unreasonable determination of the facts. True, Yarbrough testified at the evidentiary hearing that he could not remember whether he made a strategic decision not to hire a blood spatter expert. (Doc. 10-38 at 152–53). However, he testified that he and Seagle made a deliberate decision to pursue a defense strategy that aligned with Bryant's statement to police, which was that Bryant did not murder Hollis but helped move the body, which explained why Bryant had some of Hollis' blood on his jeans. (*Id.* at 140–41, 187–90, 192–93). Yarbrough further explained that the amount of blood found on Bryant's jeans was not an important part of their defense because Bryant admitted to moving the body and because the State never specifically argued that the blood came from the gunshot itself. (*Id.* at 195–97; *id.* at 153 ("I do not believe the State . . . argued that that was blood spatter from the shots fired. They just argued that it was blood on him, and there was a mixture of blood."); *id.* at 196 ("I thought it would be reasonable that there would be blood on Jerry Bryant based on our defense.")). Additionally, the ACCA reasoned that trial counsel reasonably decided not to hire a blood spatter expert because "common sense indicates that when a person is shot three times at point-blank range, there will in all likelihood be a large

amount of blood spatter on the shooter," and therefore the jury could have used their common sense to find reasonable doubt. *Bryant*, 181 So. 3d at 1149.

Bryant contends that the ACCA unreasonably determined that trial counsel did not perform deficiently because Seagle acknowledged that the blood on Bryant's jeans was significant evidence for the State and because a blood spatter expert could have bolstered trial counsel's chosen defense theory that Bryant did not shoot Hollis but merely helped move the body. Bryant also points out that trial counsel did not argue to the jury that it defied common sense for Bryant to have so little blood on him if Bryant were the shooter. But as explained previously, because the state courts determined that trial counsel performed adequately, the question for this Court is not "whether counsel's actions were reasonable" in the first instance but instead "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Gavin*, 40 F.4th at 1264 (emphasis omitted) (quoting *Harrington*, 562 U.S. at 105). And in determining whether counsel's performance was deficient, the question is not "what 'most good lawyers' would have done," *Dingle v. Sec'y for Dep't of Corr.*, 480 F.3d 1092, 1099 (11th Cir. 2007) (quoting *Conklin v. Schofield*, 366 F.3d 1191, 1204 (11th Cir. 2004)); instead, the question is whether trial counsel chose a course of action that "no competent counsel" would have taken, *Grayson v. Thompson*, 257 F.3d 1194, 1216 (11th Cir. 2001) (emphasis omitted); *see also Chandler*, 218 F.3d at 1313 ("To state the obvious: the trial lawyers, in every case, could have done something more or something different. So, omissions are inevitable. . . . [T]he issue is not what is possible or 'what is prudent or appropriate, but

only what is constitutionally compelled.'" (quoting *Burger v. Kemp*, 483 U.S. 776, 794 (1987))).

To be sure, Seagle acknowledged that the blood on Bryant's jeans was critical evidence for the State because it was the only physical evidence linking Bryant to the crime. (*See* doc. 10-38 at 91 (Seagle testifying that "the DNA evidence was what [the State] had that tied Mr. Bryant to – to the crime"); *id.* at 84 (Seagle testifying that "the only thing [the State] really had tying Mr. Bryant to the victim was the pair of blue jeans")). And Bryant is right that trial counsel did not directly argue to the jury that the minimal blood on Bryant's jeans defied common sense given the State's theory that Bryant shot Hollis three times at close range. But as discussed above, Yarbrough testified that, based on their defense theory, it was reasonable for Bryant to have had some of Hollis' blood on his jeans and that the blood was not an important part of their defense. It thus follows that Yarbrough could have reasonably concluded that trial counsel need not refute or emphasize the blood on Bryant's jeans and, therefore, that a blood spatter expert was not necessary. "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary," and "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691. Additionally, trial counsel elicited testimony from Mathis—who counsel argued was the true killer—that Mathis had thrown away the clothes he had worn the night of Hollis' murder, and counsel then argued to the jury that Mathis must have thrown away his clothes because they were covered in blood. (*See* doc. 10-7 at 115–16 (Mathis admitting he threw away his clothes

and shoes); doc. 10-9 at 53 (Yarbrough's closing argument: "Raymond Mathis threw his clothes away. How convenient. . . . Why? Probably because he had blood all over him.")). Thus, the record supports a finding that trial counsel argued to the jury, even if indirectly, that Hollis' true killer would have been covered in Hollis' blood, which Bryant was not. Considering the double deference owed to the ACCA's performance determination, Bryant has not carried his burden to show that the ACCA unreasonably determined the facts or unreasonably applied federal law in concluding that trial counsel acted reasonably in declining to pursue a blood spatter expert to test evidence that already aligned with the defense's moved-the-body theory and that, even without such an expert, the jury could have used their common sense to find reasonable doubt.

Bryant also criticizes the ACCA for taking into consideration Seagle's testimony that she was not familiar with blood spatter experts at the time of Bryant's trial, (doc. 10-38 at 100), and Yarbrough's testimony that it was not common in Houston County, Alabama, in 1998, to hire a blood spatter expert, (*id.* at 196–97). Bryant asserts that numerous experts were available to testify at that time. The evidence he presented in support of that allegation was the testimony of Mr. Bevel, whose lab was located in Oklahoma and who admitted that the main way that an attorney would have learned of his services in 1998 was through "word of mouth." (Doc. 10-39 at 23–24).[15] Thus, to the

[15] As noted by the ACCA, much of Bryant's argument to the state courts on the blood spatter issue was that Mr. Bevel was limited in his ability to analyze the evidence by the Rule 32 Court not allowing Bryant discovery during post-conviction proceedings. Bryant makes a claim in this federal habeas petition that the Rule 32 Court violated his constitutional due process rights by not allowing him such discovery, and the Court addresses and rejects that claim further in this Opinion *infra* Section V.F. In any event, Mr. Bevel's testimony about what he might have concluded had he been able to examine crime scene evidence for blood

extent the ACCA's decision relied on factual findings concerning the availability of blood spatter experts, the ACCA's decision was not based on an unreasonable determination of those facts based on the evidence presented. Moreover, the availability *vel non* of a blood spatter expert does not change the Court's conclusion that the ACCA reasonably determined that trial counsel made a reasonable strategic decision not to hire a blood spatter expert.

The ACCA did not unreasonably determine that Bryant failed to show that no competent counsel would have declined to retain a blood spatter expert to investigate evidence that was consistent with counsel's defense strategy. Consequently, Bryant is not entitled to federal habeas relief on this claim.

**5. Bryant's subclaim that trial counsel unreasonably failed to cross-examine Vickers effectively by failing to impeach him with his prior inconsistent statements to police (doc. 1 at 63–71, paras. 179–217)**

Bryant also alleges that his trial counsel was ineffective by failing to effectively cross-examine Vickers, one of the State's witnesses, during the guilt phase regarding Vickers' inconsistent statements to police before trial, which also differed from Vickers' trial testimony. In addition to his trial testimony, Vickers gave relevant statements to the police on January 29, 30, and 31, 1997. The subjects of Vickers' inconsistent statements fall into three primary categories: (1) Bryant's inculpatory statements to Vickers and Vickers' statements about Bryant's possession of a gun, (2) the sale of Hollis' cell phone,

spatter is relevant only to the prejudice prong of the *Strickland* analysis, and the Court holds that the ACCA reasonably concluded that Bryant had not established deficient performance.

and (3) the attempted sale or rental of Hollis' car.[16] According to Bryant, Vickers' testimony was critical for the State in two respects: (1) it helped the State convict Bryant of capital murder because Vickers testified that Bryant told him Bryant had killed Hollis and that Bryant forced Vickers to help move Hollis' body; and (2) it helped the State establish the aggravating circumstance that the murder was committed for pecuniary gain because Vickers testified that, after murdering Hollis, Bryant sought Mathis' help in selling Hollis' cell phone for crack and attempted to sell Hollis' car. (*See* doc. 10-7 at 7–88 (Vickers' trial testimony)).

For context, the Court summarizes the relevant portions of Vickers' statements below.

<u>Inculpatory Statements</u>: At trial, Vickers testified that when he was in the car with Bryant and after he saw Bryant's gun, Bryant told Vickers that Bryant had killed someone and that if he did not help Bryant, Bryant would kill him too. (Doc. 10-7 at 27–28). In his January 30, 1997 statement to police, Vickers said that he and Bryant drove to the location of Hollis' body before Bryant threatened Vickers' life. (Doc. 10-36 at 170). In his January 31 statement, however, Vickers said that Bryant told him Bryant had killed someone before Vickers got into the car. (*Id.* at 195). Then, according to Vickers, Vickers got into the car

[16] In the Rule 32 court, Bryant offered additional allegations in support of this ineffective assistance claim, including, for example, an allegation that counsel did not effectively cross-examine Vickers regarding what the State offered to Vickers in exchange for his testimony. (*See, e.g.*, doc. 10-26 at 78, para. 89); *see also Bryant*, 181 So. 3d at 1157–58 (outlining these additional allegations). Before this Court, however, Bryant focuses on counsel's alleged failure to effectively cross-examine Vickers concerning (1) Bryant's inculpatory statements and gun possession, (2) the sale of Hollis' cell phone, and (3) the attempted sale or rental of Hollis' car. Therefore, to the extent Bryant does not make specific allegations in this Court in support of this claim, the Court need not, and does not, consider them. Instead, the Court focuses on the allegations pleaded in Bryant's federal habeas petition and his arguments in support of the claim.

with Bryant, and Vickers did not mention fearing for his life. (*Id.*). Vickers additionally told police on January 31 that, at one point in the evening, Vickers—not Bryant—possessed the gun, and even when Vickers had the gun, he did not try to escape and voluntarily gave the gun to Bryant. (Doc. 10-37 at 5–6).

Sale of Hollis' Cell Phone: At trial, Vickers testified that Bryant drove to Mathis' house where they discussed the sale of a cell phone, after which Mathis took the phone to "some guy" in exchange for drugs. (Doc. 10-7 at 32–35). However, in his January 29 and 30, 1997 statements to the police, Vickers did not mention going to Mathis' house or Mathis' involvement with the cell phone. Indeed, in his January 29 and 30 statements, Vickers did not mention Bryant selling the cell phone or anything about the phone besides Bryant talking on it until January 30 when the police asked whether Bryant still had the cell phone; Vickers eventually said that Bryant had given the cell phone to a man standing at the corner of a store in exchange for drugs. (Doc. 10-36 at 177–78). Then, in his January 31, 1997 statement, Vickers told yet a different story: Vickers told police that Mathis (not Bryant) sold the phone to a "girl" (not a man) at her house (not on a corner). (Doc. 10-36 at 200–02).

Sale or Rental of Hollis' Car: At trial, Vickers testified that Bryant received drugs from "some dude," but he could not say whether Bryant tried to sell or rent Hollis' car in exchange for the drugs because he was not present during Bryant's conversation with the "dude." (Doc. 10-7 at 39–40). In his January 29, 1997 statement to police, Vickers did not mention an alleged sale or rental of the car. In his January 30 statement, however, Vickers said that Bryant tried to sell the car to a "dude," but the "dude" only wanted to rent the car,

although Vickers acknowledged he did not hear the conversation or see the exchange because Bryant and the "dude" had walked away. (Doc. 10-36 at 179–80). Vickers further told police on January 30 that Bryant had drugs when he returned to the car, and Bryant and Vickers then drove away in the car. (*Id.*). Then, in his January 31 statement, Vickers said that the "dude" gave Bryant some drugs in exchange for renting the car. (Doc. 10-37 at 5). In this version, a "girl" joined the "dude" and got into the front seat while Bryant and Vickers sat in the back seat, and the "dude" drove the car to a bus station. (*Id.*). Vickers also said that at the bus station, Bryant pulled the gun and drove away in the car with Vickers, leaving the "dude" and the "girl" behind. (*Id.* at 5–6).

While Bryant acknowledges that Yarbrough impeached Vickers' credibility in various areas, he contends that Yarbrough should have impeached Vickers more thoroughly concerning Bryant's inculpatory statements to Vickers as well as the sale of the cell phone and car, which Bryant submits were of central importance to the State's case. Bryant asserts that Yarbrough should have more extensively cross-examined Vickers about how the three statements he gave police in the days following the murder changed each time he gave them, and that they differed from each other and from his trial testimony. Bryant claims that targeting these inconsistencies would have called into question Bryant's statement that he killed Hollis, as well as existence of a cell phone or car sale at all, which was crucial evidence in support of the pecuniary gain aggravator.

Bryant exhausted this claim during his Rule 32 proceedings, and the state courts denied it on the merits, which means that review of this claim is limited to whether the state courts' decisions were reasonable under 28 U.S.C. § 2254(d). More specifically, Bryant

raised this claim in his first amended Rule 32 petition. (Doc. 10-26 at 78–79). After the Rule 32 Court summarily dismissed the petition, (*see* doc. 10-27 at 159–65); Bryant raised this issue on appeal to the ACCA, (doc. 10-28 at 76–81). The ACCA affirmed in part but remanded his case for the Rule 32 Court to hold an evidentiary hearing on three of his ineffective assistance of counsel claims, including Bryant's claim that "trial counsel at his first trial . . . were ineffective for failing to adequately impeach Ricky Vickers's testimony." *Bryant*, 181 So. 3d at 1129. After the evidentiary hearing, the Rule 32 Court again denied the claim, finding that Bryant's counsel's performance was not deficient in this regard. (Doc. 10-36 at 137).

Bryant appealed the Rule 32 Court's ruling to the ACCA. (Doc. 10-40 at 87–101). However, the ACCA affirmed the Rule 32 Court's ruling, reasoning as follows:

> In its order on remand, the circuit court made the following findings regarding this claim:
>
> > "[Bryant] alleges multiple inconsistencies in statements from Mr. Vickers that trial counsel could have used to impeach Mr. Vickers. Mr. Yarbrough testified that he was aware at the time of trial of some damaging information that could be introduced through Mr. Vickers that was not brought out during direct examination by the State. Further, Mr. Yarbrough testified that he used inconsistencies to impeach Mr. Vickers but proceeded cautiously in his cross-examination of Mr. Vickers to prevent the damaging information that he was aware of from being introduced. Lastly, he felt that Mr. Vickers's testimony on direct was not so helpful to the State. In his [post-hearing] briefs, [Bryant] also discusses trial counsel's lack of memory as to why he made certain decisions in the cross-examination of Mr. Vickers which occurred approximately fourteen years ago. Simply because Mr. Yarbrough cannot remember in 2012 specifically why he did or did not cover certain inconsistencies between Mr. Vickers's statement and his testimony at the trial approximately fourteen

> years ago does not have any bearing on whether he was effective. Further, [Bryant's Rule 32] counsel argues that the problem is not that Mr. Yarbrough did not impeach Mr. Vickers, but instead that he was ineffective in the way he impeached him and that had he done a better job of impeaching Mr. Vickers, a reasonable probability exists that [Bryant] would not have been convicted or may have avoided a death sentence. Simply because [Bryant's] Rule 32 counsel sets forth a multitude of ways Mr. Yarbrough could have better impeached Mr. Vickers doesn't mean Mr. Yarbrough was ineffective. Viewing the alleged deficiencies in Mr. Yarbrough's performance at the time of the trial rather than in hindsight, the Court finds that Mr. Yarbrough made well informed and reasonable strategic decisions at the time of trial with regard to whether and how to attempt to impeach Mr. Vickers. Accordingly, the Court finds that trial counsel was not ineffective by failing to adequately impeach Mr. Vickers."

(RTR, C. 1335.) These findings are supported by the record.

. . . .

With respect to Bryant's allegation that his counsel did not adequately impeach Vickers with Vickers's three prior inconsistent statements to police, at the evidentiary hearing Yarbrough said that he had reviewed Vickers's three statements to police before Bryant's trial but that he could not recall, at the time of evidentiary hearing, the specifics of those statements. However, Yarbrough stated that he had a strategic reason for not cross-examining Vickers about every inconsistency between his statements and his trial testimony. Specifically, Yarbrough said:

> "We had to be careful with Vickers, because there were some things that he had told our investigator about what had happened, and we were tip-toeing around certain things that he had told [the investigator]."

(RTR, R. 166.) According to Yarbrough, they "had to tiptoe around Vickers in [their] cross-examination of him, because of certain things that [they] knew that [they] may open the door up to." (RTR, R. 166.) Yarbrough further explained:

> "Do I recall specifically why I did not attack Vickers on some inconsistencies that may or may not have been in the police

> reports? No, I don't remember that. I do remember, though, that there were some things that we were concerned about—and to tell you today, I do not specifically remember—but that we thought Vickers could hurt us."

(RTR, R. 167–68.)

Yarbrough also testified that, in addition to trying to avoid bringing out damaging information from Vickers on cross-examination, during his testimony on direct examination by the prosecutor Vickers testified to some information that was not helpful to the prosecution and the prosecutor himself had to impeach Vickers with his prior inconsistent statements, which Yarbrough believed was helpful to the defense.[FN 12] Yarbrough explained:

> "I think his testimony, for the most part, was—we felt was going good for us, better than what we had probably expected. There were some things that we were afraid we were going to open the door on, and that's the reason we took the tactic—or I took the tactic that I did with Vickers."

(RTR, R. 187.) Overall, with respect to Vickers's testimony, Yarbrough said that he felt he had "made the points that [he] needed to make." (RTR, R. 188.)

> [FN 12] This testimony is supported by the record from Bryant's direct appeal, which reflects that Vickers was less than forthcoming during direct examination by the prosecutor, so much so that the trial court declared Vickers an adverse/hostile witness and allowed the prosecutor to use leading questions, over defense counsel's objection. The prosecutor also impeached Vickers with Vickers's prior inconsistent statements to police, and defense counsel used the State's impeachment of its own witness to argue that Vickers was not credible.

Bryant argues in his brief on return to remand that the circuit court erred in finding that Yarbrough's decision regarding how to cross-examine Vickers regarding his prior inconsistent statements was a reasonable strategic decision because, he says, the circuit court should not have "credited" Yarbrough's testimony that the nature and extent of his cross-examination of Vickers was strategically calculated to avoid eliciting information that would have been damaging to Bryant. (Bryant's RTR brief, p. 96.) Bryant appears

to argue that because Yarbrough was unable to recall, at the time of the evidentiary hearing, the exact details of each of Vickers's statements to police and Vickers's trial testimony, Yarbrough's testimony that he made a strategic decision regarding the cross-examination of Vickers was vague and conflicted with his otherwise lacking memory and was not sufficient to establish that he had a valid reason for not impeaching Vickers with the specific inconsistencies Bryant alleged in his first amended petition. In other words, Bryant's argument is based on his belief that Yarbrough's testimony was not credible. He even goes so far as to argue in his reply brief on return to remand that Yarbrough's explanation for not further impeaching Vickers with his prior inconsistent statements was simply "a pretext." (Bryant's RTR reply brief, p. 31.)

However, as noted above, "[t]he credibility of witnesses is for the trier of fact, whose finding is conclusive on appeal. This Court cannot pass judgment on the truthfulness or falsity of testimony or on the credibility of witnesses." *Hope v. State*, 521 So.2d 1383, 1387 (Ala.Crim.App.1988). It is well settled that, in order to be entitled to relief, a postconviction "petitioner must convince the trial judge of the truth of his allegation and the judge must 'believe' the testimony." *Summers v. State*, 366 So.2d 336, 343 (Ala.Crim.App.1978). See also *Seibert v. State*, 343 So.2d 788, 790 (Ala.1977). Bryant made the same argument regarding Yarbrough's credibility in his post-hearing brief in the circuit court, and the circuit court specifically rejected the argument, finding that Yarbrough's lack of memory regarding specific details some 14 years after Bryant's trial was not relevant in determining whether Yarbrough's actions at the time of trial constituted deficient performance. In other words, the circuit court found Yarbrough's testimony to be credible and, after thoroughly reviewing the record, we see no reason to disturb that finding on appeal.

"'The method and scope of cross-examination "is a paradigm of the type of tactical decision that [ordinarily] cannot be challenged as evidence of ineffective assistance of counsel."'" *Davis v. State*, 44 So.3d 1118, 1135 (Ala.Crim.App.2009) (quoting *State ex rel. Daniel v. Legursky*, 195 W.Va. 314, 328, 465 S.E.2d 416, 430 (1995)). "'"[D]ecisions whether to engage in cross-examination, and if so to what extent and in what manner, are . . . strategic in nature."'" *Hunt v. State*, 940 So.2d 1041, 1065 (Ala.Crim.App.2005) (quoting *Rosario–Dominguez v. United States*, 353 F.Supp.2d 500, 515 (S.D.N.Y. 2005), quoting in turn, *United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir.1987)). Moreover, what "[s]ubjects [are] covered during cross-examination are generally matters of trial strategy and left to the judgment of counsel." *State v. Mahoney*, 165 S.W.3d 563, 568 (Mo.Ct.App.2005). Yarbrough's decision regarding how to cross-examine

> and impeach Vickers was reasonable and strategically calculated to avoid eliciting or opening the door for the admission of damaging information about Bryant that was within Vickers's knowledge. Therefore, the circuit court properly denied Bryant relief on this claim of ineffective assistance of counsel.

*Bryant*, 181 So. 3d at 1159–62. As can be seen from the above quoted section, the ACCA first noted that Bryant did not question trial counsel at the evidentiary hearing specifically about why trial counsel did not ask certain questions of Vickers at trial. The ACCA thus concluded that the record was silent, and so Bryant had abandoned much of the claim. The ACCA also noted that trial counsel's decision regarding how to cross-examine Vickers was reasonably strategically calculated to avoid opening the door to damaging information about Bryant that was within Vickers' knowledge.

Bryant raised the claim again in his petition for certiorari in the Alabama Supreme Court, (doc. 10-43 at 73–94), but the Alabama Supreme Court denied the petition without an opinion, (*id.* at 225).

Under 28 U.S.C. § 2254(d), in order to obtain relief on this claim, Bryant must demonstrate that the decision of the ACCA, which was the last reasoned state court decision, *see Wilson*, 584 U.S. at 125, was contrary to, or an unreasonable application of, clearly established federal law as determined by the United States Supreme Court, or that it was based on an unreasonable determination of the facts that were before the state courts. *See* 28 U.S.C. § 2254(d).

Bryant contends that the ACCA's decision was unreasonable based on the facts before it because it ignored the importance of Vickers' testimony to the State. Indeed, Vickers was a key witness, as he testified that Bryant told him that he killed Hollis; that

Bryant forced him to help him dispose of Hollis's body; that the two drove to Florida to dump the body; and that the two discussed selling Hollis' cell phone with Mathis, whom Vickers claimed not to know. (Doc. 10-7 at 7–88). Bryant fails to show, however, that the ACCA unreasonably determined that Yarbrough performed adequatetely in cross-examining Vickers.

As an initial matter, before Yarbrough even had a chance to cross-examine Vickers, Maxwell had to impeach him as his own witness on direct examination by pointing to places in Vickers' statements to police that contradicted Vickers' testimony on the stand. (*See*, *e.g.*, doc. 10-7 at 19 (Maxwell asking, "Did you tell the police a different story than what you are telling here today?")). Those instances likely warned the jury to question Vickers' account of the night of the murder, which would have benefited the defense.

Then, Yarbrough pursued the theme that Vickers could not be trusted throughout his cross-examination. First, Yarbrough pointed out that Vickers had just told Maxwell something different than what he was telling Yarbrough. (*See id.* at 60–61 (Yarbrough saying, "That's not what you testified first when Mr. Maxwell asked you. . . . So you were telling a story to Mr. Maxwell then? . . . Well, you are either telling the truth or you are not telling the truth.")). Yarbrough also cross-examined Vickers on his prior inconsistent statements, including on topics that were critical to the defense theory that Bryant was at Mickey's Lounge when the murder took place and that Mathis actually killed Hollis and was thus lying when he testified that he merely helped sell Hollis' cell phone.[17]

[17] More specifically, the three times that Yarbrough asked Vickers about these inconsistencies in his statements to police were as follows:

Q. In your first statement, you didn't tell the police you went up to Mickey's Lounge, did you?
A. Not really.
Q. You didn't tell them that you and Jerry rode up to Mickey's Lounge any time that night, did you?
A. In the first statement, I didn't tell them nothing hardly.
Q. Well, okay. Maybe I am talking about the second statement. Did you tell them that you went to Mickey's Lounge?
A. Exactly.
Q. Did you or didn't you?
A. Uh-huh.
Q. Was it the second statement or third statement that you told them about Mickey's Lounge?
A. I didn't make but two statements.
Q. You didn't make a statement to the police on January the 28th, January the 29th and January the 30th or 31st? You didn't make three different statements?
A. Not that I can recall. I probably did; probably didn't.

. . . .

Q. . . . Did Raymond [Mathis] know about the body in the car?
A. Not at that time.
Q. Did you tell the police a different story?
A. Different story about what?
Q. If you would, read your statement that you gave the police. I think that's on the 31st or 30th or something.
A. Correct.
Q. You told the police that Raymond knew the body was in the car.
A. Yeah, the second time.
Q. That's not what that says. It says you went to his house.
A. That's right.
Q. He came outside and knew the body was in the car.
A. No. That's not true.
Q. So what you told the police is not true?

. . . .

Q. Now, again you say that you remember Jerry going and knocking on that door at Raymond's house that first time ya'll got there? Is that what happened?
A. Uh-huh.
Q. That's not what you told the police, is it, Mr. Vickers? If you would, read the bottom there. You told them that he blew the horn and he came out and he said, Where is the dope at?
A. That ain't what happened.
Q. So you lied to the police?
A. No. What I said—
Q. No, sir. You read your statement. Read your statement. Read it. Have you had a chance to read it?
A. Uh-huh.
Q. That's not what you told the police, is it?

Yarbrough also undermined Vickers' credibility in other areas: he got Vickers to admit the fact that after he spoke with police, his capital murder charge was reduced to hindering prosecution, (*id.* at 56–57); he elicited that Vickers smoked crack and drank alcohol on the night of the murder, (*id.* at 62, 74 (Yarbrough asking, "Were you messed up that bad? Were you high?")); he challenged Vickers' testimony on direct that Bryant had threatened to kill him if he didn't help him move the body, (*id.* at 65 (Yarbrough asking, "Now, if [Bryant] had unloaded his gun and there was no bullets in this gun, why would he tell you he was going to do you?")); and he got Vickers to acknowledge that he had prior felony convictions for drug distribution, (*id.* at 80). Finally, in Yarbrough's closing

---

A. Yeah. That's what I told them.
Q. You told the police that, I went up to this guy—wait. Went up to this guy named Raymond's house. Raymond who? Is what the officer says. I don't know his last name. Okay.
A. And I didn't.
Q. But we went up to the house. We pulled up in there. He blew the horn. Raymond came to the door. And Raymond came to the door. They like talking, you know. We can get rid of—you know where I can get rid of the cellular phone and stuff, man? No, he said. Where the dope at? Raymond said, [w]ell, man, it's too light, man. Ain't nobody out. Said, [y]ou know where I can get rid of the cell phone? And he said, Yeah. Do it work? You said he went up and blew the horn. That's what you told the police, wasn't it?
A. Exactly. But he knocked on the door.
Q. Is that not true?
A. That's true. But he went back. When he went back in the house to get his shoes, he knocked on the door.
Q. So he blew the horn and he came back out. And then Jerry went back up there and knocked on the door?
A. Yeah. And asked him was he ready.
Q. . . . do you even actually know what really happened?

. . . .

Q. I mean were you so high that you just don't remember or are you lying?

(Doc. 10-7 at 72–75, 77–78).

argument, he emphasized that Vickers was so unreliable of a witness for the State that the State had to impeach him. (Doc. 10-9 at 42 (Yarbrough calling Vickers an "absolute liar")).

Bryant insists that although Yarbrough did impeach Vickers regarding his inconsistent statements, Yarbrough focused on parts of Vickers' statements that were unimportant and did not adequately question Vickers about the most important details—Bryant's inculpatory statements and the sale of the cell phone and the car—which were critical to the State's ability to secure a murder conviction and to prove the pecuniary gain aggravator. But even if Yarbrough could have questioned Vickers more than he did about Vickers' prior inconsistent statements, Bryant nonetheless fails to show that the ACCA unreasonably determined that Yarbrough's performance was adequate. *See Gavin*, 40 F.4th at 1264 (explaining that when "§ 2254(d) applies, the question is not whether counsel's actions were reasonable" but instead "whether *there is any reasonable argument that counsel satisfied Strickland's deferential standard*" (emphasis in original) (quoting *Harrington*, 562 U.S. at 105)). The presumption in favor of trial counsel's competence is particularly strong in the area of cross-examination, given that "[t]he decision as to whether to cross-examine a witness is 'a tactical one well within the discretion of a defense attorney.'" *Fugate v. Head*, 261 F.3d 1206, 1219 (11th Cir. 2001) (quoting *Messer v. Kemp*, 760 F.2d 1080, 1090 (11th Cir. 1985)). Although Yarbrough testified at the evidentiary hearing that he could not remember specifically why he did not cross-examine Vickers on some inconsistencies in his prior statements to police, Yarbrough did remember that he wanted to avoid having information come out through Vickers' testimony that was damaging to Bryant's defense. (Doc. 10-38 at 178–80). True, Yarbrough also could not

remember the purportedly damaging information he feared eliciting from Vickers. But notwithstanding Yarbrough's lack of memory, the Rule 32 Court credited Yarbrough's testimony, and the ACCA declined to disturb this credibility determination. *See Bryant*, 181 So. 3d at 1162 (observing that the Rule 32 Court found Yarbrough's testimony to be credible). "The credibility of a witness is a question of fact entitled to a presumption of correctness under AEDPA," and absent "clear and convincing evidence," this Court may not disturb the state court's "credibility determinations of the Rule 32 witnesses." *Jenkins v. Comm'r, Ala. Dep't of Corr.*, 963 F.3d 1248, 1272 (11th Cir. 2020) (quoting *Bishop v. Warden*, 726 F.3d 1243, 1259 (11th Cir. 2013)). Bryant has not marshaled clear and convincing evidence sufficient to disturb the state court's credibility determination. Thus, on this record, the ACCA's determination that Yarbrough's approach to cross-examining Vickers was based on reasonable strategy, and ultimately not deficient, was not unreasonable.

It was also not unreasonable for the ACCA to find no deficient performance in trial counsel's cross-examination of Vickers with respect to Bryant's inculpatory statements to Vickers—among others, that he killed Hollis—and Bryant's possession of a gun. Counsel could have reasonably concluded that further cross-examination on these topics would have unduly focused the jury's attention on testimony that Bryant had admitted committing the murder and had possessed a gun, which counsel reasonably could have thought would be

unhelpful or damaging to Bryant's defense.[18] At the very least, there is a "reasonable argument" that counsel's decision not to pursue further cross-examination of Vickers on these topics was reasonable. *See Harrington*, 562 U.S. at 105.

Bryant also contends that he was prejudiced by his trial counsel's failure to adequately impeach Vickers. The ACCA did not address this prong of *Strickland*, so this Court considers it *de novo*. *See Rompilla*, 545 U.S. at 390. Upon review, the Court concludes that Bryant cannot establish a reasonable probability that the outcome of his trial would have been different if his counsel had more thoroughly impeached Vickers. As explained above, Bryant's counsel did cross-examine Vickers regarding his inconsistent statements, including Vickers' inconsistent testimony during the trial itself, which cross-examination was in addition to the prosecutor's own impeachment of Vickers. Thus, the jury already had ample reason to doubt Vickers' version of events. Nonetheless, the jury found Bryant guilty of murder, and the trial court found that the commission of the murder for pecuniary gain was an aggravating circumstance. Moreover, although Vickers did not mention going to Mathis' house or Mathis' involvement in the sale of the cell phone in his first two statements to police, any impeachment value on these details would have been minimized by the fact that Vickers did discuss Mathis' involvement in his final statement to police on January 31, 1997, (doc. 10-36 at 201–02), which was generally consistent with his trial testimony, (doc. 10-7 at 33–35). Bryant has not shown by a reasonable probability

[18] Although the state courts did not articulate this justification in deciding the ineffective assistance claim, this Court's assessment of the "reasonableness of a state court's reasons for its decision" is not limited to "the particular justifications that the state court provided"; instead, this Court "may consider any potential justification for [the state court's] reasons." *Pye v. Warden, Ga. Diagnostic Prison*, 50 F.4th 1025, 1036 (11th Cir. 2022) (en banc) (emphases omitted).

that, if trial counsel had more thoroughly impeached Vickers on these details, the jury would not have convicted Bryant of murder or found that Bryant disposed of the cell phone for pecuniary gain.

Bryant has not overcome the deference afforded to the ACCA's decision under AEDPA, and he is not entitled to relief on this claim.

**D. Bryant's Claim that Resentencing Counsel Rendered Ineffective Assistance (Doc. 1 at 71–85, paras. 218–77)**

Bryant also claims that his resentencing counsel, Crespi, was ineffective during his penalty phase retrial in two ways, amounting to a violation of his Sixth Amendment right to counsel. Before turning to these allegations, the Court sets out the framework for evaluating ineffective assistance claims in the capital sentencing context.

To establish *Strickland* prejudice in the capital sentencing context, "the question is whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695. "In determining whether there is a reasonable probability of a different result, a court must 'consider "the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding"—and "reweig[h] it against the evidence in aggravation."'" *Gavin*, 40 F.4th at 1263 (alteration in original) (quoting *Porter*, 558 U.S. at 41). Again, as to both prongs of the *Strickland* analysis, when 28 U.S.C. § 2254 applies, the issue is not whether counsel's actions were reasonable but whether "there is any reasonable argument that counsel

satisfied *Strickland*'s deferential standard." *Harrington*, 562 U.S. at 105; *see also Johnson*, 643 F.3d at 910–11 (explaining the "double deference" standard).

**1. Bryant's subclaim that resentencing counsel failed to challenge Vickers' unavailability during the penalty phase retrial (doc. 1 at 71–81, paras. 218–61)**

Bryant first alleges that his resentencing counsel was ineffective for failing to challenge the State's proffer that Vickers could not be located and thus was unavailable to testify under Rule 804(a)(5) of the Alabama Rules of Evidence, thereby allowing the State to read Vickers' prior testimony from Bryant's first trial into the record. Bryant acknowledges that Crespi, his appellate and resentencing trial counsel, argued that the State had not made the required showing of unavailability and that the State's attempts to locate Vickers were not sufficient. (Doc. 10-16 at 143–48). However, Bryant argues that Crespi should have raised additional arguments, including that the State bore the burden of proving unavailability and the State did not demonstrate due diligence, and that Crespi should have identified other places that the State could have looked for Vickers.

The Respondent contends that the ACCA decided this claim on the merits in Beckworth's Rule 32 proceedings, and so this Court reviews it for reasonableness under 28 U.S.C. § 2254(d). However, a careful review of the record reveals that this claim is procedurally defaulted from review because Bryant did not exhaust it during state post-conviction review because he failed to raise it in his petition for a writ of certiorari in the Alabama Supreme Court.

Bryant raised this claim in his first amended Rule 32 petition. (Doc. 10-26 at 83–85). After the Rule 32 Court summarily dismissed the petition, (*see* doc. 10-27 at 159–65), Bryant raised this issue on appeal to the ACCA, (doc. 10-28 at 60–61, 78–81). The ACCA affirmed in part but remanded his case for the Rule 32 Court to hold an evidentiary hearing on three of his ineffective assistance of counsel claims, including his claim "trial counsel at his second penalty-phase trial were ineffective for failing to adequately challenge Vickers's unavailability." *Bryant*, 181 So. 3d at 1129. After the hearing, at which Crespi and Vickers himself testified, the Rule 32 Court again denied the claim, finding that Bryant's counsel's performance was not deficient. (Doc. 10-36 at 137–39).

Bryant again appealed to the ACCA. (Doc. 10-40 at 101–19). The ACCA affirmed the Rule 32 Court's ruling, reasoning:

> Finally, Bryant alleged in his first amended petition that his trial counsel at his second penalty-phase trial was ineffective for not adequately contesting Vickers's unavailability with counsel's own knowledge of Vickers's whereabouts. Specifically, Bryant alleged:
>
>> "Resentencing counsel failed to effectively challenge the State's proffer of Ricky Vickers's trial transcript instead of live testimony because Ricky Vickers was 'unavailable' to testify under Ala. R. Evid. 804(a)(5). (R. 11–19; R. 316–18 Remand.) The Alabama Supreme Court stated in *Ex parte Scroggins*, 727 So.2d 131 (Ala.1998), that the prosecution must make 'a good faith effort to obtain the presence of the declarant at trial' in order to offer the statement of a witness who is not present at trial and satisfy the right of confrontation. The State must exercise due diligence in its attempt to procure the presence of a witness. *Johnson v. State*, 623 So.2d 444 (Ala.Crim.App.1993). The court imposes a high standard for proving that such due diligence took place. The party seeking to introduce the declarant's statement has to show that it is unable to procure the declarant's attendance either by legal

process or by other reasonable means. *Williams v. Calloway*, 281 Ala. 249, 251–52, 201 So.2d 506, 508 (Ala.1967).

"Resentencing counsel was ineffective for failing to demonstrate to the Court that the State did not exercise due diligence in its search for Ricky Vickers. On the first day of [the second penalty-phase] trial, the State indicated that it would be offering the transcript of Vickers's prior trial testimony because Vickers could not be located during the previous weekend. (R. 11–12 Remand.) Resentencing counsel never pointed out that the State did not exercise due diligence in procuring Vickers for trial. Resentencing counsel failed to point out that the 'Bottoms', the neighborhood where Vickers resided, spans just a couple of streets and thus it would have been very easy for the Houston County Sheriff's Office to canvass the neighborhood in search of Vickers. Resentencing counsel did not argue that the State had failed to meet the due diligence standard by questioning only those people closest to Vickers, who had strong motives to keep his whereabouts secret.

"In fact, resentencing counsel was aware of Vickers's whereabouts and knew of individuals who could testify to Vickers's location. In fact, in a recent interview with Vickers, he stated that he remembers being in the Bottoms and that he was accessible at the time that Bryant's resentencing hearing occurred. This alone, establishes the fact that the State did not exercise due diligence in attempting to procure Vickers for trial. Resentencing counsel were ineffective because they should have requested a recess to procure witnesses, including Vickers himself, to testify to Vickers's whereabouts and demonstrate that the State did not exercise due diligence in its search for Vickers.

"While resentencing counsel did not bear the burden of producing Vickers for trial, resentencing counsel did have the responsibility to demonstrate that the State's search for Vickers fell below the standard of due diligence. Resentencing counsel was ineffective because they did not challenge whether the State had met its burden to show that Vickers was 'unavailable' when the facts clearly demonstrated that Vickers was available to testify. This failure is particularly acute because Vickers's hearsay testimony is the only evidence linking Bryant to the

> alleged sale of Hollis's cell phone. The sale of the cell phone is one of only two aggravating factors on which the State relied in seeking the death penalty. Removal of Vickers's hearsay testimony was crucial to Bryant's defense."

(C. 481–83.)

Initially, we point out that Bryant's general allegations in his amended petition that counsel at his second penalty-phase trial, Michael Crespi, "never pointed out that the State did not exercise due diligence in procuring Vickers for trial" and "did not challenge whether the State had met its burden to show that Vickers was 'unavailable'" are belied by the record from the transcript of Bryant's second penalty-phase trial. Crespi did, in fact, strenuously object to the State's using Vickers's previous trial testimony against Bryant, and he argued that the State had not adequately established that Vickers was unavailable. The issue of Vickers's unavailability was thoroughly litigated just before the second penalty-phase trial began and was decided adversely to Bryant by the trial court. Also, the issue was argued on appeal and rejected by this Court. Specifically, this Court held:

> "The State offered the following facts in support of its claim that it had exercised due diligence in attempting to secure the attendance of Ricky Vickers to testify at Bryant's new sentencing hearing: Upon contacting the Department of Corrections ('DOC') to secure Vickers's attendance, the prosecution was informed that Vickers had completed his sentence and that he was no longer in the custody of DOC. The prosecution also contacted the Board of Pardons and Paroles to see if it had an address for Vickers, but was told that Vickers had completed his sentence and was no longer required to report to it. An investigator was sent out to question Vickers's family members about his location. When questioned about Vickers's whereabouts, various members of Vickers's family advised the investigator that they did not know where he was. Some speculated that Vickers might be at his girlfriend's house, but were either unwilling or unable to supply the State with a name or address for the girlfriend. When Vickers's grandmother told investigators that he might 'come by,' the State issued a subpoena for Vickers 'in care of his grandmother's house,' and had a Houston County sheriff's deputy spend three days attempting to locate and serve Vickers with the subpoena.

> "Given these circumstances, we conclude that the State proved that it used due diligence in an attempt to secure the attendance of Ricky Vickers. The State did 'more than simply issue a subpoena and stop when it [was] returned "not found."' *Flowers v. State*, 799 So.2d [966,] 980 [(Ala.Crim.App.1999)] (opinion on return to remand) (quoting *Manuel v. State*, 803 P.2d 714, 716 (Okla.Crim.App.1990)). We know of no prescribed period of time that the State is required to search for a witness in order to have exercised 'due diligence.' Certainly, some individuals will be easier to find than others. As a convicted felon and acquaintance of Bryant's, Vickers obviously had no desire to be found by the State's investigator or by a sheriff's deputy. If located, he would be required to testify against Bryant. ""'Rule 804(a)(5) does not require a proponent to butt his head against a wall just to see how much it hurts.'"' *Flowers v. State*, 799 So.2d at 980 (opinion on return to remand) (quoting *Urbano v. State*, 808 S.W.2d 519, 522 (Tex.App.1991), quoting in turn, *United States v. Kehm*, 799 F.2d 354, 360 (7th Cir.1986)). The State having exhausted all leads and expended considerable resources in its attempt to locate Vickers, we cannot say that the trial court abused its discretion when it determined that Vickers was an 'unavailable witness' and permitted the State to read Vickers's previous testimony into the record at Bryant's new sentencing hearing."

*Bryant III*, 951 So.2d at 743.

Therefore, contrary to Bryant's belief, this Court did not remand this case to allow Bryant an opportunity to generally relitigate the issue of Vickers's unavailability. Rather, this Court found this specific claim to be sufficiently pleaded because it was "based on additional evidence that [Bryant] claimed *was not*, but should have been, presented to the trial court and this Court regarding Vickers's unavailability." *Bryant IV*, 181 So.3d at 1116 (some emphasis added). The only additional *evidence* that Bryant alleged in his first amended petition was known to counsel but not presented to the trial court was that Crespi was aware of Vickers's specific whereabouts at the time of the second penalty-phase trial and also knew of specific individuals who could testify to Vickers's whereabouts, including Vickers himself, and that Crespi should have requested a continuance so that he could present the testimony of those witnesses.[FN 14]

> [FN 14] Bryant also alleged in his first amended petition that his counsel should have made additional *arguments* to the trial

> court in support of his objection. Specifically, Bryant alleged that Crespi should have argued that the neighborhood where Vickers lived, known as the "Bottoms," was small and could have easily been canvassed by law enforcement and that the State should have contacted people other than Vickers's family members in their attempts to locate him. Suffice it to say, after thoroughly reviewing the record from the second penalty-phase trial, we conclude that these additional arguments would not have made any difference in the trial court's, and subsequently this Court's, conclusion that the State had exercised due diligence in its attempts to locate Vickers.

However, Bryant does not even mention this specific allegation in his brief on return to remand, much less make any argument regarding it.[FN 15] It is well settled that this Court "will not review issues not listed and argued in brief." *Brownlee v. State*, 666 So.2d 91, 93 (Ala.Crim.App.1995). "'[A]llegations . . . not expressly argued on . . . appeal . . . are deemed by us to be abandoned.'" *Burks v. State*, 600 So.2d 374, 380 (Ala.Crim.App.1991) (quoting *United States v. Burroughs*, 650 F.2d 595, 598 (5th Cir.1981)). Because Bryant chose not to pursue this allegation in his brief on return to remand, it is deemed to be abandoned.

> [FN 15] Rather, Bryant makes all new arguments on appeal regarding this claim of ineffective assistance of counsel—new arguments based on factual assertions that were not included in Bryant's first amended petition and, thus, for the reasons stated in Part II.A. of this opinion, are not properly before this Court for review and will not be considered.

Nonetheless, out of an abundance of caution, we also note that this specific allegation is meritless based on the evidence presented at the evidentiary hearing. Contrary to the allegation Bryant made in his first amended petition, Crespi testified that he did not know Vickers's location at the time of the second penalty-phase trial. Additionally, Vickers testified at the hearing that he never spoke with Bryant's attorneys in 2004 and, therefore, they could not have known his location at that time. As noted in Part II.A. of this opinion, we remanded this case to give Bryant an opportunity to present evidence to prove the specific facts he had alleged in his first amended petition. Bryant failed to do so; he failed to prove that Crespi knew Vickers's whereabouts at the time of the second penalty-phase trial. After thoroughly reviewing the Rule 32 record as well as the record of Bryant's second penalty-phase trial, we agree with the circuit court that counsel's performance in this regard was not deficient. Therefore, the circuit

> court properly denied Bryant relief on this claim of ineffective assistance of counsel.

*Bryant*, 181 So. 3d at 1165–68. As can be seen from the foregoing, the ACCA held that Bryant abandoned the claim, but it also denied it on the merits. However, as noted previously, Bryant did not include this claim in his petition for certiorari in the Alabama Supreme Court. (Doc. 10-43 at 2–120 (entire petition)).

Because he did not raise this claim in his petition for certiorari in the Alabama Supreme Court, Bryant has not satisfied § 2254(b)(1)'s exhaustion requirement, and he is procedurally barred from raising this claim in a federal habeas petition. *See O'Sullivan*, 526 U.S. at 845–47 (concluding that the petitioner must marshal the claim through one entire round of the state's appeal process, including in a petition for discretionary review in the highest court of the state if such review is part of the state's appellate procedure); *Hunt*, 666 F.3d at 730 (explaining that an Alabama prisoner must petition the Alabama Supreme Court for certiorari review to exhaust all available remedies). Further, dismissal of his habeas petition to allow him to present this claim in the Alabama Supreme Court now would be futile because the time for filing such a certiorari petition has long passed, and the certiorari petition that he did file has long since been denied. *See* ALA. R. APP. P. 39(c)(2) (providing that a petition for further review by the Alabama Supreme Court must be filed within fourteen days after the ACCA's opinion). Thus, because any state remedy with respect to this claim is procedurally barred by these state procedural rules, the claim is procedurally defaulted from habeas review. *See McNair*, 416 F.3d at 1305.

Although the State may waive a procedural default defense, including exhaustion, AEDPA provides that "[a] State shall not be deemed to have waived the exhaustion requirement . . . unless the State, through counsel, expressly waives the requirement." 28 U.S.C. § 2254(b)(3); *see also Dill v. Holt*, 371 F.3d 1301, 1302 n.1 (11th Cir. 2004) (stating that AEDPA requires a court to address exhaustion when it is not expressly waived by the State). Although the Respondent has not identified this claim as unexhausted in his briefs to this Court, he also has not expressly waived the exhaustion requirement.

Thus, because Bryant failed to properly exhaust this claim, the Respondent has not expressly waived that failure to exhaust, and this claim could no longer be pursued in state court if this Court dismissed Bryant's petition to return to state court, this claim is procedurally defaulted. *See McNair*, 416 F.3d at 1304–05 (holding the same in a case where the state did not expressly waive exhaustion). Consequently, Bryant is not entitled to relief on this claim.

**2. Bryant's subclaim that resentencing counsel failed to impeach Vickers' trial testimony, which was read into the record during Bryant's penalty phase retrial, with Vickers' prior inconsistent statements to police (doc. 1 at 81–85, paras. 262–77)**

Bryant also alleges that his resentencing counsel was ineffective for failing to impeach Vickers' trial testimony, which was read into the record at his penalty phase retrial, with inconsistencies from Vickers' prior statements to police shortly after the murder. Bryant acknowledges that the trial court ruled that his counsel could not interpose objections during the reading of Vickers's trial testimony. He also acknowledges that, shortly after the testimony was read into the record, his counsel successfully moved to have

another of Vickers' prior felony conviction admitted into the record that had not been introduced at the first trial. (Doc. 10-18 at 119–20). However, Bryant argues that resentencing counsel could have called the police officers to whom Vickers gave statements to testify about what Vickers said in order to highlight inconsistencies between Vickers' prior statements and his trial testimony. Bryant argues that his counsel's failure to do so prejudiced him because Vickers' testimony was the main evidence that Bryant sold Hollis' cell phone and tried to sell his car, which provided a basis for the pecuniary gain aggravator.

Bryant exhausted this claim during his Rule 32 proceedings, and the state courts denied it on the merits, which means that review of this claim is limited to whether the state courts' decisions were reasonable under 28 U.S.C. § 2254(d). Bryant raised this claim in his first amended Rule 32 petition. (Doc. 10-26 at 85). After the Rule 32 Court summarily dismissed the petition, (*see* doc. 10-27 at 159–65), Bryant raised this issue on appeal to the ACCA, (doc. 10-28 at 76). The ACCA affirmed in part but remanded his case for the Rule 32 Court to hold an evidentiary hearing on three of his ineffective assistance of counsel claims, including his claim that "that trial counsel at his . . . second penalty-phase trial were ineffective for failing to adequately impeach Ricky Vickers's testimony." *Bryant*, 181 So. 3d at 1129. After the hearing, the Rule 32 Court again denied the claim, finding that Bryant failed to establish that he was prejudiced. (Doc. 10-36 at 139–40).

Bryant appealed to the ACCA. (Doc. 10-40 at 49–90). The ACCA affirmed the Rule 32 Court's decision, reasoning:

In his first amended petition, Bryant also alleged that his trial counsel at his second penalty-phase trial was ineffective for not adequately impeaching Vickers by introducing evidence of his prior statements to police. Specifically, Bryant alleged:

> "Resentencing counsel was also ineffective by not impeaching Vickers's trial testimony with prior inconsistent statements made by Vickers on several other occasions, including statements made to police on January 29 and 30, 1997. Resentencing counsel only focused on Vickers's prior convictions to impeach Vickers; this was not effective because Vickers's previous convictions were revealed during his transcript testimony. (R. 386–395 Remand.) In fact, the State did not even object to the introduction of an additional conviction because he didn't think the admission of additional convictions would 'make a big difference anyway.' (R. 392–95 Remand.) Resentencing counsel acted ineffectively because he did not offer Vickers'[s] prior inconsistent statements to police that demonstrate that Vickers clearly changed his story on a number of occasions. . . ."

(C. 483.)

In its order on second remand, the circuit court stated, in relevant part, the following regarding this claim:

> "'When reviewing claims of ineffective assistance of counsel during the penalty phase of a capital trial we apply the following legal standards.
>
> "'"When the ineffective assistance claim relates to the sentencing phase of the trial, the standard is whether there is 'a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."
>
> "'In *Wiggins v. Smith*, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), the United States Supreme Court in reviewing a claim of ineffective assistance of counsel at the penalty phase of a capital trial, stated:

> """In *Strickland v. Washington*, 466 U.S. 668 (1984), we made clear that, to establish prejudice, a 'defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' *Id.*, at 694. In assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence."'

"*Davis v. State*, 44 So.3d 1118, 11[37] (Ala.Crim.App.2009) (citations omitted).

". . . .

"The testimony given by Mr. Crespi at the Rule 32 hearing with regard to the allegations of ineffective assistance of counsel based on his failure to impeach the prior testimony of Mr. Vickers by use of his alleged inconsistent statements to the police officers is summarized as follows: Mr. Crespi testified that he was aware that Mr. Vickers gave three statements to at least two different police officers over the course of three days; to wit: January 29, 1997, January 30 1997, and January 31, 1997. Further, he believes that he was in possession of each of the three statements at the time of the second penalty phase [trial]. He had assessed the importance of Vickers's testimony to the State's case prior to beginning the resentencing trial; specifically, Vickers alleged involvement in getting the body of the deceased put in the car and moved to Florida, the alleged sale of the cell phone, and the events Vickers claimed happened in Tallahassee culminating in the return to Dothan from the Live Oak area of Florida, all of which the State alleged showed an intentional killing for pecuniary gain as an aggravating circumstance. Also, Mr. Crespi testified of his intent to cross-examine Vickers regarding the sale of the cell phone and other issues that he testified about regarding pecuniary gain had Vickers been present. He further testified that he did not attempt to offer Vickers's statements to the police to impeach Vickers's testimony because the thought of doing so did not occur to him and not doing so was not part of any strategy. However, he did

offer the felony convictions of Vickers for impeachment of Vickers's testimony from the first trial.

"It is the duty of the Court to analyze counsel's performance at the time of representation and not with hindsight. Almost invariably, an attorney will analyze his own performance in any trial and second guess whether he should have done something differently, especially if the outcome is not favorable. It is even easier to second guess someone else's actions and decisions. Although [Bryant's Rule 32] attorneys have alleged that Mr. Crespi was ineffective for not impeaching Mr. Vickers's testimony with the inconsistent statements that he gave to the police officers, they did not ask Mr. Crespi any questions regarding any of the specific inconsistent statements that they contend should have [been] used to impeach Mr. Vickers's testimony. Yet, in their briefs in support of the Rule 32 Petition they allege several inconsistencies that they believe should have been introduced into evidence to impeach Mr. Vickers's testimony. The Court finds that Bryant's attorney at the second penalty phase [trial] impeached Vickers with felony convictions but did not attempt to elicit testimony from police officers regarding Mr. Vickers's prior inconsistent statements. The Court reviewed the alleged inconsistencies in Mr. Vickers's statements to the police officers set forth in [Bryant's] Petition, which [Bryant's] attorneys did not specifically address with Mr. Crespi. The Court finds that even if Mr. Vickers's alleged inconsistent statements had been presented to the jury, the jury may still have found that Petitioner killed the victim and disposed of the cell phone for pecuniary gain and that such aggravating circumstances outweighed any mitigating circumstances, warranting a sentence of death. Therefore, the Court finds that [Bryant] has failed to demonstrate 'a reasonable probability that, absent the [alleged] errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.' *Davis v. State*, 44 So.3d [1118, 1137 (Ala.Crim.App.2009)], citing *Strickland v. Washington*. Furthermore, as the jury's verdict was an advisory verdict, the trial judge, the Honorable Edward Jackson, determined the sentence to be imposed pursuant to Ala. Code § 13A–5–47. The Court finds that, even if Mr. Vickers's inconsistent statements had been presented and the jury [had] returned an advisory verdict of life without parole, a

> reasonable probability exists that Judge Jackson may have found that the aggravating circumstances outweighed the mitigating circumstances and may have entered a sentence of death. Accordingly, the Court finds [that Bryant] has failed to show that the result of the penalty phase would have been different . . . i.e., the jury would have rendered an advisory verdict of life without parole and the trial court also would have entered a sentence of life without parole.
>
> "In conclusion, the Court finds that trial counsel at his second penalty phase trial was not ineffective for failing to adequately impeach Ricky Vickers's testimony by not introducing into evidence at the second penalty phase trial several prior statements Vickers had made to police that were inconsistent with his trial testimony."

(Record on Return to Second Remand ("RTR2"), C. 6–8.)

In his brief on return to second remand, Bryant argues that the circuit court used an incorrect standard in analyzing this claim of ineffective assistance of counsel. Specifically, Bryant takes issue with the circuit court's statements that "the jury may still have found" that the murder was for pecuniary gain and that the aggravating circumstances outweighed the mitigating circumstances, that even had the jury recommended a sentence of life imprisonment without the possibility of parole the trial judge "may have found that the aggravating circumstances outweighed the mitigating circumstances and may have entered a sentence of death," and that Bryant failed to prove that "the result of the penalty phase would have been different . . . i.e., the jury would have rendered an advisory verdict of life without parole and the trial court also would have entered a sentence of life without parole." (RTR2, C. 8.) The burden imposed by the circuit court, Bryant argues, was much higher than the "reasonable probability" test enunciated in *Strickland* and requires that the circuit court reconsider this claim a third time. We disagree.

In its order, the circuit court correctly set forth the standard under *Strickland* for evaluating claims of ineffective assistance of counsel relating to the penalty phase of a capital trial—whether there is a reasonable probability that, absent the errors, the sentencer, including the appellate court, would have concluded that the balance of aggravating and mitigating circumstances did not warrant death. Additionally, there is a presumption that circuit judges know the law and follow it in making their decisions. See *Ex parte Slaton*, 680 So.2d 909, 924 (Ala.1996) ("Trial judges are presumed

to follow their own instructions, and they are presumed to know the law and to follow it in making their decisions."). Although the circuit court's order contains imprecise language and is not artfully worded, it is clear to us from reading the order as a whole that the circuit court knew the correct standard for analyzing ineffective-assistance-of-counsel claims and applied that standard in determining that counsel's performance did not prejudice Bryant.

Moreover, we agree with the circuit court that counsel's failure to introduce evidence of Vickers's prior inconsistent statements to police did not prejudice Bryant.[FN 13] The jury was well aware that Vickers had multiple prior felony convictions and that he had initially been arrested for capital murder in connection with Hollis's death but that the charge had been reduced to hindering prosecution in exchange for Vickers's cooperation. In other words, the jury knew that Vickers had a strong incentive to lie—specifically, to minimize his role in Hollis's murder and to maximize Bryant's role in Hollis's murder. We have thoroughly reviewed the record of the second penalty-phase trial as well as Vickers's three statements to police, which were introduced into evidence at the Rule 32 hearing. Although there were several inconsistencies among the three statements as well as between the statements and Vickers's trial testimony, those inconsistencies are not nearly as stark as Bryant makes them out to be, and many of those inconsistencies were highlighted during Vickers's testimony. Even had the three prior inconsistent statements been presented to the jury in their entirety, we are convinced beyond a doubt that there is no reasonable probability that "the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695. Therefore, the circuit court properly denied Bryant relief on this claim of ineffective assistance of counsel.

> [FN 13] Because we conclude that Bryant was not prejudiced, we need not specifically address whether counsel's performance was deficient.

*Bryant*, 181 So. 3d at 1162–65.

Bryant raised this claim again in his petition for certiorari in the Alabama Supreme Court, (doc. 10-43 at 90–102), but the Alabama Supreme Court denied the petition without an opinion, (*id.* at 225).

Under 28 U.S.C. § 2254(d), in order to obtain relief on this claim, Bryant must demonstrate that the decision of the ACCA, which was the last reasoned state court decision, *see Wilson*, 584 U.S. at 125, was contrary to, or an unreasonable application of, clearly established federal law as determined by the United States Supreme Court, or that it was based on an unreasonable determination of the facts that were before the state courts. *See* 28 U.S.C. § 2254(d).

Bryant takes issue with two aspects of the ACCA's decision that he failed to show that his resentencing counsel's failure to impeach Vickers' testimony prejudiced him. First, Bryant challenges the ACCA's holding that Bryant did not demonstrate prejudice because there was already evidence before the jury at the resentencing trial that Vickers had a motive to lie and minimize his role in Hollis' murder. Bryant claims that the ACCA unreasonably determined the facts because his guilt was not at issue in the second penalty phase trial, which Bryant contends makes Vickers' role in Hollis' murder irrelevant. However, in light of the state court record, the ACCA's decision was not based on an unreasonable determination of the facts because although Bryant's guilt was already established during the second penalty phase trial, Vickers' overall credibility was still relevant to the existence of aggravating circumstances, particularly the pecuniary gain aggravator.

Bryant also takes issue with the ACCA's finding that Bryant did not demonstrate prejudice because the inconsistencies between Vickers' prior statements to police and his trial testimony "are not nearly as stark as Bryant makes them out to be, and many of those inconsistencies were highlighted during Vickers's testimony." *Bryant*, 181 So. 3d at 1165.

Bryant claims that this decision was based on an unreasonable determination of the facts. The Court disagrees. As explained earlier *supra* Section V.C.5., although Vickers did not mention Mathis' involvement until his third statement to police, Vickers's third and final statement to police was in most respects consistent with his trial testimony: that Mathis helped Bryant sell Hollis' cell phone to someone Mathis did not know. The ACCA reasonably concluded that there was not a reasonable probability that further impeachment on these details in Vickers' initial statements would have led the jury and the trial court to conclude that the balance of aggravating and mitigating circumstances did not warrant death. Thus, the ACCA's decision that Byrant failed to show prejudice was neither contrary to, nor an unreasonable application of, *Strickland*.

Accordingly, Bryant is not entitled to habeas relief on this claim.

### E. Bryant's Claim that the Admission of Vickers' Prior Trial Testimony at his Resentencing Trial Violated the Confrontation Clause (Doc. 1 at 85–86, paras. 278–85)

Bryant also contends that the trial court violated his rights under the Confrontation Clause when it admitted Vickers' prior trial testimony and allowed it to be read into the record during Bryant's resentencing trial. In *Crawford v. Washington*, 541 U.S. 36, 51–52 (2004), the Supreme Court held that Sixth Amendment's Confrontation Clause bars admission of a witness's out-of-court testimonial statement unless the witness is unavailable and the defendant had a prior opportunity to cross-examine that witness.

Bryant exhausted this claim on direct appeal following his resentencing, and the state courts denied it on the merits, which means that review of this claim is limited to whether the state courts' decisions were reasonable under 28 U.S.C. § 2254(d). Bryant

appealed the trial court's ruling that Vickers' testimony could be read into the record. (Doc. 10-21 at 13; *see also id.* at 52–53). However, the ACCA affirmed the trial court's decision, reasoning as follows:

> Bryant next argues that the circuit court erred when it admitted the prior trial testimony of Ricky Vickers as an unavailable witness, rather than requiring the State to produce the witness in person.
>
> Rule 804(a)(5), Ala.R.Evid., provides that a declarant is unavailable when he or she:
>
>> "(5) is absent from the hearing and the proponent of the statement has been unable to procure the declarant's attendance . . . by process or other reasonable means."
>
> The Alabama Supreme Court set out in *Ex parte Scroggins*, 727 So.2d 131 (Ala.1998), the requirements a prosecutor must meet in order to overcome a defendant's Sixth Amendment right to confront witnesses against him and to be permitted to use the former testimony of a witness the State says is unavailable:
>
>> "When the prosecution seeks to introduce, against a criminal defendant, the former testimony of a now unavailable witness, its burden in seeking the witness's presence is enhanced by the defendant's Sixth Amendment right to confront witnesses. *Ex parte Wright*, 625 So.2d 1135, 1136 n. 2 (Ala.1993). Thus, when at trial the State wishes to use a person's statement against a criminal defendant, in order for that statement to be admissible the State must either produce as a witness the person whose statement it wishes to use or else demonstrate that that person is 'unavailable' for the trial. *Inmon v. State*, 585 So.2d 261, 265 (Ala.Cr.App.1991).
>>
>> ". . . In order for the admission of a statement of a witness who is not present at trial to satisfy the right to confrontation of witnesses, the concerns of necessity and reliability must be satisfied. 'The necessity concern customarily requires that the prosecution either produce or account for the unavailability of the declarant.' [C. Gamble, *McElroy's Alabama Evidence*, § 242.01(7), p. 1132 (5th ed.1996)]. See *Thompson v. State*, 106 Ala. 67, 74, 17 So. 512,

514 (1895). *Ohio v. Roberts* [448 U.S. 56 (1980)] 'mandates that the prosecution have made a good faith effort to obtain the presence of the declarant at trial.' C. Gamble, supra, § 242.01(7), p. 1132.

". . . *Johnson v. State* [623 So.2d 444, (Ala. Cr. App. 1993)] sets a high standard for proving that the State exercised due diligence in its attempt to procure the presence of a witness:

> "'A party seeking to introduce a witness's testimony from a prior proceeding at a subsequent proceeding, must establish the unavailability of the witness and the reasons therefor. *Lamar v. State*, 578 So.2d [1382] (Ala.Cr.App.1991), cert. denied, *Ex parte Lamar*, 596 So.2d 659 (Ala.1991). This predicate is fulfilled when the party offering the evidence establishes that it has exercised due diligence in obtaining the witness, but without success. See *Matkins v. State*, 521 So.2d 1040, 1041–42 (Ala.Cr.App.1987).'

". . . .

"*Johnson's* standard of due diligence is based upon Alabama law holding that a declarant is not rendered 'unavailable' by absence alone. The party seeking to introduce the declarant's statement has to show that it is unable to procure the declarant's attendance either by legal process or by other reasonable means:

> "'If a witness who has given testimony in the course of a judicial proceeding between the parties litigant, before a competent tribunal, subsequently dies; or becomes insane; or after diligent search is not to be found within the jurisdiction of the court, or if that which is equivalent be shown, that he has left the state permanently, or for such an indefinite time that his return is contingent and uncertain, it is admissible to prove the substance of the testimony he gave formerly. The rule is,

> > however, exceptional, and it is essential to the admissibility of the evidence that some one of the contingencies, which are deemed to create the necessity, be satisfactorily shown. *Thompson v. State* 106 Ala. 67, 74, 17 So. 512 [(1894)].'
>
> "*Williams v. Calloway*, 281 Ala. 249, 251–52, 201 So.2d 506, 508 (Ala.1967).
>
> "While the question of the sufficiency of the proof offered to establish the predicate of a witness's unavailability is addressed to the sound discretion of the trial judge, the issue is of constitutional significance in a criminal case and especially so in a capital one."

727 So.2d at 133–34. See also *Flowers v. State*, 799 So.2d 966, 974–75 (Ala.Crim.App.1999).

The State offered the following facts in support of its claim that it had exercised due diligence in attempting to secure the attendance of Ricky Vickers to testify at Bryant's new sentencing hearing: Upon contacting the Department of Corrections ("DOC") to secure Vickers's attendance, the prosecution was informed that Vickers had completed his sentence and that he was no longer in the custody of DOC. The prosecution also contacted the Board of Pardons and Paroles to see if it had an address for Vickers, but was told that Vickers had completed his sentence and was no longer required to report to it. An investigator was sent out to question Vickers's family members about his location. When questioned about Vickers's whereabouts, various members of Vickers's family advised the investigator that they did not know where he was. Some speculated that Vickers might be at his girlfriend's house, but were either unwilling or unable to supply the State with a name or address for the girlfriend. When Vickers's grandmother told investigators that he might "come by," the State issued a subpoena for Vickers "in care of his grandmother's house," and had a Houston County sheriff's deputy spend three days attempting to locate and serve Vickers with the subpoena.

Given these circumstances, we conclude that the State proved that it used due diligence in an attempt to secure the attendance of Ricky Vickers. The State did "more than simply issue a subpoena and stop when it [was] returned 'not found.'" *Flowers v. State*, 799 So.2d at 980 (opinion on return to remand) (quoting *Manuel v. State*, 803 P.2d 714, 716 (Okla.Crim.App.1990)). We know of no prescribed period of time that the

> State is required to search for a witness in order to have exercised "due diligence." Certainly, some individuals will be easier to find than others. As a convicted felon and acquaintance of Bryant's, Vickers obviously had no desire to be found by the State's investigator or by a sheriff's deputy. If located, he would be required to testify against Bryant. """Rule 804(a)(5) does not require a proponent to butt his head against a wall just to see how much it hurts."""  *Flowers v. State*, 799 So.2d at 980 (opinion on return to remand) (quoting *Urbano v. State*, 808 S.W.2d 519, 522 (Tex.App.1991), quoting in turn, *United States v. Kehm*, 799 F.2d 354, 360 (7th Cir.1986)). The State having exhausted all leads and expended considerable resources in its attempt to locate Vickers, we cannot say that the trial court abused its discretion when it determined that Vickers was an "unavailable witness" and permitted the State to read Vickers's previous testimony into the record at Bryant's new sentencing hearing.
>
> Moreover, contrary to Bryant's contention, the United States Supreme Court's decision in *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), would not prevent the admission of Vickers's previous testimony. In *Crawford v. Washington*, the United States Supreme Court held that the admission of a wife's out-of-court statements to police officers, regarding an incident in which the defendant, her husband, allegedly stabbed the victim, violated the Confrontation Clause. The Supreme Court stated that an out-of-court testimonial statement by a witness is barred under the Confrontation Clause, unless the witness is unavailable and the defendant has had a prior opportunity to cross-examine the witness, 541 U.S. at 51–52, 124 S.Ct. 1354, regardless of whether the statement is deemed reliable by the trial court, abrogating its previous holding in *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980). Here, the previous testimony sought to be admitted was Vickers's testimony from Bryant's trial, where Bryant had an opportunity to fully and fairly cross-examine Vickers. Accordingly, the decision in *Crawford v. Washington* serves as no impediment for the admission of Vickers's previous testimony. Bryant's rights under the Confrontation Clause were not violated when the circuit court allowed the State to introduce Vickers's previous trial testimony.

*Bryant*, 951 So. 2d at 741–44. Bryant raised the claim again in his petition for certiorari in the Alabama Supreme Court, (doc. 10-22 at 4–5), but the Alabama Supreme Court denied the petition without an opinion, *see Bryant*, 951 So. 2d at 732.

Under 28 U.S.C. § 2254(d), in order to obtain relief on this claim, Bryant must demonstrate that the decision of the ACCA, which was the last reasoned state court decision, *see Wilson*, 584 U.S. at 125, was contrary to, or an unreasonable application of, clearly established federal law as determined by the United States Supreme Court, or that it was based on an unreasonable determination of the facts that were before the state courts. *See* 28 U.S.C. § 2254(d).

Bryant contends that the ACCA's decision was contrary to and an unreasonable application of *Crawford*. As the ACCA reasoned, however, the admission of Vickers' prior testimony at Bryant's resentencing did not run afoul of *Crawford* because Bryant "had an adequate opportunity to cross-examine" Vickers at his first trial. *See Crawford*, 541 U.S. at 57. The ACCA's decision was not unreasonable. That Bryant takes issue with the adequacy of counsel's cross-examination of Vickers in the context of a separate ineffective assistance of counsel claim does not change the conclusion that Bryant's trial counsel had an adequate opportunity to cross-examine Vickers for purposes of Bryant's Confrontation Clause claim.

Bryant also contends that the ACCA's adjudication of this claim was based on an unreasonable determination of the facts before it because the State made no real effort to locate Vickers, and thus Vickers was not "unavailable." The Court disagrees. The ACCA's findings, quoted above, as to the State's efforts to locate Vickers are sufficient to demonstrate the reasonableness of the ACCA's finding that "the State proved that it used due diligence in an attempt to secure the attendance of Ricky Vickers." *Bryant*, 951 So. 2d

at 743. Considering the state court record, Bryant fails to show that no fairminded jurist would agree with the ACCA's determination. *See Lee*, 726 F.3d at 1192.[19]

Under AEDPA review, Bryant is not entitled to relief on this claim.

**F. Bryant's Claim that the Rule 32 Court Erred in Denying his Requests for Discovery to Prove his Ineffective Assistance of Trial Counsel Claims (Doc. 1 at 87–91, paras. 286–302)**

Bryant alleges that he could not fully present his ineffective assistance of counsel claims in the Rule 32 proceedings because the Rule 32 Court denied him discovery from the State that he needed to do so. When the ACCA remanded three ineffective assistance of counsel claims to the Rule 32 Court to hold an evidentiary hearing, the ACCA also instructed the Rule 32 Court to reconsider its previous denial of Bryant's requests for discovery from the State. *Bryant*, 181 So. 3d at 1129–30. On remand, the Rule 32 Court held a hearing to address Bryant's discovery requests, (doc. 10-41 at 100–71), ordered the State to produce the entire DA file on the murder with the exception of attorney work product, (doc. 10-32 at 83), and later granted Bryant access to the entire court file for the purposes of copying and photographing it, (doc. 10-34 at 141). Bryant acknowledges he had access to these records but claims that additional records and evidence would have helped him prove his claims that his trial counsel were ineffective in failing to retain DNA and blood spatter experts to challenge the State's experts and evidence at trial.

[19] Additionally, the Eleventh Circuit has held that, notwithstanding the Confrontation Clause, hearsay is admissible at a capital sentencing hearing so long as the defendant has an opportunity to rebut the hearsay. *Chandler*, 240 F.3d at 918; *Muhammad v. Sec'y, Fla. Dep't of Corr.*, 733 F.3d 1065, 1077 (11th Cir. 2013). And "the right to rebut hearsay at capital sentencing does not include the right to cross-examine the hearsay declarant." *Muhammad*, 733 F.3d at 1077. The record supports the conclusion that Bryant had an opportunity to rebut Vickers' hearsay testimony at the resentencing trial. Thus, for this additional, independent reason, Bryant is not entitled to relief on his Confrontation Clause claim.

Bryant appears to argue that the Rule 32 Court's refusal of further discovery violated his due process rights, as he contends that the Rule 32 Court's decision conflicts with *Evitts v. Lucey*, 469 U.S. 387 (1985). Bryant alleges that *Lucey* stands for the proposition that "although Alabama is not required to provide for post-conviction relief, since it has chosen to do so, its procedures must provide litigants a fair opportunity to assert their claims." (Doc. 1 at 90). Bryant quotes *Lucey*'s holding: "In short, when a State opts to act in a field where its action has significant discretionary elements, it must nonetheless act in accord with the dictates of the Constitution—and, in particular, in accord with the Due Process Clause." (*Id.* (quoting 469 U.S. at 401)).

This claim does not form a basis for federal habeas relief because Bryant is not claiming that his *conviction* was unconstitutionally obtained. *See* 28 U.S.C. § 2254(a) (providing that habeas relief may be granted only on the ground that the petitioner is "in custody in violation of the Constitution or laws or treaties of the United States"); *Estelle*, 502 U.S. at 68 ("In conducting habeas review, a federal court is limited to deciding whether *a conviction* violated the Constitution, laws, or treaties of the United States." (emphasis added)). Rather, Bryant's contention that the Rule 32 Court erred in denying his specific discovery requests primarily rests on arguments that the Rule 32 Court misapplied state law concerning the scope of discovery allowed in Rule 32 proceedings. Indeed, Bryant raised the same argument to the ACCA on return from remand, arguing primarily that he was entitled to discovery under the good cause standard of *Ex parte Land*, 775 So. 2d 847

(Ala. 2000). (*See* doc. 10-40 at 26–41).[20] However, whether the Rule 32 Court correctly addressed Bryant's entitlement to discovery under Alabama law does not constitute a cognizable federal habeas claim because it is not a claim that Bryant's conviction was unconstitutional.

Further, defects in procedure in collateral civil proceedings do not provide a basis for federal habeas relief, even if a federal petitioner couches them as a constitutional violation. *See Carroll v. Sec'y, DOC*, 574 F.3d 1354, 1365–66 (11th Cir. 2009) (holding that a failure to hold an evidentiary hearing in a state postconviction proceeding, even when challenged as a due process violation, was not a basis for federal habeas relief); *In re Rutherford*, 437 F.3d 1125, 1127 (11th Cir. 2006) (finding insufficient for habeas relief the petitioner's claim that the state postconviction court denied him due process by failing to provide mental health records of a person the petitioner alleged had actually committed the crime). "The reasoning behind this well-established principle is straightforward: a challenge to a state collateral proceeding does not undermine the legality of the detention for imprisonment— *i.e.*, the conviction itself—and thus habeas relief is not an appropriate remedy." *Carroll*, 574 F.3d at 1365 (first citing *Quince v. Crosby*, 360 F.3d 1259, 1262

[20] In *Land*, the Alabama Supreme Court adopted the standard that a petitioner must show good cause to obtain discovery in post-conviction proceedings. *See* 775 So. 2d at 852. In Bryant's appeal to the ACCA on return from remand, the ACCA held that, assuming the Rule 32 Court erred in denying Bryant's discovery requests, any such error was harmless because Bryant's trial counsel's performance (in not retaining DNA and blood spatter experts) was not constitutionally deficient, and Bryant's requested discovery was only relevant to establishing prejudice. *Bryant*, 181 So. 3d at 1141. Bryant asks that this Court review the ACCA's decision under 28 U.S.C. § 2254(d) and find it objectively unreasonable. However, the Court cannot do so because this claim is not cognizable on federal habeas review.

(11th Cir. 2004); then citing *Spradley v. Dugger*, 825 F.2d 1566, 1568 (11th Cir. 1987) (per curiam)).

Additionally, the case cited by Bryant, *Lucey*, is distinguishable and does not establish that a due process violation occurred. *Lucey* did not address whether the denial of discovery in a state post-conviction proceeding violates due process rights but instead concerned whether a defendant was entitled to effective assistance of counsel on his first direct appeal. *See Lucey*, 469 U.S. at 389. In sum, this claim is due to be denied because it is not cognizable on federal habeas review.

### G. Bryant's Claim that the Trial Court Violated his Constitutional Rights by Permitting the Use of an Aggravating Circumstance as an Element of the Substantive Charge Against Him (Doc. 1 at 91–92, paras. 303–07)

Bryant alleges that the trial court erred by using an element of his charge of capital murder during the course of a kidnapping as an aggravating factor for the purpose of sentencing. Bryant contends that this practice of "double-counting" violated his rights under the Double Jeopardy Clause of the Fifth Amendment, the Due Process Clause of the Fifth and Fourteenth Amendments, and the Eighth Amendment's prohibition on cruel and unusual punishment.

Bryant exhausted this claim on direct appeal following his resentencing, and the state courts denied it on the merits, which means that review of this claim is limited to whether the state courts' decisions were reasonable under 28 U.S.C. § 2254(d). More specifically, in a motion *in limine* before his resentencing trial, Bryant asked that the State be barred from using as an aggravating circumstance that the murder was committed during a kidnapping. (Doc. 10-15 at 119–21). At a pretrial motion hearing, the trial court denied

the motion. (Doc. 10-16 at 98). Bryant appealed the trial court's ruling to the ACCA. (Doc. 10-21 at 14; *see also id.* at 59–60). However, the ACCA affirmed the trial court's rulings, reasoning:

> Although Bryant makes several broad constitutional challenges to Alabama's death penalty statute, it appears that the gist of his argument is an attack on what this Court has referred to as "double counting," that is, the use of an element of the capital offense as an aggravating circumstance. Alabama appellate courts have repeatedly rejected attacks on the constitutionality of this practice. See, e.g., *Ex parte Windsor*, 683 So.2d 1042, 1060 (Ala.1996); *Ferguson v. State*, 814 So. 2d 925, 956–68 (Ala.Crim.App.2000), aff'd, 814 So.2d 970 (Ala.2001); *Smith v. State*, 756 So.2d 892, 943 (Ala.Crim.App.1998), aff'd, 756 So. 2d 957 (Ala.2000). More recently, we have rejected claims that "double counting" violated *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). See, e.g., *Ex parte Waldrop*, 859 So.2d 1181, 1188 (Ala.2002); *Deardorff v. State*, [Ms. CR–01–0794, June 25, 2004] — So.2d — (Ala.Crim.App.2004). Accordingly, this claim is without merit.
>
> To the extent that Bryant contends that the death penalty in Alabama is imposed arbitrarily or that it is "overinclusive," his claim must likewise fail. Section § 13A–5–53(a), Ala. Code 1975, mandates in every case in which the death penalty is imposed an automatic review by this Court, under the plain-error standard, regarding the propriety of the trial court's imposition of the death penalty. In short, Alabama's death penalty is neither arbitrary nor overinclusive. Thus, this claim must fail.

*Bryant*, 951 So. 2d at 746. Bryant raised the claim again in his petition for certiorari in the Alabama Supreme Court, (doc. 10-22 at 6), but the Alabama Supreme Court denied the petition without an opinion, *see Bryant*, 951 So. 2d at 732.

Under 28 U.S.C. § 2254(d), in order to obtain relief on this claim, Bryant must demonstrate that the decision of the ACCA, which was the last reasoned state court decision, *see Wilson*, 584 U.S. at 125, was contrary to, or an unreasonable application of, clearly established federal law as determined by the United States Supreme Court, or that

it was based on an unreasonable determination of the facts that were before the state courts. *See* 28 U.S.C. § 2254(d).

Bryant fails to show that the state courts unreasonably decided this claim. Alabama law requires double-counting, *see* ALA. CODE § 13A-5-45(e) ("[A]ny aggravating circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentencing hearing."), and Bryant fails to cite any Supreme Court case that addresses the practice of double-counting, much less a case that holds that this practice is unconstitutional. To the contrary, the Supreme Court has permitted an element of the crime to reappear later as a sentencing factor. *Lowenfield v. Phelps*, 484 U.S. 231, 246 (1988) ("[T]he fact that the aggravating circumstance duplicated one of the elements of the crime does not make this sentence constitutionally infirm."). And as Bryant concedes, (doc. 24 at 145), the Eleventh Circuit has held that the Supreme Court has not forbidden the practice of double-counting, *see Lee*, 726 F.3d at 1198 ("Nothing in *Ring*—or any other Supreme Court decision—forbids the use of an aggravating circumstance implicit in a jury's verdict.").

Bryant attempts to distinguish *Lee* by contending that he also challenges the practice of double-counting under the Eighth Amendment's prohibition on cruel and unusual punishment. He argues that the ACCA, in denying his claim, ignored the holdings of *Furman v. Georgia*, 408 U.S. 238 (1972), and its progeny, which stand for the rule that death penalty statutes must be structured so as to prevent the penalty from being administered in an arbitrary and unpredictable fashion. Bryant contends that a prosecutor's

subjective choice to charge a crime to include one of the enumerated aggravating circumstances creates a statutory scheme where the death penalty is administered in an arbitrary fashion. He also contends that such a statutory scheme is over-inclusive of cases that should not result in the death penalty. However, the ACCA rejected this claim as well, and Bryant fails to cite any cases holding that the use of an element of a capital murder charge as an aggravating circumstance violates the Eighth Amendment. Thus, he cannot establish that the ACCA's rejection of his claim was contrary to, or an unreasonable application of, a clearly established United States Supreme Court holding. Consequently, Bryant is due no relief on this claim.

### H. Bryant's Supplemental Argument that AEDPA is Unconstitutional in Light of *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024) (*See* doc. 77 at 18–26)

As noted previously, this Court granted the parties leave to supplement their briefs with relevant case law decided since briefing on Bryant's petition concluded in 2017. In response to that invitation, Bryant now argues that AEDPA, and in particular the deference required under 28 U.S.C. § 2254(d), is unconstitutional because it removes a federal court's ability to independently review whether constitutional violations have occurred. In support, Bryant cites *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024).

In *Loper Bright*, the United States Supreme Court overruled the longstanding concept of *Chevron* deference, a judicially created doctrine, concluding that such deference was contrary to the Administrative Procedure Act, 5 U.S.C. § 706 ("APA"). 603 U.S. at 412. Prior to *Loper Bright*, federal courts gave deference to reasonable agency interpretations of ambiguous statutes administered by the relevant agency. *See Chevron,*

*U.S.A, Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984). After *Loper Bright*, federal courts no longer owe such deference and must make their own independent judgments "in deciding whether an agency has acted within its statutory authority, as the APA requires." *See Loper Bright*, 603 U.S. at 412. Bryant contends that, in light of *Loper Bright*, federal courts cannot afford deference to a state court's interpretation of the Constitution because federal courts must maintain their independent judgment over federal cases. Thus, according to Bryant, AEDPA deference is unconstitutional, and he submits that this Court should review his habeas claims without providing any deference to the decisions of the Alabama state courts that have already decided them.

The Court is not persuaded that *Loper Bright* provides a basis to overrule AEDPA. *Loper Bright* does not address AEDPA or AEDPA deference; indeed, the United States Supreme Court's grant of certiorari in *Loper Bright* was "limited to the question whether *Chevron* should be overruled or clarified." 603 U.S. at 384. And "[a]t bottom, the Supreme Court's decision in *Loper Bright* is an interpretation of the Administrative Procedure Act—not the Constitution." *Bates v. Sec'y, Fla. Dep't of Corr.*, 2025 WL 2305211, at *1 (11th Cir. Aug. 1, 2025) (per curiam).[21] Moreover, Bryant's argument appears to rest on a misunderstanding about "what federal courts do in AEDPA review": a federal court undertaking AEDPA review is not, as Bryant suggests, forced to adopt a "state court's constitutional interpretation as [its] own." *Sanders v. Plappert*, 168 F.4th 837, 852 (6th Cir. Mar. 3, 2026). Instead, the federal court conducts its "own legal analysis under AEDPA,"

[21] Here, and elsewhere in this Opinion, the Court cites nonbinding authority. While the Court acknowledges these cases are nonprecedential, the Court finds them persuasive.

then "ask[s] whether the Constitutional violation was so egregiously wrong that habeas relief" is warranted. *Id.* If not, the federal court exercises restraint. *Id.* "That end result—judicial restraint in the face of reasonable competing views—is not a subversion of the Constitution; instead, it upholds core constitutional principles: Congressional control over jurisdiction and remedies and leeway for state courts to analyze their own criminal law, particularly so if that is what Congress desires." *Id.* (citing *Shinn v. Ramirez*, 596 U.S. 366, 390 (2022)). For these reasons, the Court is not persuaded that *Loper Bright* overruled AEDPA deference. *Cf. Agostini v. Felton*, 521 U.S. 203, 237 (1997) (opining that courts "should follow the [Supreme Court] case which directly controls, leaving to th[e] [Supreme] Court the prerogative of overruling its own decisions" (citation omitted)).

## VI. CERTIFICATE OF APPEALABILITY

Under AEDPA, before a petitioner may appeal the denial of a § 2254 habeas corpus petition, the petitioner must obtain a Certificate of Appealability ("COA"). *Miller-El v. Cockrell*, 537 U.S. 322, 335–36 (2003); 28 U.S.C. § 2253(c)(2). Thus, this Court is required to issue or deny a COA when entering a final order that is adverse to a federal habeas petitioner. *See* Rule 11(a), Rules Governing Section 2254 Cases. A COA will not be granted unless the petitioner makes a substantial showing of the denial of a constitutional right. *Tennard v. Dretke*, 542 U.S. 274, 282 (2004); *Miller-El*, 537 U.S. at 336; *Slack v. McDaniel*, 529 U.S. 473, 483 (2000). To make such a showing, the petitioner must demonstrate that reasonable jurists could debate whether the petition should have been resolved in a different manner or that the issues presented are adequate to deserve

encouragement to proceed further. *Miller-El*, 537 U.S. at 336 (citing *Slack*, 529 U.S. at 484).

After careful review, the Court finds that Bryant fails to meet either standard, and thus the Court will not grant a COA.[22]

## VII. CONCLUSION

Accordingly, for the reasons stated, it is

ORDERED that Bryant's petition for a writ of habeas corpus (doc. 1), as supplemented by his briefs in support (docs. 24, 33, 77, 82), is DENIED. It is further

ORDERED that Bryant is DENIED a Certificate of Appealability as to all issues.

An appropriate Final Judgment will be entered contemporaneously herewith.

DONE this 21st day of September, 2026.

/s/ Emily C. Marks
EMILY C. MARKS
UNITED STATES DISTRICT JUDGE

[22] The Court acknowledges that in an earlier case, it granted a COA on the issue of whether AEDPA deference is unconstitutional. *See Washington v. Marshall*, 2025 WL 793272, at *2 (M.D. Ala. Feb. 7, 2025). However, after this Court decided *Washington*, the Eleventh Circuit in an unpublished opinion denied a COA to a habeas petitioner who raised this argument, concluding that it was not even debatable whether AEDPA deference is unconstitutional. *Bates*, 2025 WL 2305211, at *1. After further consideration in light of the court's decision in *Bates*, which this Court finds persuasive, this Court declines to grant a COA in this case on the issue of whether AEDPA deference is unconstitutional.